Nos. 2022-1021, -1068, -1078

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS

*Plaintiff-Appellee*

FONTAINE INC., GOVERNMENT OF CANADA, MARCEL LAUZON INC., LES PRODUITS FORESTIERS D&G LTÉE, NORTH AMERICAN FOREST PRODUCTS LTD., PARENT-VIOLETTE GESTION LTÉE, LE GROUPE PARENT LTÉE, SCIERIE ALEXANDRE LEMAY & FILS INV., GOVERNMENT OF QUÉBEC, MOBILIER RUSTIQUE (BEAUCE) INC., GOVERNMENT OF THE PROVINCE OF NEW BRUNSWICK

*Plaintiffs-Appellants*

V.

UNITED STATES

*Defendant-Appellee*

Appeal from the United States Court of International Trade
in Consolidated Court No. 19-00122,
Chief Judge Mark A. Barnett

## BRIEF FOR PLAINTIFFS-APPELLANTS

Joanne Osendarp
Lynn G. Kamarck
Alan Kashdan
Tim Hruby
Conor Gilligan

MCDERMOT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20009
Tel: (202) 756-8349
Email: josendarp@mwe.com
*Counsel for Government of Canada*

December 20, 2021

(Counsels continue on next page)

Stephan E. Becker
Aaron R. Hutman
Moushami P. Joshi
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 17th Street, NW
Washington, DC 20036
Tel: (202) 663-8277
Email:
stephan.becker@pillsburylaw.com
*Counsel for Government of the Province of New Brunswick*

Matthew J. Clark
Nancy A. Noonan
Aman Kakar
ARENT FOX LLP
1717 K Street, N.W.
Washington, DC 20006
Tel: (202) 663-8277
Email: matthew.clark@arentfox.com
*Counsel for Government of Québec*

Edward M. Lebow
Angela Oliver
HAYNES AND BOONE, LLP
800 17th Street, NW, Suite 500
Washington, DC 20006
Tel: (202) 654-4514
Email: ed.lebow@haynesboone.com
*Counsel for Les Produits Forestiers D&G Ltée* and *Marcel Lauzon, Inc.*

John R. Magnus
TRADEWINS LLC
1330 Connecticut Ave. NW
Washington, DC 20036
Tel: (202) 744-0386
Email: jmagnus@tradewinsllc.net
*Counsel for Mobilier Rustique (Beauce) Inc.*

Richard L.A. Weiner
Rajib Pal
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Tel: (202) 736-8075
Email: rweiner@sidley.com
*Counsel for North American Forest Products Ltd.*, *Parent-Violette Gestion Ltée* and *Le Groupe Parent Ltée*

Yohai Baisburd
Jonathan M. Zielinski
James E. Ransdell
Cassidy Levy Kent (USA) LLP
900 19th Street, NW, Suite 400
Washington, DC 20006
Tel: (202) 567-2319
Email: ybaisburd@cassidylevy.com
*Counsel for Scierie Alexandre Lemay & Fils Inc.*

Mark B. Lehnardt
LAW OFFICES OF DAVID L. SIMON, PLLC
1025 Connecticut Ave., N.W.
Ste. 1000
Washington, D.C. 20036
Tel: (202) 642-4850
Email: marklehnardt@dlsimon.com
*Counsel for Fontaine Inc.*

# CERTIFICATES OF INTEREST (filed Oct. 29)

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CORRECTED CERTIFICATE OF INTEREST

**Case Number** 22-1021

**Short Case Caption** Committee Overseeing Action for Lumber v. U.S

**Filing Party/Entity** Fontaine Inc.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/10/2021

Signature: /s/ Mark B. Lehnardt

Name: Mark B. Lehnardt

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Fontaine Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Law Offices of David L. Simon, PLLC | | Baker & Hostetler, LLP |
| Mark B. Lehnardt | | Elliot J. Feldman |
| | John Anwesen | Michael S. Snarr |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1021, -1068, -1078

**Short Case Caption** COMMITTEE OVERSEEING ACTION FOR LUMBER v. US

**Filing Party/Entity** Government of Canada

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/29/2021

Signature: /s/ Joanne Osendarp

Name: Joanne Osendarp

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Government of Canada | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Dean A. Pinkert | McDermott Will & Emery, LLP | Appeared in the originating Court, but will not appear in this Court |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

FORM 9. Certificate of Interest | Form 9 (p. 1) July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 22-1021, -1068, -1078

**Short Case Caption** Committee Overseeing Action for Lumber v. US

**Filing Party/Entity** Les Produits Forestiers D&G Ltée and Marcel Lauzon Inc.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/28/2021

Signature: /s/ Edward M. Lebow

Name: Edward M. Lebow

FORM 9. Certificate of Interest

Form 9 (p. 2)
July 2020

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Les Produits Forestiers D&G Ltée | | Gesco Star Group Ltd. (aka Le Groupe Gesco-Star Ltée) |
| | | |
| Marcel Lauzon Inc. | | 9408-6535 Quebec Inc. (formed by merger of Placement Marcel Lauzon Ltd. and Investments LRC) |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

Case: 22-1021 Document: 24 Page: 11 Filed: 11/01/2021

**FORM 9. Certificate of Interest** **Form 9 (p. 1)**
**July 2020**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1021, -1068, -1078

**Short Case Caption** Committee Overseeing Action for Lumber v. US

**Filing Party/Entity** Scierie Alexandre Lemay & Fils Inc.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/01/2021

Signature: /s/ Yohai Baisburd

Name: Yohai Baisburd

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Scierie Alexandre Lemay & Fils Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Dentons (US) LLP | Vedia Eidelman, Esq. | |
| Michael E. Zolandz, Esq. | Nimrah Najeeb, Esq. | |
| Daniel Morris, Esq. | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1021, 2022-1068, 2022-1078

**Short Case Caption** Committee Overseeing Action for Lumber v. US

**Filing Party/Entity** North American Forest Products Ltd., Le Groupe Parent Ltee, Parent-Violette Gestion Ltee

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/02/2021

Signature: /s/ Richard L.A. Weiner

Name: Richard L.A. Weiner

FORM 9. Certificate of Interest

Form 9 (p. 2)
July 2020

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| North American Forest Products Ltd., | | Parent-Violette Gestion Ltee |
| Le Groupe Parent Ltee | | |
| Parent-Violette Gestion Ltee | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 3)
July 2020

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Rajib Pal | Counsel | Sidley Austin LLP |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Fed. Cir. Docket No. 2022-1068 | Fed. Cir. Docket No. 2022-1078 | These cases are consolidated with Lead case 2022-1021 |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

Case: 22-1021 Document: 25 Page: 19 Filed: 11/01/2021

**FORM 9. Certificate of Interest** **Form 9 (p. 1)**
**July 2020**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1021, -1068, -1078

**Short Case Caption** Committee Overseeing Action for Lumber v. US

**Filing Party/Entity** Government of Québec

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/01/2021 Signature: /s/ Nancy A. Noonan

Name: Nancy A. Noonan

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Government of Québec | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Friederike S. Goergens | Arent Fox LLP | TERMINATED: 02/16/2021 |
| John A. Gurtunca | Arent Fox LLP | Appeared in the originating Court, but will not appear in this Court. |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1021

**Short Case Caption** Committee Overseeing Action for Lumber v. US

**Filing Party/Entity** Mobilier Rustique (Beauce) Inc.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/28/2021

Signature: /s/ John R. Magnus

Name: John R. Magnus

Case: 22-1021 Document: 13 Page: 2 Filed: 10/28/2021



| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Mobilier Rustique (Beauce) Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| John R. Magnus | TradeWins LLC | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| 22-1068 | Fontaine v. United States | consolidated |
| 22-1078 | Govt of Canada et al v. United States | consolidated |
| | | |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1021, -1068, -1078

**Short Case Caption** Committee Overseeing Action for Lumber v. US

**Filing Party/Entity** Plaintiff - Appellant: GOVERNMENT OF THE PROVINCE OF NEW BRUNSWICK

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/28/2021

Signature: /s/ Stephan E. Becker

Name: Stephan E. Becker

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| GOVERNMENT OF THE PROVINCE OF NEW BRUNSWICK | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Fed. Cir. Docket No. 2022-1068 | Fed. Cir. Docket No. 2022-1078 | These cases are consolidated with Lead case 2022-1021 |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATES OF INTEREST (filed Oct. 29) .......... i

TABLE OF CONTENTS .......... xxvi

TABLE OF AUTHORITIES .......... xxviii

STATEMENT OF RELATED CASES .......... xxxiv

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 4

STATEMENT OF ISSUES .......... 4

STATEMENT OF THE CASE .......... 5

A. The CVD Investigation .......... 6

B. The CVD Expedited Review .......... 7

C. Appeal to the CIT .......... 10

D. Commerce's Remand Redetermination .......... 15

E. The CIT's Final Judgment .......... 15

SUMMARY OF ARGUMENT .......... 16

ARGUMENT .......... 19

I. URAA Section 103(a) Provides Authority for Commerce to Carry Out CVD Expedited Reviews .......... 22

A. Under *Chevron* Step One, the Statutory Text, Context, and Other Canons of Construction Demonstrate that Congress Unambiguously Intended to Provide Expedited Reviews .......... 22

B. URAA Section 103(a) Provides Commerce Authority to Implement Expedited Reviews Through Regulation .......... 30

C. To The Extent That Congressional Intent is Unclear, Under *Chevron* Step Two Commerce's Interpretation of the URAA Is Reasonable and Entitled to Deference .......................... 48

II. URAA Section 103(b) Independently Authorizes Expedited Review Regulations .......................... 52

A. The Plain Meaning of URAA Section 103(b), Read with the SAA, Provides Commerce With Authority To Promulgate Expedited Review Regulations .......................... 52

B. The CIT Failed to Meaningfully Respond to the Canadian Parties Additional Arguments .......................... 59

CONCLUSION AND STATEMENT OF RELIEF SOUGHT .......................... 62

ADDENDUM OF REQUIRED DOCUMENTS

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES[†]

**PAGE(S)**

**CASES**

*Albemarle Corp. & Subsidiaries v. United States*,
821 F.3d 1345 (Fed. Cir. 2016) ....................19, 27

*Allegheny Ludlum Corp. v. United States*,
367 F.3d 1339 (Fed. Cir. 2004) ....................37, 39

*Apex Frozen Foods Private Ltd. v. United States*,
862 F.3d 1337 (Fed. Cir. 2017) ....................20

*Bestfoods v. United States*,
165 F.3d 1371 (Fed. Cir. 1999) ....................*passim*

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983)....................21, 40, 42

*Candle Corp. of America v. Int'l Trade Comm'n*,
374 F.3d 1087 (Fed. Cir. 2004) ....................21

*Changzhou Hawd Flooring Co. v. United States*,
947 F.3d 781 (Fed. Cir. 2020) ....................31, 35

*Chevron*, *U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984)....................*passim*

*City of Arlington v. FCC*,
569 U.S.290 (2013)....................*passim*

*ClearCorrect Operating, LLC v. Int'l Trade Comm'n*,
810 F.3d 1283 (Fed. Cir. 2015) ....................20, 23

[†] Short forms, where used for authorities other than cases, are introduced at the end of the authority's citation here.

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*,
393 F.Supp.3d 1271 (Ct. Int'l Trade 2019) ........................................10

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*,
413 F.Supp.3d 1334 (Ct Int'l Trade 2019) ........................................4, 11

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*,
483 F. Supp. 3d 1253 (Ct. Int'l Tr. 2020)........................................*passim*

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*,
535 F. Supp. 3d 1336 (Ct. Int'l Tr. 2021)........................................*passim*

*Cuozzo Speed Technologies, LLC v. Lee*,
579 U.S. 261 (2016)........................................21

*Diamond Sawblades Mfrs. Coalition v. United States*,
986 F.3d 1351 (Fed. Cir. 2021) ........................................27

*FAG Italia S.p.A. v. United States*,
291 F.3d 806 (Fed. Cir. 2002) ........................................46, 47

*Federal-Mogul Corp. v. United States*,
63 F.3d 1572 (Fed. Cir. 1995) ........................................21, 37

*Fitzgerald v. Dep't of Homeland Sec.*,
837 F.3d 1346 (Fed. Cir. 2016) ........................................43, 44

*Goodluck India Ltd. v. United States*,
11 F.4th 1335 (2021) ........................................19

*Gulf States Utilities Co. v. Fed. Power Comm'n*,
411 U.S. 747 (1973)........................................56

*Haig v. Agee*,
453 U.S. 280 (1981)........................................40, 41, 45

*Heino v. Shinseki*,
683 F.3d 1372 (Fed. Cir. 2012) ........................................18, 20

*Hyundai Steel Co. v. United States*,
No. 21-1748, 2021 WL 5856804 (Fed. Cir. Dec. 10, 2021) ............................47

*Kisor v. Wilkie*,
139 S.Ct. 2400 (2019)..........................................................................................57

*Louisiana Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986)............................................................................................46

*Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affs.*,
260 F.3d 1365 (Fed. Cir. 2001) .........................................................................54

*Norwegian Nitrogen Prods v. United States*,
288 U.S. 294 (1933)............................................................................................42

*Red Lion Broad. Co. v. FCC*,
395 U.S. 367 (1969)............................................................................................40

*Robers v. United States*,
572 U.S. 639 (2014)............................................................................................54

*Schism v. United States*,
316 F.3d 1259 (Fed. Cir. 2002) (en banc) ..................................................43, 44

*Suprema, Inc. v. Int'l Trade Comm'n*,
796 F.3d 1338 (Fed. Cir. 2015) .........................................................................20

*TNA Merchant Projects, Inc. v. Fed. Energy Regul. Comm'n*,
857 F.3d 354 (D.C. Cir. 2017)............................................................................56

*Transpacific Steel LLC v. United States*,
4 F.4th 1306 (Fed. Cir. 2021) ............................................................................53

*United States v. Eurodif S.A.*,
555 U.S. 305 (2009)......................................................................................*passim*

*Wheatland Tube Co. v. United States*,
495 F.3d 1355 (Fed. Cir. 2007) ...................................................................21, 60

**STATUTES**

5 U.S.C. § 706(c)(2)...............................................................................................11

19 U.S.C. § 1516a(a)..............................................................................................11

19 U.S.C. § 1671d(c)(1)(B)(i)(I).....7

19 U.S.C. § 1671d(c)(5)(A).....7

19 U.S.C. § 1671d(c).....14

19 U.S.C. § 1671d(c)(5).....34, 55

19 U.S.C. § 1673.....49

19 U.S.C. § 1673d(c)(5).....34, 55

19 U.S.C. § 1673d(c)(5)(B).....27

19 U.S.C. § 1675(a)(1).....14

19 U.S.C. § 1675(b).....14

19 U.S.C. § 1677f-1(e)(1).....6

19 U.S.C. § 1677f-1(e)(2).....6

19 U.S.C. §§ 2191, 2903.....26

19 U.S.C. §§ 2901–2906.....26

19 U.S.C. § 2903(a)(1)(B).....26

19 U.S.C. § 2903(a)(2)(B)(ii)(III).....26

19 U.S.C. § 3314(a).....33

19 U.S.C. § 3314(b).....57

19 U.S.C. § 3511 ("section 101" of the URAA).....15, 38, 60

19 U.S.C. § 3511(a) ("section 101(a)" of the URAA).....*passim*

19 U.S.C. § 3511(a)(1) ("section 101(a)(1)" of the URAA).....*passim*

19 U.S.C. § 3511(a)(2) ("section 101(a)(2)" of the URAA).....*passim*

19 U.S.C. § 3511(b) ("section 101(b)" of the URAA).....38

19 U.S.C. § 3511(d)(7).....13, 16, 25

19 U.S.C. § 3511(d)(12) ........................................................................ *passim*

19 U.S.C. § 3511(d)(13) ........................................................................13, 16, 25

19 U.S.C. § 3512(d) (“section 102(d)” of the URAA) .................................. *passim*

19 U.S.C. § 3513(a) (“section 103(a)” of the URAA).................................... *passim*

19 U.S.C. § 3513(b) (“section 103(b)” of the URAA) .................................. *passim*

28 U.S.C. § 1295(a)(5)...........................................................................................4

28 U.S.C. § 1581(c) ...........................................................................................4, 11

28 U.S.C. § 1581(i) ...........................................................................................4, 11

28 U.S.C. § 1581(i)(iv) .......................................................................................4, 11

28 U.S.C. § 2640(e) ...............................................................................................11

NAFTA Implementation Act, Pub.L. 103–122, 107 Stat.2057 (1993) ........... *passim*

Uruguay Round Agreements Act, Pub. L. 103-465, 108 Stat 409 (1994) (“URAA”) ......................................................................... *passim*

Uruguay Round Agreements Act, Sec. 233, 108 Stat. 4898..................................50

**REGULATIONS**

19 C.F.R. § 351.214(l) (also referred to by its prior location of 19 C.F.R. § 351.214(k))......................................................................... *passim*

19 C.F.R. § 351.214(l)(3)(i).......................................................................................8

19 C.F.R. § 351.214(l)(3)(iii), (iv)...........................................................................8

**ADMINISTRATIVE DECISIONS**

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (“Final Rule”)..........................................................................38, 42, 57

*Antidumping Duties; Countervailing Duties, Notice of Proposed Rulemaking,* 61 Fed. Reg, 7308 (Feb. 27, 1996) ..................................38, 42, 58

*Certain Softwood Lumber Products from Canada*: *Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 83 Fed. Reg. 347 (Jan. 3, 2018)............................7

*Certain Softwood Lumber Products From Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Nov. 8, 2017)..........................................................................................7

*Certain Softwood Lumber Products From Canada: Final Results of Countervailing Duty Expedited Review*, 84 Fed. Reg. 32,121 (July 5, 2019) ("*Final Results of Expedited Review*")........................................*passim*

*Certain Softwood Lumber Products From Canada: Initiation of Countervailing Duty Investigation,* 81 Fed. Reg. 93,897 (Dec. 22, 2016) ..................................................................................................6

*Initiation of Expedited Review of the Countervailing Duty Order*, 83 Fed. Reg. 9,833 (March 8, 2018).........................................................................8

**OTHER AUTHORITIES**

S. REP. No. 103-412 – Uruguay Round Agreements Act (1994) ....................*passim*

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. 1 (1994), reprinted in U.S.C.C.A.N. 4040 ("SAA") ................................................*passim*

WTO Agreement on Subsidies and Countervailing Measures, Apr. 14, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1A, 1869 U.N.T.S. 14 ("SCM Agreement")............*passim*

## STATEMENT OF RELATED CASES

Appellants are not aware of any other appeal in or from the same proceeding previously before this or any other appellate court other than those cases consolidated into this appeal.

* * * * *

Pursuant to Federal Circuit Rules 28 and 28.1, we submit this brief on behalf of the Government of Canada, the Government of Québec, the Government of New Brunswick, and six Canadian companies that participated in the proceedings below: Fontaine Inc. ("Fontaine"), Mobilier Rustique (Beauce) Inc. ("Rustique"), Scierie Alexandre Lemay & Fils Inc., Les Produits Forestiers D & G Ltée, Marcel Lauzon Inc., and North American Forest Products Ltd (including its cross-owned affiliates Parent-Violette Gestion Ltée and Le Groupe Parent Ltée) (collectively, the "Canadian Parties").

## INTRODUCTION

This case raises the question of whether the U.S. Department of Commerce ("Commerce") had the legal authority in 1997 to issue its expedited review regulation at 19 C.F.R. § 351.214(k) (now at 19 C.F.R. § 351.214(l)), and under authority of that regulation, to conduct expedited reviews of the countervailing duty ("CVD") order on Softwood Lumber from Canada for the six Canadian companies that are participating in this appeal.

Expedited review procedures generally provide smaller companies with the opportunity to demonstrate to Commerce that their individual subsidy rates differ from the rates calculated for the larger companies individually examined in the investigation, and allow them to be excluded from the CVD order entirely when they demonstrate that they received zero or *de minimis* subsidies during the time-period covered by the initial investigation. Congress expressed its intent in the Statement of Administrative Action ("SAA") that an expedited review procedure based on the requirement in the WTO Agreement on Subsidies and Countervailing Measures (the "SCM Agreement") be provided in administering the U.S. CVD law.

The obligation to conduct expedited reviews is found in Article 19.3 of the SCM Agreement, which Congress expressly approved in section 101(a)(1) of the Uruguay Round Agreements Act ("URAA"). In enacting the URAA through "fast

track" trade promotion authority, Congress also approved, in URAA sections 101(a)(2) and 102(d), the SAA, which addresses CVD expedited reviews. Pursuant to its rulemaking authority under URAA section 103, Commerce conducted notice-and-comment rulemaking and, in 1997, established the CVD expedited-review process now at 19 C.F.R. § 351.214(l), consistent with these international obligations approved by Congress. Commerce has conducted multiple expedited reviews since 2003.

In *Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States*, 535 F. Supp. 3d 1336 (Ct. Int'l Trade 2021) ("*Coalition IV*") (Appx0004), the CIT found that Commerce lacked legal authority to issue the expedited review regulation and conduct the expedited review at issue in this case, based on the court's interpretation of relevant provisions of the URAA, and the SAA that accompanied the URAA. The CIT thereupon vacated the expedited review regulation and Commerce's *Final Results of Expedited Review* issued in connection with the CVD order on certain softwood lumber products from Canada. *See Certain Softwood Lumber Products From Canada: Final Results of Countervailing Duty Expedited Review*, 84 Fed. Reg. 32,121 (July 5, 2019) ("*Final Results of Expedited Review*"). The CIT dismissed as moot the appeals raised by Fontaine and Rustique challenging certain aspects of the *Final Results of Expedited Review*.

In a prior decision, the CIT had concluded that, under the first step of *Chevron*, *U.S.A., Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837 (1984), the relevant statutory language of the URAA was clear and, in its view, did not provide legal authority for Commerce to issue the expedited review regulation or conduct the softwood lumber expedited reviews. *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*, 483 F. Supp. 3d 1253, 1262, (Ct. Int'l Tr. 2020) ("*Coalition III*") (Appx0052, Appx0066). In doing so, the CIT failed to give proper consideration to the language and context of relevant statutory provisions of the URAA cited by Commerce as authority for the expedited review regulation, and the authoritative legislative history in the SAA.

The CIT's restrictive reading of the URAA improperly dismissed the relevance of the URAA requirement that Commerce establish an expedited review procedure. Further, the CIT failed to give proper weight to Congress's clear intent in the SAA that the expedited review procedure the SCM Agreement requires be provided in administering the U.S. CVD law. The CIT therefore erred in concluding that the relevant statutory language does not support the expedited review regulation or the expedited reviews conducted in this case. The Canadian Parties respectfully ask this Court to reverse that decision.

## JURISDICTIONAL STATEMENT

On August 18, 2021, the CIT issued a final judgment and order sustaining Commerce's Final Results of Redetermination Pursuant to Court Remand ("the Remand Redetermination") in the case *Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States,* Consol. Court No. 19-00122 (Appx0001 (judgment), Appx0004 (opinion)). Prior to this Court's consolidation, notices of appeal from that judgment were timely filed on September 27, October 15, and October 18, 2021. In earlier stages of the proceedings below, while all parties agreed that the CIT had jurisdiction, it was disputed whether that jurisdiction was pursuant to 28 U.S.C. § 1581(c) or 28 U.S.C. § 1581(i). The CIT determined it had jurisdiction pursuant to 28 U.S.C. § 1581(i)(iv). *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*, 413 F.Supp.3d 1334, 1343-46 (Ct. Int'l Trade 2019) ("*Coalition II*"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## STATEMENT OF ISSUES

The SCM Agreement and SAA, both of which Congress expressly approved in the URAA, require expedited reviews so that any company that is not individually examined in a Commerce CVD investigation may obtain an individual, company-specific CVD rate. Pursuant to its rulemaking authority,

Commerce conducted notice-and-comment rulemaking and, in 1997, established a CVD expedited review process for this very purpose. The issues in this case are as follows:

1. Did the CIT err in concluding that Commerce did not have legal authority to promulgate its regulation now at 19 C.F.R. § 351.214(l). That section provides a procedure by which any company that is not individually examined in a CVD investigation can request an expedited review of any resulting CVD order to determine a company-specific CVD deposit rate for that company and possible exclusion from the order;

2. Did the CIT err in vacating Commerce's expedited review regulation;

3. Did the CIT err in vacating the *Final Results of Expedited Review* conducted by Commerce in connection with the CVD order on *Certain Softwood Lumber from Canada*;

4. Did the CIT err in dismissing as moot challenges to the *Final Results of Expedited Review* brought by Fontaine Inc. and Mobilier Rustique (Beauce) Inc., two Canadian producers and exporters of softwood lumber that are appellants here?

## STATEMENT OF THE CASE

This case comes to the Court as a result of a CVD expedited review proceeding conducted by Commerce. On appeal of Commerce's decisions in that

proceeding, the CIT held that Commerce lacked authority to conduct CVD expedited reviews and vacated Commerce's regulation creating that type of proceeding.

### A. The CVD Investigation

On November 25, 2016, the Committee Overseeing Action for Lumber International Trade Investigations or Negotiations (the "COALITION") filed a petition seeking the imposition of countervailing duties on imports of softwood lumber from Canada, describing a number of Canadian federal and provincial measures that it claimed provided countervailable subsidies to Canadian producers and exporters of softwood lumber. Commerce initiated a CVD investigation on December 15, 2016, *see Certain Softwood Lumber Products From Canada: Initiation of Countervailing Duty Investigation,* 81 Fed. Reg. 93,897 (Dec. 22, 2016), and subsequently decided to individually examine five of the largest Canadian producers and exporters.[1] None of the companies involved in this appeal were among those five.

---

[1] Though not directly relevant to this appeal, 19 U.S.C. § 1677f-1(e)(1) instructs Commerce to determine individual CVD rates for each known exporter or producer of the merchandise being investigated. If Commerce determines, however, that because of a large number of producers and exporters it is not practicable to examine every company, 19 U.S.C. § 1677f-1(e)(2) authorizes Commerce to determine individual CVD rates by limiting its investigation to either a statistically valid sample, or to the exporters or producers accounting for the largest volume of

Commerce issued a final affirmative CVD determination on November 8, 2017, in which it calculated individual CVD rates for the five investigated companies. *See Certain Softwood Lumber Products From Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Nov. 8, 2017) (incorporating final Issues and Decision Memorandum (Appx1105)). In that determination, pursuant to 19 U.S.C. §§ 1671d(c)(1)(B)(i)(I) and 1671d(c)(5)(A), Commerce also calculated a CVD deposit rate for all other producers and exporters equal to 14.25% (the "all-others rate"). This rate applied to entries of softwood lumber by any non-investigated company, including the six appellant companies. *Id.*

On January 3, 2018, Commerce issued a countervailing duty order, in which it slightly modified the all-others rate to 14.19% for non-investigated companies, including the six companies in this appeal. *See Certain Softwood Lumber Products from Canada*: *Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 83 Fed. Reg. 347 (Jan. 3, 2018).

**B. The CVD Expedited Review**

On March 8, 2018, in response to requests made pursuant to 19 C.F.R. § 351.214(l) by a number of Canadian producers and exporters that did not receive

---

the merchandise exported from the country in question. In this case, Commerce chose to investigate five of the largest exporters.

individual rates in the investigation, Commerce initiated an expedited review of the Softwood Lumber CVD order for eight companies or company groups, including the six participating in this appeal. *See Certain Softwood Lumber Products from Canada: Initiation of Expedited Review of the Countervailing Duty Order*, 83 Fed. Reg. 9,833 (March 8, 2018). Thirty-eight companies originally requested expedited reviews; all but eight subsequently withdrew their requests.

What is now section 351.214(l) implements the requirements of Article 19.3 of the SCM Agreement by providing an expedited review procedure available in CVD proceedings where Commerce limited the number of companies individually examined during the investigation.[2] In an expedited review, exporters that were not individually examined in the CVD investigation participate in a separate Commerce review in order to establish their own individual CVD rates. 19 C.F.R. § 351.214(l)(3)(i). Section 351.214(l) further provides that if Commerce determines that a company's rate in the review is *de minimis* (less than one percent), Commerce may exclude that company from the CVD order. 19 C.F.R. § 351.214(l)(3)(iii), (iv).

In the expedited review in this case, all the respondent companies provided responses to Commerce's standard CVD questionnaires, and were subject to

---

[2] *See* note 1 above.

on-site verification of the companies' responses.[3] Commerce published the final results of the expedited review on July 5, 2019. *See Certain Softwood Lumber Products From Canada: Final Results of Countervailing Duty Expedited Review*, 84 Fed. Reg. 32,121 (July 5, 2019) ("*Final Results of Expedited Review*"). It found that five of the companies had *de minimis* rates and, therefore, were to be excluded from the CVD order.[4] The unliquidated countervailing duty deposits made on entries of merchandise produced and exported by these five *de minimis* companies would be (and eventually were) refunded. *See Certain Softwood Lumber Products From Canada: Final Results of Countervailing Duty Expedited Review*, 84 Fed. Reg. 32,121 (July 5, 2019). Commerce also found that two of the other appellant companies had CVD rates slightly above the one percent *de minimis* threshold—1.26% for Fontaine, and 1.99% for Rustique. These companies remained subject to the CVD order,[5] but their new duty deposit rates were considerably below the 14.19% "all-others" rate for non-investigated companies.

---

[3] The companies participating in the expedited review, all relatively small, expended substantial time and resources in participating in the review.

[4] The five excluded companies were Scierie Alexandre Lemay & Fils Inc., Les Produits Forestiers D&G Ltée, Marcel Lauzon Inc., North American Forest Products Ltd, and Roland Boulanger & Cie Ltée. Roland Boulanger subsequently went out of business and did not participate in this appeal.

[5] A third company group, Produits Matra Inc. and Sechoirs de Beauce Inc., also received an above *de minimis* rate. It did not appeal the *Final Results of Expedited Review* and is not in this appeal.

### C. Appeal to the CIT

Fontaine and Rustique each appealed certain aspects of Commerce's findings that led to them receiving above-*de minimis* CVD margins and so remain subject to the CVD order.[6] The COALITION (the U.S. petitioner seeking the imposition of countervailing duties) also appealed, challenging the legality of the expedited review regulation, Commerce's authority to conduct expedited reviews, and the validity of the *Final Results of Expedited Review*. Each of the companies in this appeal, as well as the Governments of Canada, Québec, and New Brunswick, intervened as defendant-intervenors in support of the legality of the expedited review process.

In its first decision ("*Coalition I*"), the CIT denied the COALITION's motion for a preliminary injunction to enjoin liquidation of the respondent companies' entries, concluding that the COALITION had not established a likelihood of irreparable injury. *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*, 393 F.Supp.3d 1271 (Ct. Int'l Trade 2019). That decision is not relevant to this appeal. The CIT next opined that expedited reviews are not identified in any of the statutory provisions referenced in 19 U.S.C. § 1516a(a) and, accordingly, that the court's jurisdiction

[6] The Governments of Canada and Québec appealed in support of Fontaine and Rustique.

lay in 28 U.S.C. § 1581(i)(4),[7] not 28 U.S.C. § 1581(c). *Coalition II*, 413 F.Supp.3d at 1343–1347.

In proceeding on the merits, the U.S. Government and the Canadian Parties supported Commerce's authority to conduct expedited reviews. They first noted that section 101(a)(1) of the Uruguay Round Agreements Act, Pub. L. 103-465, 108 Stat 409 (1994) ("URAA"), 19 U.S.C. § 3511(a)(1), requires the United States, as a signatory to the WTO Uruguay Round Agreements (including the SCM Agreement), to establish an expedited review procedure for companies that were not individually examined in a CVD investigation. This obligation is found in Article 19.3 of the SCM Agreement, which provides in relevant part:

> Any exporter whose exports are subject to a definitive countervailing duty but who was not actually investigated for reasons other than a refusal to cooperate, shall be entitled to an expedited review in order that the investigating authorities promptly establish an individual countervailing duty rate for that exporter.

---

[7] Subsequently, in *Coalition III*, 483 F. Supp. 3d. 1253, the CIT identified that under 28 U.S.C. § 2640(e), the standard of review for cases brought under section 1581(i) is that set out in the Administrative Procedure Act, 5 U.S.C. § 706(c)(2):

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

s*ee Coalition III*, 483 F. Supp. 3d. at 1262 (Appx0065) (quoting 5 U.S.C. § 706(c)(2)).

SCM Agreement, art 19.3, Apr. 14, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1A, 1869 U.N.T.S. 14.

The U.S. Government and Canadian Parties then pointed to specific language regarding expedited reviews in the authoritative SAA accompanying the URAA. The SAA, approved by Congress in section 101(a)(2) of the URAA, 19 U.S.C. § 3511(a)(2), and required by the fast track process by which Congress passed the URAA, stated:

> 5. Company-Specific Subsidy Rates and Expedited Reviews
>
> Pursuant to existing section 706(a)(2), Commerce normally calculates a country-wide rate applicable to all exporters unless there is a significant differential in CVD rates between companies or if a state-owned company is involved. Article 19.3 of the Subsidies Agreement provides that any exporter whose exports are subject to a CVD order, but which was not actually investigated for reasons other than a refusal to cooperate, shall be entitled to an expedited review to establish an individual CVD rate for that exporter.
>
> Several changes must be made to the Act to implement the requirements of Article 19.3 of the Subsidies Agreement. The Administration has used the amendments being made to implement the Antidumping Agreement as a model for amending the CVD law.

Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1 (1994), reprinted in U.S.C.C.A.N. 4040 at 941 (section heading bold in original).

The U.S. Government then argued, *see* Defendant's Response to Plaintiffs Motion for Judgment on the Agency Record at 6–14 (Appx0317–0325), that section 103(a) of the URAA, 19 U.S.C. § 3513(a), authorized Commerce to

promulgate the expedited review regulations and conduct expedited reviews. Section 103(a) authorizes, in pertinent part, the issuance of "such regulations . . . as may be necessary to ensure that any provision of this Act, or amendment made by this Act . . . is appropriately implemented."[8] The U.S. Government also cited section 103(b) of the URAA, 19 U.S.C. § 3513(b), as authority for expedited reviews, which authorizes "any interim regulation necessary or appropriate to carry out any action proposed in the statement of administrative action approved under section [19 U.S.C. §] 3511(a) . . . to implement an agreement described in [19 U.S.C. §] 3511(d)(7), (12), or (13) . . . ." 19 U.S.C. § 3513(b). *See* Defendant's Response to Plaintiffs Motion for Judgment on the Agency Record at 9 (Appx0320). The Canadian Parties supported both positions.

The CIT rejected these arguments. Instead, the CIT held in *Coalition III* that "section 103(a) [of the URAA] provides limited rulemaking authority to Commerce which does not encompass CVD expedited reviews. Further examination of the statutory structure and legislative history do not demonstrate a contrary intent." *Coalition III,* 483 F. Supp. 3d. at 1267 (Appx0074). The CIT

[8] During the underlying expedited review proceeding at Commerce, in response to comments from the COALITION, Commerce had cited section 103(a) as the source of its authority to conduct expedited reviews. *See Certain Softwood Lumber Products From Canada: Final Results of Countervailing Duty Expedited Review*, 84 Fed. Reg. 32,121 (Jul. 5, 2019) and accompanying Issues and Decision Memorandum at 31 (Appx1105).

also rejected section 103(b) as support with only cursory analysis, stating that "the SAA does not propose any action to implement CVD expedited reviews." *Id.* (Appx0075).

At the U.S. Government's request, the CIT remanded the matter to Commerce to consider various other grounds put forward by the U.S. Government and the Canadian Parties in addition to section 103(a), including section 103(b). *Id.* at 1272 (Appx0084). Additional grounds cited by the Canadian Parties included several Tariff Act provisions that also supported Commerce's authority to conduct expedited reviews, independent of sections 103(a) and 103(b). These included 19 U.S.C. §§ 1675(a)(1), which provides Commerce authority to conduct administrative reviews of CVD and antidumping duty ("AD") orders; 1675(b), under which Commerce is authorized to conduct "changed circumstances" reviews of CVD and AD orders, with broad discretion to determine what constitutes a "changed circumstance"; and 1671d(c), which authorizes Commerce to calculate individual company rates for additional companies as an extension of its authorization to make a final affirmative CVD determination. Defendant-Intervenors' Brief in Opposition to Plaintiffs Motion for Judgment on the Agency Record at 22–27 (Appx0389–0394). Although the Canadian Parties do not focus on these alternative bases in this appeal, the Canadian Parties continue to believe they further support expedited review authority.

### D. Commerce's Remand Redetermination

Commerce filed its Remand Redetermination in response to *Coalition III* on February 21, 2021. Final Results of Redetermination Pursuant to Court Remand (Appx0547). Commerce explained that in its view the CIT's ruling in *Coalition III* precluded it from finding that sections 103(a) or (b) of the URAA provided Commerce with authority to issue the expedited review regulation and conduct the expedited reviews. *Id.* at 2 (Appx0548). Commerce also explained that it disagreed with the CIT's interpretation of these provisions, and that it continued to believe that both sections 103(a) and (b), read in conjunction with section 101 of the URAA, the SAA, and Article 19.3 of the SCM Agreement, provided authority to promulgate the expedited review regulation and conduct expedited reviews. *Id.* at 22–24 (Appx0567–0570).

### E. The CIT's Final Judgment

The CIT issued its final opinion and judgment on August 18, 2021. *Coalition IV*, 535 F. Supp. 3d at 1336 (Appx0001 (judgment), Appx0004 (opinion)). The CIT upheld the Remand Redetermination and ordered that the expedited review regulation and the *Final Results of Expedited Review* be vacated, with that vacation to operate prospectively. The CIT dismissed as moot the challenges to the *Final Results* raised by the non-excluded companies Fontaine and Rustique.

## SUMMARY OF ARGUMENT

This case raises the question of whether the CIT properly applied *Chevron* in determining that neither of two sections of the URAA, sections 103(a) and 103(b), provided Commerce the legal authority to promulgate Commerce's expedited review regulation and to conduct the reviews in question. As demonstrated below, we respectfully urge this Court to find that the CIT misapplied *Chevron*, and that the expedited review regulation and the reviews conducted under that regulation were in fact lawful.

Section 103(a) provides, in relevant part, that "appropriate officers of the U.S. Government may issue such regulations, as may be necessary to ensure that any provision of [the URAA] or any amendment made by [the URAA] . . . is appropriately implemented." Section 103(b) separately authorizes the issuance of regulations "necessary or appropriate to carry out any action proposed in the [SAA] . . . to implement an agreement described in section 101(d)(7), (12), or (13)." Section 101(d)(12) is the SCM Agreement.

One of the provisions of the URAA covered by section 103(a) is section 101(a)(1), in which Congress approved the trade agreements resulting from the Uruguay Round of trade negotiations. Among those agreements is the SCM Agreement. Article 19.3 of the SCM Agreement requires signatories to provide a procedure in their domestic CVD laws by which exporters that were not

individually examined in a CVD investigation could seek an expedited review to determine individual CVD rates for their exports.

In section 101(a)(2), Congress also expressly approved the SAA. Congress further directed that "in any judicial proceeding in which a question arises concerning . . . interpretation or application" of the Uruguay Round Agreements and the URAA, the SAA, approved by Congress in section 101(a)(2) of the URAA, "shall be regarded as an authoritative expression by the United States concerning [such] interpretation and application." 19 U.S.C. § 3512(d). The SAA recognized the obligation imposed by Article 19.3 of the SCM Agreement to provide expedited reviews, and that this obligation had to be implemented into U.S. law.

Although the URAA did not make an amendment to the CVD law that expressly covers expedited reviews, Congress recognized the U.S. obligation under Article 19.3 of the SCM Agreement, and, under section 103, provided authorization to Commerce to promulgate the necessary regulations to implement this requirement. In accordance with this authorization, in 1997 Commerce promulgated a regulation to create an expedited review procedure. Applying its understanding of the *Chevron* step one framework for determining whether Congress intended that Commerce would have authority to implement an expedited review procedure, the CIT determined that Commerce did not have that

legal authority. The CIT made that determination on the basis that (1) no "provision" of the URAA within the meaning of section 103(a) expressly provided for an expedited review procedure, and (2) the SAA did not "propose" any action within the meaning of section 103(b) to implement the Article 19.3 obligation. *Coalition III*, 483 F. Supp. 3d at 1264, 1267 (Appx0068–0069, Appx0075).

The Canadian Parties submit that the CIT did not correctly apply the *Chevron* framework. This Court has stated that in the first step in the *Chevron* analytical framework the court must "employ traditional tools of statutory construction and examine 'the statute's text, structure, and legislative history, and apply the relevant canons of interpretation.'" *Heino v. Shinseki*, 683 F.3d 1372, 1378 (Fed. Cir. 2012) (quoting *Delverde, SrL v. U.S.*, 202 F.3d 1360, 1363 (Fed. Cir. 2000)). These relevant canons include the *Charming Betsy* doctrine, and acquiescence by Congress in the agency's interpretation. When the URAA framework is considered as a whole, including the "text, structure, and legislative history," and taking account of these canons of interpretation, one must conclude that Congress indeed intended there would be an expedited review procedure, and that section 103 provided the requisite authorization to issue implementing regulations.

If this Court were nevertheless to conclude that the language of section 103 is ambiguous, *Chevron* step two requires judicial deference to an agency's

reasonable interpretation of a statute it administers. Commerce is the only U.S. Government agency entrusted with administering the subsidy provisions of U.S. CVD law, and its reasonable interpretation of the URAA and SAA's provisions directed to the CVD law are therefore entitled to deference at step two. Commerce's conclusion that the URAA and SAA provided Congressional authorization for an expedited review procedure embodied in an expedited review regulation is reasonable. The CIT's opinion to the contrary should be reversed.

## ARGUMENT

This Court reviews decisions by the CIT *de novo*, applying the same standard of review applied by the CIT. *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1342 (Fed. Cir. 2021).

"The question of whether Commerce's statutory interpretation accords with law is guided by the two-part test articulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–843 (1984)." *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1351 (Fed. Cir. 2016). Under *Chevron*, this Court follows a two-step inquiry:

> The first [step] is whether Congress has directly spoken to the precise question at issue. If the answer is yes, then the inquiry ends, and we must give effect to Congress' unambiguous intent. If the answer is no, the second [step] is whether the agency's answer to the precise question at issue is based on a permissible construction of the statute. The agency's interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of

language that is ambiguous.

*Suprema, Inc. v. Int'l Trade Comm'n*, 796 F.3d 1338, 1346 (Fed. Cir. 2015) (citations omitted).

***Chevron* Step One.** At *Chevron* step one, courts use all the "traditional tools of statutory construction" to determine if Congress has spoken "unambiguously" as to what the agency is to do. *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1345 (Fed. Cir. 2017) (quoting *Chevron*, 467 U.S. at 843 n.9 (1984)). The first of these tools is the language of the statute, with its plain meaning determined "in context and with a view to their place in the overall statutory scheme," *ClearCorrect Operating, LLC v. Int'l Trade Comm'n*, 810 F.3d 1283, 1290 (Fed. Cir. 2015) (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)), followed by all the other "traditional tools" to determine if Congress has expressed a clear intent. *See, e.g.*, *Heino v. Shinseki*, 683 F.3d 1372, 1378 (Fed. Cir. 2012).

As this Court explained in *Heino*, "in order to determine whether a statute clearly shows the intent of Congress in a *Chevron* step-one analysis, we employ traditional tools of statutory construction and examine 'the statute's text, structure, and legislative history, and apply the relevant canons of interpretation.'" 683 F.3d at 1378. (quoting *Delverde*, 202 F.3d at 1363). These canons include statutory purpose, the *Charming Betsy* doctrine, and asking whether Congress has acquiesced in the agency's interpretation. *See, e.g.*, *Candle Corp. of America v.*

*Int'l Trade Comm'n*, 374 F.3d 1087, 1093–1094 (Fed. Cir. 2004) (looking to statutory purpose); *Federal-Mogul Corp. v. United States*, 63 F.3d 1572, 1581–1582 (Fed. Cir. 1995) (applying the *Charming Betsy* canon); *Bob Jones Univ. v. United States*, 461 U.S. 574, 600–601 (1983) (looking to Congressional acquiescence to an agency interpretation). As demonstrated in Section I below, looking at the "statute's text, structure, and legislative history," and applying "the relevant canons of interpretation," leads to but one conclusion—Commerce's interpretation of the statute and its authority to promulgate the expedited review regulation was correct under *Chevron* step one, and the CIT's was not.

***Chevron* Step Two.** If Congress' intent is unclear or cannot be ascertained using all of these "traditional tools," the question at step two is whether the agency's interpretation is "reasonable." *See Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1360 (Fed. Cir. 2007). The reasonableness of a rule is judged "in light of the text, nature, and purpose of the statute." *Cuozzo Speed Technologies, LLC v. Lee*, 579 U.S. 261, 277 (2016).

Here, the Court need not reach the question of deference under *Chevron* step two because Congressional intent is clear under *Chevron* step one. If, however, the Court determines that Congressional intent regarding CVD expedited reviews is unclear, the Court should defer to Commerce's interpretation of its authority to

establish CVD expedited reviews because Commerce's interpretation is reasonable.

## I. URAA Section 103(a) Provides Authority for Commerce to Carry Out CVD Expedited Reviews

Congress authorized Commerce to implement expedited reviews in compliance with U.S. commitments under the SCM Agreement. The URAA contains authorizing language in section 103(a), and applicable tools of statutory construction should lead the Court to find such authority under *Chevron* step one. The CIT's determination to the contrary was incorrect.

As demonstrated below, the CIT misapplied the requirements of *Chevron* step one, failing to give due consideration to the various tools that courts use to discern Congressional intent. Further, as discussed in Section I.C, to the extent the statute is found ambiguous, the CIT failed to consider and give deference to Commerce's interpretation of the statutory scheme under *Chevron* step two.

### A. Under *Chevron* Step One, the Statutory Text, Context, and Other Canons of Construction Demonstrate that Congress Unambiguously Intended to Provide Expedited Reviews

At step one in the *Chevron* analysis, Congressional intent regarding CVD expedited reviews is clear. The traditional tools of statutory construction all point toward one conclusion: Congress intended to enact the Uruguay Round Agreements into domestic law, including that portion of those agreements that requires a CVD expedited review.

Before addressing the CIT's errors in applying *Chevron,* a review of the relevant underlying legal provisions may be helpful to the Court. Section I.A.1 below presents that review. The CIT believed that these provisions did not support a finding that Commerce acted lawfully in issuing the expedited review regulation. As shown in the remainder of this brief, the CIT erred in so deciding. When these provisions are properly evaluated in the framework of *Chevron* step one, looking at each not in isolation but as part of a whole, *see ClearCorrect,* 810 F.3d at 1290, Congress not only provided Commerce with the requisite authority to issue the expedited review regulation and conduct expedited reviews, but specifically intended that Commerce do so.

#### 1. Sections 101, 102, and 103 of the URAA Demonstrate That Congress Intended That There Be an Expedited Review Process to Implement Article 19.3 of the SCM Agreement

Three provisions of the URAA, sections 101(a), 102(d), and 103, are relevant in demonstrating that Commerce in fact had authority to issue the expedited review regulation and conduct expedited reviews.

First is section 101(a). There, Congress formally approved two important documents: (1) in section 101(a)(1), it approved the Uruguay Round Agreements that are listed in section 101(d), including the SCM Agreement containing the expedited review requirement in Article 19.3, 19 U.S.C. § 3511(a)(1), (d)(12), and (2) in section 101(a)(2), it approved the SAA, including the SAA's discussion of

expedited reviews, *id.* § 3511(a)(2). The SAA and the SCM Agreement are addressed in Section I.A.3 below.

Second is section 102(d). Section 102(d) provides that the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the URAA] in any judicial proceeding in which a question arises concerning such interpretation or application." This necessarily includes the SAA's discussion of Article 19.3, discussed below.

Last is section 103. Section 103(a) provides that "the President may proclaim such actions, and other appropriate officers of the U.S. Government may issue such regulations, as may be necessary to ensure that any provision of [the URAA] or any amendment made by [the URAA] . . . is appropriately implemented." Through section 103(a), Congress thereby expressly delegated to Commerce the authority to promulgate regulations to ensure that the U.S. Government implements the provisions of the URAA, including sections 101(a)(1) and (2), and the SAA, and by extension Article 19.3 of the SCM Agreement. Section 103(b) authorizes issuance of regulations "necessary or appropriate to carry out any action proposed in the [SAA] to implement an agreement described in section 101(d)(7), (12), or (13) . . . ." This would also include the obligation to provide expedited reviews in the SCM Agreement, as confirmed by the SAA.

Rather than focusing on these statutory provisions that incorporate the expedited review procedure, the CIT wrongly focused its analysis narrowly on the absence of a statutory provision in the URAA itself that *expressly* addresses expedited reviews, and on the absence in the SAA of a *specific* proposed action regarding expedited reviews. *Coalition III*, 483 F. Supp. 3d at 1264 (Appx0068–0069). Under *Chevron* step one, the explicit statutory provisions at sections 101(a), 102(d), and 103 of the URAA, and those provisions' express approval of the SAA, and Article 19.3 of the SCM Agreement, must be examined as a whole. When considered in the context of the unique "fast track" procedure governing adoption of the URAA, discussed below, it is clear that Congress authorized Commerce to establish an expedited review process, and that Commerce accordingly acted lawfully.

**2. The "Fast Track" Procedure Under Which Congress Adopted the URAA Demonstrates the Significance of the SAA and Establishes that Congress Authorized Expedited Reviews in Adopting the Legislative Package that Consisted of the URAA and the SAA**

Congress's use of "fast track" authority to implement the URAA is further evidence that Congress authorized expedited reviews. The CIT failed to take this into account.

The United States implemented the URAA under the procedures specified in 19 U.S.C. §§ 2901–2906, the then-applicable "fast track" authority for

Congressional approval of trade agreements. *See* 19 U.S.C. § 3511(a). Under fast track authority, a series of extensive consultations first occurs between the Executive Branch and relevant House and Senate committees, and then with the whole of those chambers. At the end of these consultations, the President submits to Congress an implementing bill and "a statement of any administrative action proposed to implement the trade agreement," which Congress then considers together. 19 U.S.C. § 2903(a)(1)(B); *see also id.* § 2903(a)(2)(B)(ii)(III) (requiring the President to submit a statement to Congress explaining "why the implementing bill *and proposed administrative action* is required or appropriate to carry out the agreement." (emphasis added)). Congress then implements a trade agreement by passing the implementing bill with an up-or-down majority vote of both houses (without the two-thirds vote in the Senate alone normally applicable to treaties). *See generally* 19 U.S.C. §§ 2191, 2903.

In section 102(d), Congress further directed that "in any judicial proceeding in which a question arises concerning . . . interpretation or application" of the Uruguay Round Agreements and URAA, the SAA, approved by Congress in section 101(a)(2) of the URAA, "shall be regarded as an authoritative expression by the United States concerning [such] interpretation and application." 19 U.S.C. § 3512(d). Thus, the SAA has an elevated significance in interpreting the URAA.

This Court has regularly used the SAA as exactly that—an authoritative guide to the "interpretation" and "application" of the URAA and as a document whose language stands alongside the URAA's statutory provisions, rather than being limited in the manner accorded to more traditional legislative history. *See, e.g. Diamond Sawblades Mfrs. Coalition v. United States*, 986 F.3d 1351, 1365 (Fed. Cir. 2021) (referring to the SAA as "authoritative" as to the meaning of the URAA); *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1354 (Fed. Cir. 2016) (holding that the SAA "unambiguously provide[d]" the "expected method" to implement 19 U.S.C. § 1673d(c)(5)(B)). For example, in *Albemarle Corp. & Subsidiaries v. United States*, this Court read 19 U.S.C. § 1673d(c)(5)(B) in parallel with the text of the SAA to determine the method Commerce is to apply to determine the all-others rate in an antidumping case where all individually examined respondents have zero or *de minimis* rates. 821 F.3d 1345, 1354 (Fed. Cir. 2016). There, the Court explained that the "SAA unambiguously provided" the "expected method" for calculating a separate rate in those circumstances. *Id.* *Albemarle* characterized the SAA as Congress having "unmistakably explained" the preferred method to use. *Id.* at 1354 n.8.

The fact that the URAA was passed pursuant to this "fast track" procedure is the context for many of the Canadian Parties' specific arguments below. That Congress approved the text of the URAA together with the SAA as one package

that "is *required or appropriate* to carry out the [Uruguay Round Agreements]," 19 U.S.C. § 2903(a)(2)(B)(ii)(III) (emphasis added), is one reason why section 103(a) of the URAA has a broader scope than the CIT believed. The extensive Congressional consultations required in the "fast track" procedure belie the CIT's conclusion that Congress did not know about Commerce's expedited review regulation and practice. And the independent grant of rulemaking authority of sections 103(a) and 103(b), which the CIT dismissed practically out of hand, is a consequence of the "fast track" process because it empowers agencies to enact the Congressionally mandated and approved SAA.

### 3. The SAA Establishes that Congress Authorized the Provision of an Expedited Review Procedure, Consistent with the SCM Agreement

The SAA is designated in section 102(d) as an "authoritative" statement of the meaning of both the URAA and the Uruguay Round SCM (and other) Agreements approved in section 101(a). Regarding expedited reviews, the SAA states:

> Company-Specific Subsidy Rates and Expedited Reviews
>
> Pursuant to existing section 706(a)(2), Commerce normally calculates a country-wide rate applicable to all exporters unless there is a significant differential in CVD rates between companies or if a state-owned company is involved. *Article 19.3 of the Subsidies Agreement provides that any exporter whose exports are subject to a CVD order, but which was not actually investigated for reasons other than a refusal to cooperate, shall be entitled to an expedited review to establish an individual CVD rate for that exporter.*

> Several changes must be made to the Act to implement the requirements of Article 19.3 of the Subsidies Agreement. The Administration has used the amendments being made to implement the Antidumping Agreement as a model for amending the CVD law.

SAA at 941 (italics added for emphasis, section heading bold in original). The SAA thus establishes that Congress both understood that the Article 19.3 obligation to provide expedited reviews applied to the United States and intended that expedited reviews be provided under U.S. law.

As the portion of the SAA that is highlighted above recognized, Article 19.3 of the SCM Agreement requires that exporters not individually examined in an investigation be granted an opportunity to demonstrate their specific level of subsidization (or lack of subsidization). Article 19.3 itself provides, in relevant part:

> Any exporter whose exports are subject to a definitive countervailing duty but who was not actually investigated for reasons other than a refusal to cooperate, shall be entitled to an expedited review in order that the investigating authorities promptly establish an individual countervailing duty rate for that exporter.

SCM Agreement, art 19.3. Commerce promulgated the expedited review regulation specifically to implement the United States' obligation under Article 19.3 for companies such as the Canadian exporters participating in this appeal.

The SAA language quoted above thus indicates that Congress intended that expedited reviews, as required by the United States' international obligations in

Article 19.3, be made available under U.S. law. As discussed below, section 103(a) authorizes Commerce to establish such procedures by regulation.

### B. URAA Section 103(a) Provides Commerce Authority to Implement Expedited Reviews Through Regulation

The plain meaning of section 103(a) of the URAA provides Commerce with broad authority to implement expedited reviews through regulations. Specifically, section 103(a) of the URAA provides, in part, that "appropriate officers of the United States Government may issue such regulations . . . as may be necessary to ensure that any provision of this Act, or amendment made by this Act, that takes effect on the date any of the Uruguay Round Agreements enters into force with respect to the United States is appropriately implemented on such date." 19 U.S.C. § 3513(a).

In wrongly concluding that section 103(a) did not authorize Commerce to promulgate the expedited review regulation, the CIT focused only on the fact that there was no statutory provision in the URAA itself or in any amendment made by the URAA that *expressly* addressed expedited reviews. The CIT erred in centering its entire analysis of the rulemaking authority conferred by section 103(a) on this one point, without properly considering other statutory language or evidence of Congressional intent, as required by *Chevron* step one.

### 1. The SAA, Together with Section 103, Provides the Basis for Expedited Review Regulations

As shown above, the SAA plainly endorses the requirement for CVD expedited reviews. The CIT's focus on whether there is a standalone provision in the URAA or the Tariff Act explicitly authorizing expedited reviews ignores the unique structure of the URAA, in particular regarding the SAA, and thus the CIT improperly applied step one of *Chevron*.

The ultimate goal of a *Chevron* analysis is to determine what Congress permitted the agency to do. *See Changzhou Hawd Flooring Co. v. United States*, 947 F.3d 781, 786 (Fed. Cir. 2020) ("If Congress has unambiguously answered the question before the court, the congressional answer controls."). The unambiguous answer here is that Congress intended there to be, and authorized Commerce to conduct, expedited reviews.

Section 101(a)(2) of the URAA provides that Congress approved "the statement of administrative action proposed to implement the agreements that was submitted to the Congress on September 27, 1994." 19 U.S.C. § 3511(a)(2). Section 102(d) then provides that "the [SAA] *shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application*." *Id.* § 3512(d). (emphasis added).

The SAA explains that Article 19.3 of the SCM Agreement *requires* CVD expedited reviews and indicates Congressional intent to establish CVD expedited reviews; section 103(a) then grants Commerce authority to promulgate expedited review regulations and conduct expedited reviews. SAA at 941.

Congress' grant of rule-making authority in legislation implementing trade agreements, such as the URAA, arises from the unique aspects of the fast-track procedures, discussed above. As noted, under fast-track authority, Congress in parallel passes an implementing bill making needed *statutory* changes and approves a statement of administrative action describing needed *regulatory* changes.

This Court has previously recognized this parallel structure in *Bestfoods v. United States*, 165 F.3d 1371 (Fed. Cir. 1999). In *Bestfoods*, the Court addressed changes to the Tariff Act implemented by the NAFTA Implementation Act, Pub.L. 103–122, 107 Stat.2057 (1993), which was also passed with "fast track" authority, and treated that act's analogue of section 103 as broad enough to address changes made by both statute *and* regulation. The Court specifically noted that the NAFTA Implementation Act "did not include matters that were expected to be addressed through regulation." *Id.* at 1376. As this Court put it, this grant of rulemaking authority "authoriz[ed] the Secretary of the Treasury to promulgate regulations

'necessary or appropriate' to make the United States' marking rules comply with the [NAFTA provisions there at issue]." *Id.* at 1375.

The NAFTA Implementation Act incorporated its own mandatory statement of administrative action and a grant of rulemaking authority, with language *identical* to section 103(a) of the URAA, providing that appropriate officers of the U.S. Government may make rules "as may be necessary to ensure that any provision of this Act, or amendment made by this Act . . . is appropriately implemented." 19 U.S.C § 3314(a) (repealed 2020). In *Bestfoods*, this Court construed that grant of rulemaking authority as broad enough to include changes mentioned in the NAFTA Implementation Act's statement of administrative action as being necessary to comply with international law obligations, even if those changes were not made in the NAFTA Implementation Act itself. *Bestfoods*, 165 F.3d at 1375–76. Likewise, the provisions of the URAA and the SAA statements authorize the expedited review regulations and Commerce's authority to conduct expedited reviews.

Further, the legislative history of the URAA indicates that Congress understood that expedited reviews were matters that *Bestfoods* described as those "expected to be addressed through regulation." *Id.* at 1376. The Senate Finance Committee report on the URAA noted that "current Commerce *practice* . . . must be modified in order to comport with Article 19[, which entitles non-investigated

exporters to expedited reviews].” S. REP. No. 103-412, at 98 (1994) (emphasis added). In other words, the Committee understood that expedited review procedures would be implemented through regulatory changes.

In *Bestfoods*, this Court rejected an argument akin to the CIT’s reasoning here, i.e., that the absence of a statutory amendment on a particular issue precluded the Treasury Department from lawfully implementing by regulation the United States’ NAFTA treaty obligation. *Bestfoods*, 165 F.3d at 1376. This is the case here. The fact that the SAA refers to several changes to be made to the Tariff Act but does not refer to a specific statutory change with respect to expedited reviews did not preclude Commerce from implementing by regulation the obligation to conduct expedited reviews.[9] Indeed, in *Bestfoods* this Court held that the fact that Congress made certain amendments to U.S. law by statute did not limit Treasury’s power to make other amendments by regulation. *Id.* The Court should hold the same true of the *identical* grant of rulemaking authority in section 103(a) of the URAA.

---

[9] The changes specifically discussed in the SAA related to the calculation of the “all others” rate that was already codified in the statute, and therefore required statutory changes. For example, subpart (5)(b) describes the amendment of section 705(c) of the Tariff Act to provide for the calculation of an “all-others” rate in a manner that parallels the calculation of an all-others rate in AD proceedings. *See* SAA at 941–942; *compare* 19 U.S.C. § 1671d(c)(5) *with* 19 U.S.C. § 1673d(c)(5) (identically determining AD and CVD all-others rates).

Section 101(a) is the "provision of this Act" required by section 103(a) that gives Commerce authority to implement provisions of the Uruguay Round Agreements described in the SAA. The SAA describes expedited reviews. That should end the inquiry into Congressional authorization for expedited reviews. *See Changzhou Hawd*, 947 F.3d at 786 ("If Congress has unambiguously answered the question before the court, the congressional answer controls.").

**2. Article 19.3 of the SCM Agreement Must Be Considered**

The requirement for expedited reviews in Article 19.3 of the SCM Agreement must also be considered in the context of understanding Congress's intent in enacting section 103(a). While the CIT's discussion of the URAA cited the SAA text that refers to Article 19.3 of the SCM Agreement, the CIT dismissed as "tangential" the relevance of what is required under Article 19.3. *Coalition III*, 483 F. Supp. 3d at 1268 (Appx0077). In dismissing the significance of Article 19.3, the Court failed to take into account that in section 101(a)(2) Congress expressly approved the SAA, and in section 102(d) provided that the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act."

The CIT acknowledged that to accept the U.S. Government's (and the Canadian Parties') position that section 103(a) authorized the expedited review regulation "would require the court to accept the proposition that Article 19.3

requires expedited reviews." *Id.* But the CIT then dismissed the relevance of any further discussion of Article 19.3 by incorrectly asserting that at oral argument the parties had "agreed that interpreting the text and requirements of Article 19.3 is beyond the scope of this litigation." *Id.* (Appx0077–0078). The Canadian Parties had explained that if there were any question as to what was intended by the SAA's reference to Article 19.3, then Article 19.3 would indeed be relevant.[10] *See* Sept. 16 Transcript, p. 38 (Appx0487).

Finally, the CIT never engaged with the fact that sections 101(a)(1) (approving the SCM Agreement), 101(a)(2) (approving the SAA), and 102(d) (describing the authoritative weight to be given to the SAA) are all "provision[s] of this Act" within the meaning of section 103(a), which gave Commerce rulemaking authority with respect to "any provision of this Act." 19 U.S.C. § 3513(a). Those sections are explicit declarations of Congressional intent for reviewing courts to look to the WTO agreements adopted by Congress, and to the SAA, to determine

---

[10] If it is accepted that the SAA does require an expedited review procedure of the kind that Commerce provided for in its regulation, then the meaning of Article 19.3 might not be central to the interpretation of section 103(a). In that regard, the CIT acknowledged that the SAA statement about expedited reviews was "fairly straightforward . . . as a recognition of a requirement to provide for expedited reviews." Sept. 16 Transcript, p. 39 (Appx0488). In any event, the meaning of Article 19.3 continues to be of great relevance to understanding what exactly Congress approved in section 101(a) of the URAA, and to the proper application of the *Charming Betsy* canon, discussed below.

Congress' understanding of what the SCM Agreement required of the United States in providing a mechanism for CVD expedited reviews.

#### 3. The *Charming Betsy* Canon Supports Commerce's Authority to Promulgate Expedited Review Regulations and Conduct Expedited Reviews

Commerce's authority to promulgate expedited review regulations and conduct expedited reviews is supported by the *Charming Betsy* canon.

The *Charming Betsy* canon provides that "absent express Congressional language to the contrary, statutes should not be interpreted to conflict with international obligations." *Federal-Mogul Corp. v. United States*, 63 F.3d 1572, 1581 (Fed. Cir. 1995). This Court has elsewhere described *Charming Betsy* as operating to require that statutes "must be interpreted to be consistent with international obligations, absent contrary indications in the statutory language or its legislative history." *Allegheny Ludlum Corp. v. United States*, 367 F.3d 1339, 1348 (Fed. Cir. 2004) (alteration accepted) (quoting *Luigi Bormioli Corp. v. United States*, 304 F.3d 1362, 1368 (Fed. Cir. 2002)).

The content of the United States' international obligations here is clear. The SCM Agreement requires that "[a]ny exporter whose exports are subject to a definitive countervailing duty but who was not actually investigated for reasons other than a refusal to cooperate, *shall be entitled to an expedited review* in order that the investigating authorities promptly establish an individual countervailing

duty rate for that exporter." SCM Agreement art. 19.3 (emphasis added). Commerce explicitly noted compliance with these obligations as the motivating concern for the promulgation of the CVD expedited review regulations. *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,322 (final rule) (May 19, 1997) ("Final Rule") ("[P]aragraph (k) [providing for expedited reviews] implements Article 19.3 of the SCM Agreement."); *see also Antidumping Duties; Countervailing Duties,* 61 Fed. Reg, 7308, 7318 (notice of proposed rulemaking) (Feb. 27, 1996).

There is overwhelming evidence of Congress's intent to comply with the Uruguay Round Agreements through its approval of the Agreements, its authorization to the President to accept the Agreements in section 101(a)(1) and 101(b), and its authorization in section 103(a) to adopt regulations necessary to implement the URAA—including Congress' approval of the Agreements themselves in section 101. Unsurprisingly, there is no explicit or implicit indication of Congressional intent to violate international law in the URAA or elsewhere in United States law.

This Court has spoken clearly: the *Charming Betsy* canon applies unless the text or scheme of a statute expressly indicates Congress intended for U.S. law to be inconsistent with international law. *See Allegheny Ludlum*, 367 F.3d at 1348. Here, both the text and scheme of the URAA indicate the exact opposite.

The CIT wrongly dismissed the relevance of *Charming Betsy* as "not compel[ling] a different outcome" and as "inapposite," stating that section 103(a) "does not . . . directly implement the United States' international obligations." *Coalition III*, 483 F. Supp. 3d at 1267 (Appx0074). That is not the point. Rather, in the face of an unambiguous international obligation in Article 19.3 of the SCM Agreement, and Congress's clear intent—expressed in the SAA—to import that obligation into U.S. law, the *Charming Betsy* canon indeed is apposite, and should inform this Court's reading of the scope of the section 103(a) rulemaking authority with respect to the CVD expedited review procedure at issue here.

**4. Congress Acquiesced in Commerce's Expedited Review Regulation and Process**

To the extent that the URAA and SAA may not completely resolve the issue before the Court, Congress acquiesced in Commerce's expedited review regulations and the conduct of expedited reviews. The Canadian Parties and the U.S. Government argued that several factors—the SAA language endorsing the expedited review procedure, adoption of the expedited review regulation following notice-and-comment rulemaking, multiple Congressional amendments to the Tariff Act since the promulgation of the expedited review regulation, and administrative practice conducting expedited reviews over nearly two decades—all supported a finding that Congress considered expedited reviews as an appropriate part of administration of the CVD law. *See id.* at 1269 (Appx0079). The CIT rejected

that analysis, stating there was no evidence that Commerce's expedited review process had come to the attention of Congress, and that any Congressional acquiescence did not apply to Commerce's claim of authority under section 103(a) as Commerce did not assert that basis for its authority until 2018. *Id.* at 1269–70 (Appx0079–0080). Lastly, the CIT concluded, "perhaps most importantly" in its view, that acquiescence could not apply when there are, quoting *Haig v. Agee*, 453 U.S. 280, 291 (1981), "compelling indications" that the agency's construction of the statute is wrong. *Id.* at 1271 (Appx0083).

Acquiescence has been described by the Supreme Court as "a venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong, especially when Congress has refused to alter the administrative construction." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 (1969) (citations omitted); *see also Bob Jones Univ. v. Unites States*, 461 U.S. 574, 599–602 (holding that Congress' awareness of a twelve-year old IRS policy, coupled with a lack of amendment, demonstrated "ratification by implication" of the IRS position). In this case, Congressional acquiescence demonstrates Congressional approval of CVD expedited reviews and the expedited review regulation.

The extensive Congressional consultations required as part of the "fast track" procedure demonstrates that Congress was aware of the expedited review

procedure and approved that procedure in passing the URAA. Any question of acquiescence is further addressed by the fact that Commerce issued expedited review regulations, after public notice and comment, and Commerce has conducted such reviews for 24 years, during which Congress has amended the Tariff Act over forty times without addressing expedited reviews.

The CIT's conclusion that Congress was unaware of Commerce's practice is flawed in two ways. First, it focuses on the wrong question, asking whether Congress was aware of Commerce's interpretation of section 103(a). The question that should have been asked is whether Congress was aware of the expedited review regulation and Commerce's practice to conduct expedited reviews.

Second, *Haig's* holding is inapposite for the simple reason that no such "compelling indications" exist.

The CIT wrote the following in its acquiescence analysis:

> Commerce only recently announced *its reliance on section 103(a)* as authority for the regulation governing such reviews, *see Irving Paper Ltd., et al. v. United States, et al.*, Court No. 17-cv-00128 (Jan. 30, 2018), ECF No. 53 (the United States' response to the court's questions concerning the court's jurisdiction to entertain an action challenging the results of a CVD expedited review and Commerce's authority to promulgate 19 C.F.R. § 351.214(k)). Thus, in contrast to *Haig* and *Norwegian Nitrogen* [*Prods v. United States*, 288 U.S. 294 (1933)], there has been little time or opportunity for Congress to acquiesce to Commerce's interpretation of section 103(a).

*Coalition III*, 483 F. Supp. 3d at 1271 (Appx0082–0083) (emphasis added and footnote omitted). The CIT thus focused on whether Congress knew of

Commerce's reference to section 103(a) as the authority for the expedited review regulation. But the real issue in acquiescence analysis is whether Congress was aware of the expedited review regulation and Commerce's practice to conduct expedited reviews. *See Bob Jones Univ.*, 461 U.S. at 600–601 ("It is hardly conceivable that Congress . . . was not abundantly aware of what was going on.")

The expedited review regulation was promulgated almost 25 years ago, after notice-and-comment rulemaking. Commerce explained then that the regulation was intended to (1) conform to "the statutory amendments made by the URAA" and (2) elaborate through regulation "certain statements contained in the Statement of Administrative Action." Final Rule, 62 Fed. Reg. at 27,296. In its initial proposal for the expedited review regulation, Commerce stated expressly that the purpose of the regulation was to implement the SCM Agreement's Article 19.3 obligation, in line with the statement regarding expedited reviews in the SAA. *See Antidumping Duties; Countervailing Duties*, 61 Fed. Reg, 7308, 7318 (notice of proposed rulemaking) (Feb. 27, 1996); Final Rule*,* 62 Fed. Reg at 27,321–27,322; SAA at 941.

Commerce received "hundreds" of comments on the proposed regulations, including comments on the proposed expedited review regulation. Final Rule at 27,296, 27,321–22. None of the comments questioned Commerce's legal authority to promulgate the regulation. Neither, to the knowledge of the Canadian Parties,

did any member of Congress, or any Congressional committee with responsibility for international trade laws, ever object to or even question the legitimacy of the regulation. Nor has Congress ever questioned the legitimacy of expedited reviews that Commerce has been conducting since 2003.

Further, the CIT's focus on a specific reference to section 103(a) in its acquiescence analysis ignores both the evidence that Congress in fact knew of Commerce's intent to enact expedited reviews through rulemaking, S. REP. NO. 103-412, at 98 ("Current Commerce practice . . . must be modified in order to comport with Article 19."), and the canon that Congress is aware of both existing law and applicable regulations when legislating, *see Fitzgerald v. Dep't of Homeland Sec.*, 837 F.3d 1346, 1355 (Fed. Cir. 2016) (citing *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–185 (1988), for the presumption that Congress is aware of existing law and *Minneapolis & St. Louis Ry. Co. v. United States*, 361 U.S. 173, 187 (1959), for the same as to existing regulations). The CIT's citation to *Schism v. United States*, 316 F.3d 1259 (Fed. Cir. 2002) (en banc) on this point is inapposite and readily distinguishable. *See Coalition III*, 483 F. Supp. 3d at 1269–1270 (Appx0079–0080).

*Schism* involved military recruiters promising potential recruits free lifetime medical care if they served for twenty years. *Schism*, 316 F.3d at 1262. This Court rejected an acquiescence argument on two grounds. First, the Court found

that there was no evidence of Congressional knowledge of recruiters making these promises, an evidentiary concern inapplicable to this regulation promulgated through notice-and-comment rulemaking given the Senate Finance Committee report and the presumption of Congressional awareness of regulations in *Fitzgerald*. *See id.* at 1297; *Fitzgerald*, 837 F.3d at 1355. Second, this Court in *Schism* noted that Congress had in fact repeatedly passed legislation creating more limited entitlements to healthcare for veterans, "vitiat[ing] any argument of acquiescence." *Schism*, 316 F.3d at 1299. In contrast, no subsequent legislation has rejected or undermined CVD expedited reviews.

Rather than focusing on whether and when Congress was aware of Commerce's claim of authority under section 103(a), the CIT instead should have focused on whether, after the expedited review regulation was promulgated in 1997 and Commerce concluded its first expedited review in 2003, Congress acted in a manner to show its disagreement with expedited reviews. This period comprises some two decades in which Congress has amended the Tariff Act on numerous occasions and could have acted to limit the practice of expedited reviews.[11] Considering the fast track context of the URAA's passage, and applying the presumption that Congress is aware of existing regulations, Congress' inaction

[11] The Canadian Parties have identified over 40 further occasions on which Congress amended the Tariff Act since the 1994 passage of the URAA.

over these two decades is further evidence that Congress intended Commerce to have the authority to conduct CVD expedited reviews.

Last, as noted, the CIT also rejected the applicability of the Congressional acquiescence canon, asserting that under *Haig* there were "compelling indications" to conclude that the agency's interpretation of the statute was wrong. *Coalition III*, 483 F. Supp. 3d. at 1270–71 (Appx0083). But those "compelling indications" were nothing more than the CIT's determination that the language of 103(a) on its face—without considering any other statutory provision or evidence of Congressional intent—proved the absence of authorization for Commerce to enact an expedited review procedure and conduct expedited reviews. Under *Chevron* step one, the CIT should have looked further for evidence of Congressional intent; as demonstrated above, using all of the language of the URAA and "traditional tools" of statutory interpretation, Congress unambiguously authorized the expedited review regulation and, thus, the expedited reviews conducted in this case.

**5. Cases Cited by the CIT Do Not Support its Conclusions**

The CIT principally relied on two cases in support of its conclusion that the statute did not permit CVD expedited reviews: *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355 (1986), and *FAG Italia S.p.A. v. United States,* 291 F.3d 806 (Fed. Cir. 2002). *Coalition III*, F. Supp. 3d at 1264–1265 (Appx0069–0071). Both

are inapposite in light of the unambiguous Congressional intent demonstrated above.

In *Louisiana Public Service Commission*, the FCC implemented a regulation requiring state agencies to follow FCC depreciation practices, in direct contravention of another provision of federal law *which specifically barred* the FCC from doing so. *Id.* at 374. No similar provision of federal law prohibits Commerce's promulgation of the CVD expedited review regulations.

In *FAG Italia*, this Court rejected Commerce's duty absorption review in the seventh annual review of an AD order, where the Tariff Act only allowed for duty absorption reviews in the second and fourth reviews. *See* 291 F.3d at 814–816. The Court there noted that "the absence of a statutory prohibition cannot be the source of agency authority." *Id.* at 816. In contrast to this case, in *FAG Italia* Commerce was acting in the face of a statutory command to follow a specific procedure, and yet claimed that that command allowed it to conduct a different procedure. *Id.* at 817 ("The fact that Commerce is empowered to take action in certain limited situations does not mean that Commerce enjoys such power in other instances.").

Similarly, this Court's recent decision in *Hyundai Steel Co. v. United States*, No. 21-1748, 2021 WL 5856804 (Fed. Cir. Dec. 10, 2021), which endorsed *FAG Italia*'s holding, is distinguishable. In *Hyundai Steel*, this Court rejected the

application of a particular market situation adjustment to a good's cost of production, as the statutory authorization for a particular market situation adjustment was limited to use in a constructed value calculation. The Court rejected legislative history indicating a contrary conclusion as "very general" and thus "unpersua[sive]," reiterating *FAG Italia's* holding that the "the absence of a statutory prohibition cannot be the source of agency authority." *Id.* at *14–16 (quoting *FAG Italia*, 291 F.3d at 816). In this case, in contrast, Commerce issued the expedited review regulation based on the positive statutory authority in section 103(a) and the clear intent expressed in the SAA, not merely based on the absence of a prohibition.

*FAG Italia* and *Hyundai Steel* also presented limited, if any, legislative history to support Commerce's practice. In this case, however, Congress expressly approved the Uruguay Round Agreements that contain the expedited review requirement and approved the SAA as an "authoritative expression" of the U.S. interpretation of the Uruguay Round Agreements and of the URAA itself. 19 U.S.C. §§ 3511(a), 3512(d). And, as demonstrated, the SAA explicitly calls for CVD expedited reviews under the Uruguay Round Agreements. Sections 101(a) and 103(a) of the URAA provide authority for the expedited reviews to be implemented by regulation, and the Senate Finance Committee Report, S. REP. NO.

103-412, at 98,[12] provides further evidence that Congress contemplated this would be implemented by regulation.

The SAA and SCM Agreement call for CVD expedited reviews. The URAA explicitly incorporates that SAA. This Court has both termed the SAA as the "authoritative" exposition of the URAA and, in *Bestfoods*, treated the identical grant of rulemaking authority in the NAFTA Implementation Act in the opposite manner as the CIT read section 103(a) here. The CIT's conclusion that the language of the URAA forecloses CVD expedited reviews was, therefore, in error.

### C. To The Extent That Congressional Intent is Unclear, Under *Chevron* Step Two Commerce's Interpretation of the URAA Is Reasonable and Entitled to Deference

If this Court concludes that, after applying a proper *Chevron* step one analysis, Congressional intent as to section 103(a) is still unclear, Commerce's determination that the statute permits expedited reviews is entitled to deference as a reasonable interpretation of the statute under *Chevron* step two.

*Chevron* deference applies equally to an agency's interpretation of a statute and to an agency's interpretation of its jurisdiction to act. *City of Arlington v. FCC*, 569 U.S.290, 296–297 (2013). "No exception exists to the normal deferential standard of review for jurisdictional or legal questions concerning the

[12] *See* Section I.B.1 (explaining that Congress understood that expedited review procedures would be implemented through regulatory changes).

coverage of an Act." *Id.* at 301 (cleaned up). The "jurisdictional question" raised here is whether section 103(a), combined with the SAA's description of a specific activity for Commerce to carry out, is sufficient to grant Commerce rulemaking authority to engage in that activity. Commerce reasonably answered that it is, and under *City of Arlington* this Court should accept that answer as reasonable.

The CIT quoted *City of Arlington* for the proposition that "*Chevron* applies to an agency's 'construction of a[n ambiguous] jurisdictional provision *of a statute it administers*,'" questioning whether or not Commerce is due deference in its interpretation of section 103(a). *Coalition III*, 483 F. Supp. 3d at 1262 n.16 (Appx0066) (quoting *City of Arlington*, 569 U.S. at 301). However, the Supreme Court in *City of Arlington* explicitly used Commerce administering the trade remedy provisions of the Tariff Act as an example of a situation that merits *Chevron* deference. *City of Arlington*, 569 U.S. at 302 (citing *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009)).

Specifically, *Eurodif* held that Commerce was owed *Chevron* deference in its interpretation of what is a sale of goods under 19 U.S.C. § 1673, a section of the Tariff Act itself amended by the URAA, *see* URAA Sec. 233, 108 Stat. 4898. *Eurodif*, 555 U.S. at 316. Commerce had determined that a contract for the enrichment of uranium was a contract for the sale of goods, bringing it under the auspices of antidumping duty law. *See id.* at 314, 316 ("The issue is not whether,

for purposes of 19 U.S.C. § 1673, the better view is that a [uranium enrichment] contract is one for the sale of services, not goods. The statute gives this determination to the Department of Commerce in the first instance . . . [and] its interpretation governs in the face of unambiguous statutory language to the contrary"). *Eurodif* was clear: Commerce is due *Chevron* deference for those determinations entrusted to it, including a determination of the scope of what was entrusted in the first place. *See id* at 316, 319 ("This [law being ambiguous] is the very situation in which we look to an authoritative agency *for a decision about the statute's scope* . . . and once the choice is made we ask only whether the department's application was reasonable." (emphasis added)).

The CIT correctly noted that other "appropriate officers of the United States Government" also have rulemaking authority under section 103(a) as to their competencies under the URAA. *Coalition III*, 483 F. Supp. 3d at 1262 n.16 (Appx0066). However, only Commerce is responsible for investigating and quantifying subsidies under the CVD law, including in expedited reviews. No other agency of the United States government administers those aspects of the CVD law or expedited reviews under that law. Commerce's rulemaking as to expedited reviews is therefore due *Chevron* deference where not foreclosed by "unambiguous statutory language to the contrary." *Eurodif*, 555 U.S. at 316.

As the Supreme Court explained in *Nat'l Cable & Telecommc'ns Ass'n v. Brand X Internet Servs.*: "If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." 545 U.S. 967, 980 (2005). If this Court reaches step two in this case, there is no basis to make any finding other than that Commerce's interpretation of the statutory scheme was eminently reasonable, given the purpose of the URAA of implementing the SCM Agreement and the explicit statement in favor of expedited reviews in the SAA.

Last, the URAA is one of only a few statutes passed by Congress with a statutorily incorporated, authoritative statement of administrative action as required for fast track implementation of a trade agreement; the NAFTA Implementation Act at issue in *Bestfoods* is another example. To the extent this Court finds any ambiguity as to Congressional intent in sections 101(a) or 102(d) of the URAA, Commerce reasonably took Congress's endorsement of the SAA in sections 101 and 102 of the URAA to mean that it had the power to implement the procedure expressly discussed in the SAA, a position *City of Arlington* makes clear is due *Chevron* deference. 569 U.S. 301–302. Commerce's reasonable interpretation should thus be allowed to stand.

## II. URAA Section 103(b) Independently Authorizes Expedited Review Regulations

Section 103(b) specifically authorizes regulations such as the expedited review regulation. The CIT gave short shrift to the U.S. Government's and the Canadian Parties' argument that section 103(b) of the URAA also conferred on Commerce authority for CVD expedited reviews, concluding that the SAA "does not propose any action to implement CVD expedited reviews." *Coalition III*, 483 F. Supp. 3d at 1267 (Appx0075). In response to a request from the Canadian Parties that it reconsider that decision, the CIT found no basis to do so, simply repeating its statement from *Coalition III* that section 103(b) does not apply because the SAA does not propose any specific "action," and rejecting other arguments raised in support of section 103(b) authority. *Coalition IV*, 535 F. Supp. 3d at 1345, 1350–1352 (Appx0016, Appx0025–0029). The CIT provided no further analysis in *Coalition III* or *Coalition IV*. As demonstrated below, the CIT erred on all accounts.

### A. The Plain Meaning of URAA Section 103(b), Read with the SAA, Provides Commerce With Authority To Promulgate Expedited Review Regulations

#### 1. The SAA, Read in Conjunction with Section 103(b), Supports the Expedited Review Regulations

Section 103(b) specifically authorizes regulations for circumstances relevant here, providing for the issuance of "[a]ny interim regulation necessary or appropriate to carry out any action proposed in the statement of administrative

action approved under section 101(a)."[13] 19 U.S.C. § 3513(b). This grant of rulemaking authority, by its plain language, is even broader than that of section 103(a), which is limited to the issuance of regulations *necessary* for the implementation of "any provision of [the Uruguay Round Agreements] Act, or amendment made by [the Uruguay Round Agreements] Act." *Id.* at § 3513(a). The CIT's restricted reading of the meaning of the term "action proposed" in section 103(b), when considered in light of the language and structure of the SAA, fails to properly apply *Chevron* step one.

The language of the SAA section containing the discussion of expedited reviews provides an expansive view of what a "proposed action" may be. The discussion of expedited reviews is under Section B of the SAA. The chapeau of Section B, in all capital letters in the original, states "ACTION REQUIRED OR APPROPRIATE TO IMPLEMENT THE [SUBSIDIES] AGREEMENT," and the text specifically lists "Company-Specific Subsidy Rates and Expedited Reviews." SAA at 923, 941. The words "required or appropriate" thus parallel the "necessary or appropriate" language in section 103(b) of the URAA, and there is no basis

---

[13] That section 103(b) calls for regulations to be "issued not later than 1 year" does not limit Commerce's power to act beyond one year. Both this Court and the Supreme Court have recognized that the expiry of a statutory deadline "does not, without more, entail lack of authority, or of obligation, to take the action after that date has passed." *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1320 (Fed. Cir. 2021); *see also id.* at 1320–1321 (citing Supreme Court cases).

anywhere in the URAA or the SAA to suggest they refer to different things. Thus, actions discussed under the subheadings of Section B, which are specifically called "actions" by the chapeau, should be considered "actions" within the meaning of section 103(b). *See, e.g.*, *Robers v. United States*, 572 U.S. 639, 643 (2014) ("Generally, identical words used in different parts of the same statute are ... presumed to have the same meaning.") (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 86 (2006) (internal quotation marks omitted)); *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1379 (Fed. Cir. 2001) (holding that this persistent usage canon "applies with equal force where, as here, the words at issue are used in two different sections of a *complex statutory scheme*." (emphasis added)).

Despite language explicitly addressing expedited reviews at subheading (B)(5)of the SAA, SAA at 941, the CIT erroneously opined that what the SAA explicitly called "action required or appropriate," *id.* at 923, did not in fact propose any "action." *Coalition III*, 483 F. Supp. 3d at 1267 (Appx0075); *see also Coalition IV*, 535 F. Supp. 3d at 1351 (Appx0026).

The SAA not only lists expedited reviews in its heading, but explicitly addresses the SCM Agreement requirement for CVD expedited reviews.[14] SAA at

[14] This section of the SAA goes on to address the URAA changing the method of calculating the "all-others" rate in CVD proceedings generally to parallel that in AD proceedings. *See* SAA at 941–942; *compare* 19 U.S.C. 1671d(c)(5) with 19

941. There, the SAA establishes a right to an individual CVD rate: "any exporter . . . not actually investigated for reasons other than a refusal to cooperate, *shall be entitled* to an expedited review." *Id.* (emphasis added). There is no requirement that the SAA use a phrase such as "the Administration proposes that action *X* be taken to implement the Article 19.3 obligation," as the language and structure of the URAA and the SAA demonstrate that the SAA proposes that implementing action be taken. Section 103(b) is thus a separate source of authority in addition to the authority provided by section 103(a).

The SAA proposes action regarding expedited reviews that is "required or appropriate" to implement the SCM Agreement. The CIT's claim otherwise cannot stand. The CIT's holding is inconsistent with Congress's admonition that the SAA is the "authoritative expression" of the URAA, 19 U.S.C. § 3512(d). The SAA's description of its own contents, not a court's later gloss, is the best determiner of what an "action" is within the meaning of section 103(b).

U.S.C. § 1673d(c)(5) (identically determining AD and CVD all-others rates). Because expedited reviews provide for an exporter to receive its own rate to avoid receiving the all-others rate determined in an investigation, those specific changes are immaterial to the question presented by this case.

### 2. Section 103(b) Is a Broad Grant of Authority

Section 103(b) is by its terms an even broader grant of rulemaking authority in substantive coverage than Section 103(a). *Compare* 19 U.S.C. § 3513(a) *with* 19 U.S.C. § 3513(b).

Section 103(b) expands on section 103(a) by giving Commerce rulemaking authority to enact regulations "necessary *or appropriate*" to take actions in the SAA. 19 U.S.C. § 3513(b) (emphasis added). The phrase "necessary or appropriate" itself indicates that Congress intended section 103(b) to be a broad grant of rulemaking authority to Commerce. *See, e.g.*, *Gulf States Utilities Co. v. Fed. Power Comm'n*, 411 U.S. 747, 756 (1973) (describing the Federal Power Commission's powers to act "as it may find *necessary or appropriate*" as "broad"); *TNA Merchant Projects, Inc. v. Fed. Energy Regul. Comm'n*, 857 F.3d 354, 359 (D.C. Cir. 2017) (describing FERC's authority to "perform any and all acts . . .*necessary or appropriat*e" as "broad authority") (both emphases added).

Indeed, in the identical situation in *Bestfoods, supra*, this Court explained that the grant of rulemaking authority at issue there—identical in pertinent part to the language used in 103(b)—"authoriz[ed] the Secretary of the Treasury to promulgate regulations 'necessary or appropriate'" to allow the United States to be in compliance with its international obligations under NAFTA. 165 F.3d at 1375 (quoting 19 U.S.C. § 3314(b) (repealed 2020)). Determinations as to what is

"necessary or appropriate" necessarily connote the application of judgment and discretion, and Commerce possesses the "unique expertise" such that its determinations in this sphere are to be respected. *See Kisor v. Wilkie*, 139 S.Ct. 2400, 2413 (2019) (discussing agencies' "unique expertise" and competency in their fields and noting that "[i]t is because of those features that Congress . . . assigns rulemaking power to an agency.").

Commerce, entrusted with a broad grant of rulemaking authority to do what it believed appropriate to carry out actions proposed in the SAA, reasonably fashioned a rule to implement the CVD expedited reviews that the SAA said must be done.[15] In doing so, Commerce intended to ensure that for the regulatory regime entrusted to it, the United States would be in compliance with its international obligations. In fact, the promulgation of the final rule explicitly noted WTO compliance as the motivating concern for the promulgation of CVD expedited reviews. *See* Final Rule, 62 Fed. Reg. at 27,322 ("[P]aragraph (k) [providing for expedited reviews] implements Article 19.3 of the SCM Agreement."); *see also Antidumping Duties; Countervailing Duties,* 61 Fed. Reg. at 7318 (notice of proposed rulemaking).

[15] Section II.B below addresses the CIT's conclusion that Commerce has no special role to play in implementing section 103(b).

Further, even if this Court considers ambiguous the scope of what is an "action proposed in the SAA to implement" the SCM Agreement, under *Chevron* step two it is for Commerce to make that determination in the first instance. *See City of Arlington*, 569 U.S. at 301 ("No exception exists to the normal deferential standard of review for jurisdictional or legal questions *concerning the coverage of an Act*." (cleaned up and emphasis added)).[16]

Finally, if this Court disagrees with the interpretation of section 103(a) the Canadian Parties advance above, legislative history and the *Charming Betsy* canon compel a broader reading of section 103(b). The Senate Finance Committee Report indicates that Congress understood Commerce would implement expedited review procedures through regulations, S. REP. NO. 103-412, at 98 ("Current Commerce practice . . . must be modified in order to comport with Article 19."), and Article 19.3 of the SCM Agreement requires expedited reviews. If section 103(a) does not allow Commerce to promulgate expedited reviews, section 103(b) must.

[16] *See also* Section I.C above, addressing *Chevron* step two in the context of URAA section 103(a).

### B. The CIT Failed to Meaningfully Respond to the Canadian Parties Additional Arguments

The Canadian Parties argued that section 103(b) accords Commerce the same if not greater authority than did section 103(a) to promulgate the expedited review regulation, for at least two reasons: section 103(b) authorizes "necessary" and "appropriate" regulations, and it applies specifically to just two agencies—Commerce and the International Trade Commission ("ITC"). Defendant-Intervenors' Comments on Remand Redetermination at 14–15 (Mar. 19, 2021) (Appx0615–0616). Commerce thus had particular expertise to determine what regulations would be necessary or appropriate to implement the SAA. The CIT wrongly rejected these arguments in a footnote. *See Coalition IV*, 535 F. Supp. 3d at 1351 n.17 (Appx0026).

Although *Chevron* is clear as to when deference arises, the CIT stated that the Canadian Parties had not indicated what level of deference was owed under section 103(b). *Id.* Deference arises if the analysis has proceeded to *Chevron* step two; if the matter is resolved under step one, deference need not be considered. *Chevron*, 467 U.S. at 842–843 ("[T]he court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). Under step two, if Commerce's interpretation is reasonable, it must be sustained. *Id.* at 844 ("[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency"); *see also*

*Wheatland Tube*, 495 F.3d at 1360. Commerce's interpretation of the statutory scheme was a reasonable method to implement expedited reviews required by the SCM Agreement.

Second, despite section 103(b) applying specifically to Commerce, the CIT held that *Chevron* deference is only owed to agency interpretations of statutes that it administers, and then incorrectly claimed that Commerce does not administer section 103(b). *See Coalition III*, 483 F. Supp. 3d at 1262 n.16 (Appx0066). By its own terms, section 103(b) only applies to actions necessary or appropriate with respect to implementing three of the eighteen Uruguay Round Agreements that were approved under section 101—Article VI of the General Agreement on Tariffs and Trade 1994 (the "Antidumping Agreement"), the SCM Agreement, and the Agreement on Safeguards. *See* 19 U.S.C. § 3513(b). Only two U.S. Government agencies have primary responsibility for these three Agreements: Commerce administers the unfair trade practice components of the Antidumping and SCM Agreements, and the ITC administers the injury components of all three. Only Commerce could be involved under the SCM Agreement in implementing the expedited review provisions. Commerce is therefore an agency responsible for administering section 103(b). *See Eurodif*, 555 U.S. at 316.

Last, despite section 103(b)'s general grant of authority and specific application to the context of this case, the CIT concluded that it did not need to

resolve these section 103(b) issues; it claimed that the SAA proposed no action regarding expedited reviews and the language of section 103(b) thus "unambiguously precludes the Canadian Parties' interpretation." *Coalition IV*, 535 F. Supp. 3d 1351 n.17 (Appx0026–0027). As demonstrated above, the CIT's opinion was in error. Read in conjunction with the SAA, sections 101(a)(1), 101(a)(2), and 102(d) of the URAA, and Article 19.3 of the SCM Agreement, it is plain that Congress authorized action to be taken—that is, for Commerce to implement the expedited review requirements of Article 19.3 by regulations, and Commerce reasonably did so.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For all the foregoing reasons, the Canadian Parties respectfully urge this Court to—

Find that the Commerce had legal authority to promulgate its expedited review regulation at 19 C.F.R. § 351.214(k) (now 19 C.F.R. § 351.214(l));

Reverse the CIT's determination to vacate Commerce's expedited review regulation;

Reverse the CIT's determination to vacate the *Final Results of Expedited Review*; and

Remand this case to the CIT to determine on the merits the claims brought by Fontaine and Rustique challenging the *Final Results of Expedited Review*.

December 20, 2021

Respectfully submitted,


*/s/ Joanne Osendarp*

Joanne Osendarp
Lynn G. Kamarck
Alan Kashdan
Tim Hruby
Conor Gilligan
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
Tel: (202) 756-8349
Email: josendarp@mwe.com

*Counsel for Government of Canada*

*/s/ Stephan E. Becker*

Stephan E. Becker
Aaron R. Hutman
Moushami P. Joshi
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 17th Street, NW
Washington, DC 20036
Tel: (202) 663-8277
Email: stephan.becker@pillsburylaw.com

*Counsel for Government of New Brunswick*

*/s/ Matthew J. Clark*

Matthew J. Clark
Nancy A. Noonan
Aman Kakar
ARENT FOX LLP
1717 K Street, N.W.
Washington, DC 20006
Tel: (202) 857-6000
Email: matthew.clark@arentfox.com

*Counsel for Government of Québec*

*/s/ Edward M. Lebow*

Edward M. Lebow
Angela Oliver
HAYNES AND BOONE, LLP
800 17th Street, NW, Suite 500
Washington, DC 20006
Tel: (202) 654-4514
Email: ed.lebow@haynesboone.com

*Counsel for Les Produits Forestiers D&G Ltée* and *Marcel Lauzon Inc.*

*/s/ John R. Magnus*
John R. Magnus
TRADEWINS LLC
1330 Connecticut Ave. NW
Washington, DC 20036
Tel: (202) 744-0386
Email: jmagnus@tradewinsllc.net

*Counsel for Mobilier Rustique (Beauce) Inc.*

/s/ *Richard L.A. Weiner*
Richard L.A. Weiner
Rajib Pal
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Tel: (202) 736-8075
Email: rweiner@sidley.com

*Counsel for North American Forest Products Ltd.*

/s/ *Yohai Baisburd*

Yohai Baisburd
Jonathan M. Zielinski
James E. Ransdell
CASSIDY LEVY KENT (USA) LLP
900 19th Street, NW, Suite 400
Washington, DC 20006
Tel: (202) 567-2319
Email: ybaisburd@cassidylevy.com

*Counsel for Scierie Alexandre Lemay & Fils Inc.*

/s/ *Mark B. Lehnardt*

Mark B. Lehnardt
LAW OFFICES OF DAVID L. SIMON, PLLC
1025 Conneticut Ave., N.W. Ste. 1000
Washington, D.C. 20036
Tel: (202) 642-4850
Email: marklehnardt@dlsimon.com

*Counsel for Fontaine Inc.*

# ADDENDUM OF REQUIRED DOCUMENTS

| No. | Description | BPI/ Public | Appendix Citation |
|---|---|---|---|
| 1 | *Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States*, Consol. Court. No. 19-00122, Judgment (Aug. 18, 2021) | Public | Appx0001–0003 |
| 2 | *Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States*, Slip Op. 21-104 (Aug. 18, 2021) | Public | Appx0004–00051 |
| 3 | *Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States*, Slip Op. 20-167 (Nov. 19, 2020) | Public | Appx0052–0086 |

**UNITED STATES COURT OF INTERNATIONAL TRADE**

COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS,

Plaintiff,

and

FONTAINE INC., ET AL.,

Consolidated Plaintiffs,

v.

UNITED STATES,

Defendant,

and

FONTAINE INC., ET AL.,

Defendant-Intervenors.

Before: Mark A. Barnett, Judge
Consol. Court No. 19-00122

**JUDGMENT**

These consolidated cases having been duly submitted for decision, and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby

**ORDERED** that the U.S. Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Court Remand (ECF No. 173-1) are **SUSTAINED**; it is further

**ORDERED** that 19 C.F.R. § 351.214(k) is **VACATED**; it is further

**ORDERED** that the Commerce determination styled as *Certain Softwood Lumber Products From Canada*, 84 Fed. Reg. 32,121 (Dep't Commerce July 5, 2019) (final results of CVD expedited review) ("*Final Results of Expedited Review*") (ECF No. 99-5), is **VACATED**; it is further

**ORDERED** that Commerce must issue a *Timken*-like Notice rescinding the *Final Results of Expedited Review,* consistent with the requirements set forth in 19 U.S.C. § 1516a(c)(1); reinstate the excluded companies in the *CVD Order* prospectively; and, for all companies that were covered by the *Final Results of Expedited Review*, impose a cash deposit requirement based on the all-others rate from the investigation or the company-specific rate determined in the most recently completed administrative review in which the company was reviewed; it is further

**ORDERED** that Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record (ECF Nos. 101, 102) is **GRANTED IN PART**, **DENIED IN PART**, and **DENIED IN PART AS MOOT**; it is further

**ORDERED** that the Motion for Judgment Upon the Agency Record Under Rule 56.2 of Consolidated Plaintiff Mobilier Rustique (Beauce) Inc. (ECF No. 100) is **DENIED AS MOOT**; it is further

**ORDERED** that the Rule 56.2 Motion of Fontaine, Inc. for Judgment on the Agency Record (ECF No. 103) is **DENIED AS MOOT**; it is further

**ORDERED** that Consolidated Plaintiff Government of Canada's Rule 56.2 Motion for Judgment on the Agency Record (ECF No. 105) is **DENIED AS MOOT**; and it is further

**ORDERED** that Consolidated Plaintiff's Government of Québec's Rule 56.2 Motion for Judgment on the Agency Record (ECF No. 106) is **DENIED AS MOOT**.

/s/ Mark A. Barnett
Mark A. Barnett, Judge

Dated: August 18, 2021
New York, New York

Slip Op. 21-104

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS,<br><br>Plaintiff,<br><br>and<br><br>FONTAINE INC., ET AL.,<br><br>Consolidated Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>FONTAINE INC., ET AL.,<br><br>Defendant-Intervenors. | Before: Mark A. Barnett, Chief Judge<br>Consol. Court No. 19-00122 |

**OPINION**

[Sustaining the U.S. Department of Commerce's remand determination that it lacked statutory authority to promulgate 19 C.F.R. § 351.214(k); vacating 19 C.F.R. § 351.214(k) and the Final Results of Countervailing Duty Expedited Review; setting parameters for prospective application of the vacatur.]

Dated: August 18, 2021

Lisa W. Wang, Andrew W. Kentz, David A. Yocis, Nathanial M. Rickard, Whitney M. Rolig, Sophia J.C. Lin, and Zachary J. Walker, Picard Kentz & Rowe LLP, of Washington, DC, for Plaintiff Committee Overseeing Action for Lumber International Trade Investigations or Negotiations.

Joanne E. Osendarp, McDermott Will & Emery LLP, of Washington, DC, for Consolidated Plaintiff/Defendant-Intervenor Government of Canada.

Case 1:19-cv-00122-MAB Document 198 Filed 08/18/21 Page 2 of 48



Matthew J. Clark, Arent Fox LLP, of Washington, DC, for Consolidated Plaintiff/Defendant-Intervenor Government of Québec.

Elliot J. Feldman, Baker & Hostetler, LLP, of Washington, DC, for Consolidated Plaintiff/Defendant-Intervenor Fontaine Inc.

John R. Magnus, TradeWins LLC, of Washington, DC, for Consolidated Plaintiff/Defendant-Intervenor Mobilier Rustique (Beauce) Inc.

Stephen C. Tosini, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With him on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Nikki Kalbing, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Stephan E. Becker, Pillsbury Winthrop Shaw Pittman LLP, of Washington, DC, for Defendant-Intervenor Government of New Brunswick.

Yohai Baisburd, Cassidy Levy Kent (USA) LLP, of Washington, DC, for Defendant-Intervenor Scierie Alexandre Lemay & Fils Inc.

Edward M. Lebow, Haynes and Boone, LLP, of Washington, DC, for Defendant-Intervenors Les Produits Forestiers D&G Ltée and Marcel Lauzon Inc.

Richard L.A. Weiner, Sidley Austin LLP, of Washington, DC, for Defendant-Intervenors North American Forest Products Ltd, Parent-Violette Gestion Ltée, and Le Groupe Parent Ltée.

Barnett, Chief Judge: In this consolidated action, Plaintiff, Committee Overseeing Action for Lumber International Trade Investigations or Negotiations ("Plaintiff" or "the Coalition"), challenged the U.S. Department of Commerce's ("Commerce" or "the agency") authority to promulgate a regulation establishing an expedited review process to determine individual countervailing duty ("CVD") rates for exporters not individually

examined in an investigation.[1] *See* Compl. ¶¶ 15–16, ECF No. 2. Plaintiff disputed the lawfulness of the regulation, 19 C.F.R. § 351.214(k), as part of its challenge to Commerce's final results in the CVD expedited review of certain softwood lumber products from Canada. *See* Compl. ¶¶ 2, 14–22; *see also Certain Softwood Lumber Products From Canada*, 84 Fed. Reg. 32,121 (Dep't Commerce July 5, 2019) (final results of CVD expedited review) ("*Final Results of Expedited Review*"), ECF No. 99-5, and accompanying Issues and Decision Mem. ("I&D Mem."), C-122-858 (June 28, 2019), ECF No. 99-6.[2] Plaintiff alleged that Commerce's reliance on section 103(a) of the Uruguay Round Agreements Act ("URAA" or "the Act"), Pub. L. No. 103-465, 108 Stat. 4809 (1994), as authority for its regulation was misplaced and, thus, that Commerce's promulgation of the regulation and issuance of the *Final Results of Expedited Review* exceeded Commerce's statutory authority. *See* Compl. ¶¶ 15–16.

In due course, the Coalition filed a motion for judgment on the agency record pursuant to U.S. Court of International Trade ("USCIT" or "CIT") Rule 56.2 incorporating the foregoing claim. *See* Conf. Pl.'s Rule 56.2 Mot. for J. on the Agency R. and accompanying Conf. Mem. in Supp. of Pl.'s Rule 56.2 Mot. for J. on the Agency R. ("Pl.'s Mem."), ECF No. 101. Defendant, United States ("Defendant" or "the

---

[1] For ease of reference, the court characterizes the type of proceeding at issue in this case as a "CVD expedited review."

[2] The administrative record associated with the *Final Results of Expedited Review* is divided into a Public Administrative Record ("PR"), ECF No. 99-2, and a Confidential Administrative Record, ECF Nos. 99-3, 99-4. Commerce also filed a public administrative record associated with the Remand Results. *See* Index to Admin. [Remand] R., ECF No. 177-2. Plaintiff filed a joint appendix of documents cited in Parties' comments on the Remand Results. *See* J.A. to Comments After Remand ("PRJA"), ECF No. 191. .

Government"), and several Defendant-Intervenors consisting of Canadian softwood lumber producers and governmental entities, defended the lawfulness of 19 C.F.R. § 351.214(k) and the underlying proceeding. Conf. Def.'s Resp. [to] Pls.' Mots. For J. on the Agency R., ECF No. 110; Joint Br. of Def.-Ints. Gov't of Can. and Gov't of Que. in Opp'n to Pl.'s Mot. for J. on the Agency R. ("Jt. Canada Br."), ECF No. 120; [Resp.] of Def.-Ints. Les Produits Forestiers D&G Ltée and Marcel Lauzon Inc in Opp'n to Pl.'s Mot. for J. on the Agency R., ECF No. 117; Resp. of Def.-Int. Scierie Alexandre Lemay & Fils Inc. in Opp'n to Pl.'s Mot. for J. on the Agency R., ECF No. 119.[3]

In *Committee Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States* ("*Lumber III*"), the court held, *inter alia*, that "Commerce exceeded its authority to the extent that it promulgated 19 C.F.R. § 351.214(k) pursuant to URAA § 103(a)." 44 CIT ___, ___, 483 F. Supp. 3d 1253, 1263–64 (2020).[4] The

---

[3] A complete list of Defendant-Intervenors in this action includes the Government of Canada, the Government of Québec, the Government of the Province of New Brunswick, Fontaine Inc. ("Fontaine"), Marcel Lauzon Inc. ("Lauzon"), Les Produits Forestiers D&G Ltee ("D&G"), North American Forest Products Ltd. ("NAFP"), Parent-Violette Gestion Ltee, Le Groupe Parent Ltee, Scierie Alexandre Lemay & Fils Inc. ("Lemay"), and Mobilier Rustique (Beauce) Inc. ("Rustique"). *See* Docket.

[4] Prior to *Lumber III*, the court issued an opinion vacating a temporary restraining order requested by the Coalition barring U.S. Customs and Border Protection ("CBP") from liquidating unliquidated entries of softwood lumber produced or exported by Canadian companies that received reduced or *de minimis* rates in the *Final Results of Expedited Review* and denying the Coalition's corresponding request for a preliminary injunction. *See Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States* ("*Lumber I*"), 43 CIT ___, 393 F. Supp. 3d 1271 (2019). The court also issued an opinion denying the Government's motion to dismiss pursuant to USCIT Rule 12(b)(1) for lack of subject matter jurisdiction. *See Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States* ("*Lumber II*"), 43 CIT ___, ___, 413 F. Supp. 3d 1334 (2019). While the court summarizes the relevant legal and factual background herein, familiarity with prior opinions is presumed.

court remanded the *Final Results of Expedited Review* for Commerce to consider various *post hoc* justifications for the regulation offered by Defendant and the Governments of Canada and Québec and declined to vacate the regulation pending Commerce's remand redetermination. *See id.* at 1272–73.

The matter is now before the court following Commerce's redetermination upon remand. *See* Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), ECF No. 173-1. On remand, Commerce addressed two issues: (1) whether any statutory authority existed for the agency's promulgation of 19 C.F.R. § 351.214(k); and (2) in the absence of such authority, what actions Commerce should take with respect to entries of subject merchandise exported or produced by companies subject to the CVD expedited review (collectively referred to as "the subject companies") in the event the court annuls the *Final Results of Expedited Review*. *See generally id.*

As will be discussed in further detail below, Commerce concluded that it could not identify an explicit or implicit statutory basis for its regulation that would be consistent with the court's opinion in *Lumber III*. *See id.* at 9–12, 19–25. Commerce further indicated that it intended to follow the procedure set forth in 19 U.S.C. § 1516a(c)(1) with respect to the subject companies, such that "the effect of this decision would be prospective" and "the rates established as a result of the [CVD] expedited review would cease to apply 10 days after publication of [a] Notice of Court Decision Not in Harmony in the *Federal Register*." *Id.* at 28 & n.124 (citation omitted).[5]

---

[5] Section 1516a(c)(1) requires Commerce to publish in the *Federal Register* "a notice of a decision of the United States Court of International Trade, or of the United States

The Coalition filed comments opposing Commerce's decision to follow 19 U.S.C. § 1516a(c)(1) and arguing that the court should instead vacate 19 C.F.R. § 351.214(k) and annul the *Final Results of Expedited Review*. *See* Pl.'s Cmts. on [Remand Results] ("Pl.'s Opp'n Cmts."), ECF No. 182. Defendant-Intervenors (collectively referred to herein as "the Canadian Parties") filed comments arguing that Commerce's analysis of its statutory authority for the regulation was perfunctory and deficient; considerations of equity preclude rescission of the *Final Results of Expedited Review*; and, to the extent the *Final Results of Expedited Review* are rescinded, any revised rates should be prospective only. *See* Consol. Def.-Ints.' Cmts. in Resp. to [Commerce's] February 17, 2021 [Remand Results] ("Def.-Ints.' Opp'n Cmts"), ECF No. 183.

---

Court of Appeals for the Federal Circuit, not in harmony with [the underlying] determination . . . within ten days from the date of the issuance of the court decision." 19 U.S.C. § 1516a(c)(1). Such notice may be referred to as a "*Timken* Notice" pursuant to *Timken Co. v. United States*, 893 F.2d 337, 341 (Fed. Cir. 1990). The statute further requires the *Timken* Notice to apply to imports entered or withdrawn from warehouse on or after the date of publication of the *Timken* Notice. 19 U.S.C. § 1516a(e)(1). When Commerce misses the ten-day deadline for publication of the *Timken* Notice, Commerce regularly applies its *Timken* Notices as of the date that is ten days following issuance of the court decision. *See, e.g.*, *Large Power Transformers From the Republic of Korea*, 86 Fed. Reg. 38,980 (Dep't Commerce July 23, 2021) (notice of court decision not in harmony with final results, notice of amended results of review; 2015-16) (where the court issued judgment on July 9, 2021 and the *Timken* Notice was effective as of July 19, 2021); *Drawn Stainless Steel Sinks From the People's Republic of China*, 81 Fed. Reg. 57,474, 58,474 (Dep't Commerce Aug. 25, 2016) (notice of court decision not in harmony with am. final determination pursuant to court decision) (where the court issued judgment on July 24, 2016 and the *Timken* Notice was effective as of July 24, 2016); *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China*, 78 Fed. Reg. 70,917 (Dep't Commerce Nov. 27, 2013) (notice of decision of the [CIT] not in harmony and notice of amended final determination) (where the court issued judgment on October 30, 2013 and the *Timken* Notice was effective as of November 9, 2013). Commerce appears to have misstated its position in the Remand Results.

The Government filed comments arguing that Commerce's Remand Results comply with the court's directive in *Lumber III* to consider alternative legal bases for the regulation; Commerce is not precluded from relying on 19 U.S.C. § 1516a(c)(1) to implement the court's judgment; and any equitable remedy lies solely within the court's—not the agency's—discretion. *See* Def.'s Resp. to the Parties' Remand Cmts. ("Def.'s Reply Cmts."), ECF No. 186. The Canadian Parties filed comments in reply to the Coalition's opposition comments. *See* Consol. Def.-Ints.' Cmts. in Resp. to Pl.'s March 19, 2021 Cmts. on [Remand Results] ("Def.-Ints.' Reply Cmts."), ECF No. 187. The Coalition likewise filed comments in reply to the Canadian Parties' opposition comments. *See* Pl.'s Cmts. in Supp. Of [Remand Results] ("Pl.'s Reply Cmts."), ECF No. 188.

For the reasons discussed herein, the court will sustain Commerce's Remand Results and vacate 19 C.F.R. § 351.214(k) and the *Final Results of Expedited Review*. The court further orders prospective application of its judgment in this case.

## Background

The URAA amended the domestic antidumping ("AD") and CVD laws in connection with several international trade agreements referred to as the Uruguay Round Agreements. *See* 19 U.S.C. §§ 3511(a)(1), (d), & 3501(7).[6] One such agreement is the Agreement on Subsidies and Countervailing Measures ("SCM

[6] Section 101(a) of the URAA reflects congressional approval of "the trade agreements described in subsection (d) resulting from the Uruguay Round of multilateral trade negotiations." 19 U.S.C. § 3511(a)(1). Section 101(b) of the URAA provided for the President's acceptance of the Uruguay Round Agreements. *See id.* § 3511(b).

Agreement"). *Id.* § 3511(d)(12); *see generally* Agreement Establishing the World Trade Organization, Apr. 15, 1994, 1869 U.N.T.S. 14, Annex 1A, SCM Agreement. Pursuant to Article 19.3 of the SCM Agreement:

> When a countervailing duty is imposed in respect of any product, such countervailing duty shall be levied, in the appropriate amounts in each case, on a non-discriminatory basis on imports of such product from all sources found to be subsidized and causing injury, except as to imports from those sources which have renounced any subsidies in question or from which undertakings under the terms of this Agreement have been accepted. *Any exporter whose exports are subject to a definitive countervailing duty but who was not actually investigated for reasons other than a refusal to cooperate, shall be entitled to an expedited review in order that the investigating authorities promptly establish an individual countervailing duty rate for that exporter.*

SCM Agreement, art. 19.3 (emphasis added).

The Statement of Administrative Action ("SAA") accompanying the URAA explains that "Article 19.3 of the [SCM] Agreement provides that any exporter whose exports are subject to a CVD order, but which was not actually investigated for reasons other than a refusal to cooperate, shall be entitled to an expedited review to establish an individual CVD rate for that exporter." URAA, SAA, H.R. Doc. No. 103–316, vol.1, at 941–42 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4250–51.[7] The SAA noted that "[s]everal changes must be made to the [Tariff Act of 1930] to implement the requirements of Article 19.3." *Id.* Thereafter, while the SAA discusses several

[7] Congress expressly approved the SAA in the URAA. *See* 19 U.S.C. § 3511(a)(2). Further, the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act [i.e., the URAA] in any judicial proceeding in which a question arises concerning such interpretation or application." *Id.* § 3512(d).

necessary changes to U.S. trade laws effectuated by sections 264, 265, and 269[8] of the URAA, *id.* at 941–42, *reprinted in* 1994 U.S.C.C.A.N. at 4251, the SAA does not discuss the implementation of CVD expedited reviews.

Section 103 of the URAA delegated authority to Commerce, among others, to promulgate interim and final regulations implementing the provisions of the Act. *See* 19 U.S.C. § 3513. Section 103(a) of the URAA delegates authority to "appropriate officers of the United States Government [to] issue such regulations, as may be necessary to ensure that any provision of this Act, or amendment made by this Act, . . . is appropriately implemented." *Id.* § 3513(a)(2). Section 103(b) of the URAA authorized the promulgation of "interim regulation[s] necessary or appropriate to carry out any action proposed in the [SAA] approved under section 3511(a) of this title to implement an agreement described in section 3511(d)(7), (12), or (13) of this title" within "[one] year after the date on which the agreement enters into force with respect to the United States." *Id.* § 3513(b).

On May 11, 1995, Commerce issued interim regulations. *See Antidumping and Countervailing Duties*, 60 Fed. Reg. 25,130 (Dep't Commerce May 11, 1995) (interim regulations; request for cmts.). Commerce's interim regulations did not address CVD expedited reviews. *See id.* at 25,130–33 (discussing the regulations).

On May 19, 1997, Commerce published its final agency regulations concerning the implementation of the URAA. *See Antidumping Duties; Countervailing Duties*, 62

---

[8] The SAA misattributes changes made by URAA § 269 to URAA § 265. *See* SAA at 941–42, *reprinted in* 1994 U.S.C.C.A.N. at 4251; URAA § 269(a) (amending 19 U.S.C. § 1677f-1 to add new subsection (e)).

Fed. Reg. 27,296 (Dep't Commerce May 19, 1997) (final rule) ("*Preamble*"). These regulations finalized new provisions governing new shipper reviews. *See id.* at 27,318–22 (discussing 19 C.F.R. § 351.214). Subsection (k) of the new shipper regulation also provided for Commerce's implementation of CVD expedited reviews. *See* 19 C.F.R. § 351.214(k) (1998); *Preamble*, 62 Fed. Reg. at 27,321.

Subsection (k) of the new shipper regulation permits a respondent that was not selected "for individual examination" or accepted "as a voluntary respondent" in a CVD investigation in which Commerce "limited the number of exporters or producers to be individually examined" to "request a review . . . within 30 days of the date of publication in the Federal Register of the [CVD] order." 19 C.F.R. § 351.214(k)(1). Any company requesting a CVD expedited review must certify compliance with certain regulatory requirements. *See id.* § 351.214(k)(1)(i)–(iii). An expedited review will be initiated "in the month following the month in which a request for review is due." *Id.* § 351.214(k)(2)(i). Additionally, the expedited review will be conducted "in accordance with the provisions of this section applicable to new shipper reviews," subject to certain exceptions. *Id.* § 351.214(k)(3).[9]

---

[9] Those exceptions are:

> (i) The period of review will be the period of investigation used by the [agency] in the investigation that resulted in the publication of the countervailing duty order;
> (ii) The [agency] will not permit the posting of a bond or security in lieu of a cash deposit under paragraph (e) of this section;
> (iii) The final results of a review under this paragraph (k) will not be the basis for the assessment of countervailing duties; and
> (iv) The [agency] may exclude from the countervailing duty order in question any exporter for which the [agency] determines an individual net

On January 3, 2018, following affirmative determinations of countervailable subsidization and material injury, Commerce published the CVD order on certain softwood lumber products from Canada. *See Certain Softwood Lumber Products From Canada*, 83 Fed. Reg. 347 (Dep't Commerce Jan. 3, 2018) (am. final aff. [CVD] determination and [CVD] order) ("*CVD Order*"). On March 8, 2018, Commerce initiated an expedited review of the *CVD Order* with respect to certain Canadian producers that were not selected for individual examination during the investigation and had been assigned the "all-others" rate of 14.19 percent. *See Certain Softwood Lumber Products From Canada*, 83 Fed. Reg. 9,833 (Dep't Commerce Mar. 8, 2018) (initiation of expedited review of the [*CVD Order*]); *CVD Order*, 83 Fed. Reg. at 348–49 (noting the all-others rate).

On July 5, 2019, Commerce issued the *Final Results of Expedited Review*, pursuant to which the agency calculated reduced rates for Fontaine and its cross-owned affiliates, Rustique and its cross-owned affiliates, and Matra and Sechoirs de Beauce Inc. (together, "Matra") and their cross-owned affiliate. *See* 84 Fed. Reg. at 32,122. Commerce calculated *de minimis* rates for D&G and its cross-owned affiliates, Lauzon and its cross-owned affiliates, NAFP and its cross-owned affiliates, Roland Boulanger & Cie Ltée ("Roland") and its cross-owned affiliates, and Lemay and its cross-owned affiliates. *See id.*

---

> countervailable subsidy rate of zero or de minimis . . . , provided that the [agency] has verified the information on which the exclusion is based.

19 C.F.R. § 351.214(k)(3) (citation omitted).

Because D&G, Lauzon, NAFP, Roland, Lemay, and their respective affiliates (collectively, "the excluded companies") obtained *de minimis* rates, Commerce stated it would instruct CBP "to discontinue the suspension of liquidation and the collection of cash deposits of estimated countervailing duties on all shipments of softwood lumber produced and exported by" those companies that were entered on or after July 5, 2019; "liquidate, without regard to countervailing duties, all suspended entries of shipments of softwood lumber produced and exported by" those companies; and "refund all cash deposits of estimated countervailing duties collected on all such shipments." *Id.* With respect to the companies that received a lower—but not *de minimis*—rate (Fontaine, Rustique, Matra, and their respective affiliates) (collectively, "the non-excluded companies"), Commerce stated it would instruct CBP "to collect cash deposits of estimated countervailing duties" at the lower rates calculated in the *Final Results of Expedited Review*. *Id.*

For the *Final Results of Expedited Review*, Commerce relied on section 103(a) of the URAA as authority for 19 C.F.R. § 351.214(k) and its conduct of CVD expedited reviews. *See* I&D Mem. at 18–20. The court's examination of the statutory text, structure, and legislative history compelled the court to conclude otherwise. *See Lumber III*, 483 F. Supp. 3d at 1263–64.

The court reasoned that, in section 103(a), Congress explicitly limited Commerce's regulatory authority to *enacted* provisions and did not "encompass perceived international obligations that Congress did not implement through the URAA."

*Id.* at 1264; *see also id.* at 1264–66.[10] With respect to statutory structure, the court explained, *inter alia*, that URAA § 103(b) did not authorize or otherwise support Commerce's promulgation of 19 C.F.R. § 351.214(k) "because the SAA does not propose any action to implement CVD expedited reviews." *Id.* at 1267. The court reviewed the SAA and other relevant legislative history and concluded that, on balance, it supported Plaintiff's position. *See id.* at 1269. Lastly, the court rejected the argument that Congress has acquiesced to Commerce's interpretation of section 103(a). *See id.* at 1269–71. The court remanded the *Final Results of Expedited Review* for Commerce to consider additional justifications for its regulation. *See id.* at 1271–73.

In the Remand Results, Commerce considered several alternative bases for its regulation.[11] With respect to section 103(b) of the URAA, Commerce opined that the statutory provision governing interim regulations, in conjunction with the reference to Article 19.3 of the SCM Agreement in the SAA, reflects congressional intent "for

---

[10] The court further explained that congressional silence concerning CVD expedited reviews did not confer authority on Commerce to conduct such reviews, *Lumber III*, 483 F. Supp. 3d at 1264–66; the court's interpretation of URAA § 103(a) was "consistent with the non-self-executing nature of the Uruguay Round Agreements," *id.* at 1366; and "[t]he judicial canon of statutory construction referred to as the *Charming Betsy* doctrine [did] not compel a different outcome" because "[s]ection 103(a) does not . . . directly implement the United States' international obligations," *id.* at 1267 (citing *Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804)).

[11] Commerce briefly revisited section 103(a) of the URAA. While Commerce "presume[d]," consistent with *Lumber III*, that the provision does not convey "explicit or implicit authority to conduct CVD expedited reviews," Commerce stated that in promulgating 19 C.F.R. § 351.214(k), the agency "ensured that all provisions of U.S. law are consistent with U.S. obligations under the URAA." Remand Results at 24. While Commerce presumably intended to refer to the Uruguay Round Agreements and not the URAA, Commerce did not, however, identify the particular obligation to which it referred.

Commerce to have the inherent and implicit authority to conduct [CVD] expedited reviews and to issue regulations providing for such reviews." Remand Results at 22. Commerce, however, considered itself "bound by the [c]ourt's holding," *id.* at 22–23 & n.100 (citing *Lumber III*, 483 F. Supp. 3d at 1267), and, thus, "presume[d]" that section 103(b) does not authorize the regulation, *id.* at 23.

Commerce also addressed congressional approval of the SCM Agreement in section 101(a) of the URAA and concluded that such a "general reference" does not confer "express" statutory authority for the regulation. *Id.* at 11. Commerce found, however, that section 101(a)–(b) of the URAA, together with section 103(a)–(b), affords Commerce "inherent authority" to promulgate 19 C.F.R. § 351.214(k) and conduct CVD expedited reviews. *Id.* at 23. Nevertheless, because the court previously found "that no provision of the URAA provides for CVD expedited reviews," Commerce concluded that it lacked "inherent authority" to promulgate the regulation pursuant to URAA § 101. *Id.*

With respect to "sections 705(c), 751(a), 751(b), and 777A(e) of the [Tariff Act of 1930]," codified at 19 U.S.C. §§ 1671d, 1675(a),(b), and 1677f-1, Commerce concluded that none of those provisions provide authority for 19 C.F.R. § 351.214(k) or the conduct of CVD expedited reviews. *Id.* Specifically, Commerce explained that: (1) 19 U.S.C. § 1671d addresses final CVD investigation determinations, *id.* at 11; (2) 19 U.S.C. § 1675(b) governs changed circumstance reviews, *id.*; (3) 19 U.S.C. § 1677f-1 governs Commerce's calculation of "individual subsidy rates for each known exporter or producer in investigations or administrative reviews" or a reasonable number thereof, *id.*; and (4), with respect to 19 U.S.C. § 1675(a), "[CVD expedited reviews and

administrative reviews] are separate proceedings that are governed by different regulations, promulgated according to distinct authorities, and provide different remedies," *id.* at 12 (quoting I&D Mem. at 26) (alteration in original); *see also id.* at 19–21.

Commerce also "presume[d]" that "Congress's failure to prohibit CVD expedited reviews in recent amendments to the [Tariff Act of 1930]" does not signal congressional acquiescence to Commerce's conduct of CVD expedited reviews. *Id.* at 10. Commerce further "concluded that Commerce's inherent authority to reconsider prior decisions, and lack of an explicit prohibition on CVD expedited reviews, do not equate to specific statutory authorization under the URAA to conduct CVD expedited reviews and promulgate CVD expedited review regulations." *Id.* at 10–11; *see also id.* at 21. Commerce therefore concluded that it lacked statutory authority to promulgate 19 C.F.R. § 351.214(k) and conduct CVD expedited reviews. *See id.* at 12.

With respect to Commerce's treatment of companies covered by the *Final Results of Expedited Review*, Commerce explained that, pursuant to 19 U.S.C. § 1516(c)(1),[12] any change in the applicable rates "would be prospective." *Id.* at 28.

---

[12] The statute provides that,

> "[u]nless such liquidation is enjoined by the court . . ., entries of merchandise of the character covered by a determination of [Commerce] contested under subsection (a) shall be liquidated in accordance with the determination . . . if they are entered, or withdrawn from warehouse, for consumption on or before the date of publication in the Federal Register by [Commerce] of a notice of a decision of the United States Court of International Trade, or of the United States Court of Appeals for the Federal Circuit, not in harmony with that determination."

JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(i)(4).[13] The court reviews an action commenced pursuant to 28 U.S.C. § 1581(i)(4) in accordance with the standard of review set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, as amended. *See* 28 U.S.C. § 2640(e). Section 706 directs the court, *inter alia*, to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

DISCUSSION

**I. Commerce's Authority to Promulgate 19 C.F.R. § 351.214(k) and Conduct CVD Expedited Reviews**

**A. Parties' Contentions**

The Canadian Parties contend that, "with the partial exception of 19 U.S.C. § 1675(a)(1) and section 103(b) of the URAA," Commerce did not meaningfully engage "with each of the alternative bases." Def.-Ints.' Opp'n Cmts. at 2. They urge the court to remand again for Commerce to do so. *See id.* at 4. The Canadian Parties further contend that 19 U.S.C. § 1675(a)(1) and URAA § 103(b) provide authority for

---

19 U.S.C. § 1516a(c)(1). As noted, the court declined to enjoin liquidation of the subject companies' entries pending the outcome of this litigation. *See Lumber I*, 393 F. Supp. 3d at 1278—79.

[13] In *Lumber II*, the court denied the Government's motion to dismiss, finding jurisdiction pursuant to section 1581(i)(4) and not under section 1581(c). *See* 413 F. Supp. 3d at 1343–47. CVD expedited reviews do not fall within the statutory provisions identified as a basis for the court's review pursuant to 19 U.S.C. § 1516a and, consequently, the court's section 1581(c) jurisdiction is not available. *See id.* at 1346.

Commerce to conduct CVD expedited reviews and request the court to reconsider its position concerning the language of section 103(b). *See id.* at 6–19. The Canadian Parties incorporate by reference prior arguments addressing additional statutory bases. *See id.* at 4 n.13 (citing Jt. Canada Br. at 22–29).

The Government contends that Commerce adequately considered the alternative legal bases for CVD expedited reviews and, thus, "further remand is unnecessary." Def.'s Reply Cmts. at 6; *see also id.* at 6–9.

The Coalition contends that the Canadian Parties misconstrue the standard of review. *See* Pl.'s Reply Cmts. at 4. According to the Coalition, the court's review of the statutory bases considered by Commerce on remand "is predicated on the [c]ourt's analysis of the statutory text, . . . not whether Commerce has provided sufficient explanation of its conclusion under the substantial evidence standard of review." *Id.* at 5. The Coalition further contends that "the plain language of 19 U.S.C. §§ 1671d(c), 1675(b), and 1677f-1(e) is unambiguous" and does not authorize Commerce's promulgation of 19 C.F.R. § 351.214(k). *Id.* at 5. The Coalition also contends that the court has previously found that 19 U.S.C. § 1675(a)(1) does not contemplate CVD expedited reviews, *see id.* at 6 (citing *Lumber II*, 413 F. Supp. 3d at 1343), and the court should decline the Canadian Parties' invitation to reconsider its findings concerning URAA § 103(b), *see id.* at 7–8.

**B. Commerce's Remand Results Will Be Sustained**

The court remanded the *Final Results of Expedited Review* for Commerce to consider whether any statutory provision other than URAA § 103(a) "authoriz[ed] the

Case 1:19-cv-00122-MAB Document 193 Filed 12/08/21 Page 18 of 48



agency's promulgation of 19 C.F.R. § 351.214(k)." *Lumber III*, 483 F. Supp. 3d at 1272–73. Commerce considered the proffered bases; as to each, Commerce either presumed that it was incapable of conferring authority in light of the court's prior statements, *see* Remand Results at 10, 22–24, or concluded that the provision did not authorize the regulation, *see id.* at 11–12, 19–21.

The APA provides the scope of judicial review governing this action. The court therefore reviews Commerce's determination that it lacks authority for its regulation pursuant to 5 U.S.C. § 706(2)(A). Thus, the court considers whether Commerce's explanation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *cf., e.g.*, *Serv. Women's Action Network v. Sec'y of Veterans Affs.*, 815 F.3d 1369, 1374 (Fed. Cir. 2016) (applying the same standard to a denial of a petition for rulemaking); *Preminger v. Sec'y of Veterans Affs.*, 632 F.3d 1345, 1353 (Fed. Cir. 2011) (same).

While the Canadian Parties take issue with the depth of Commerce's analysis of certain statutory provisions, *see, e.g.*, Def.-Ints.' Opp'n Cmts. at 2–4, Commerce considered these alternatives and explained its reasons for finding that the provisions do not support the regulation. *See* Remand Results at 9–12, 19–25. Thus, a remand for further consideration is unnecessary. Moreover, the Canadian Parties do not develop the argument that Commerce's determination is arbitrary, capricious, or an abuse of discretion. Instead, they argue that Commerce's statutory interpretations are largely incorrect. *See* Def.-Ints.' Opp'n Cmts. at 4 n.13, 6–12. To resolve these contentions, the court is guided by the two-part framework set forth in *Chevron U.S.A.*

*Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45 (1984).[14] *Cf. Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States*, 883 F.2d 93, 96–97 (D.C. Cir. 1989) (explaining that the court will reverse "an agency's decision not to initiate a rulemaking only for compelling cause, such as plain error of law or a fundamental change in the factual premises previously considered by the agency," and restating that, pursuant to *Chevron*, when congressional intent is unclear, the court must accept an agency's reasonable interpretation of the substantive terms of a statute the agency is charged with administering); *Serv. Women's Action Network*, 815 F.3d at 1375.

The Canadian Parties concede that there is no explicit statutory authority for CVD expedited reviews but argue instead that certain statutory provisions are nevertheless broad enough to encompass CVD expedited reviews pursuant to a *Chevron* prong two analysis. *See* Def.-Ints.' Opp'n Cmts. at 4 n.13 (citing Jt. Canada Br. at 22–29); *id.* at 6–12. The court agrees with the Government, however, that Commerce analyzed each provision and explained its position as to why the provision did not confer authority for Commerce's promulgation of 19 C.F.R. § 351.214(k).

With respect to section 1675(a)(1), the statute provides for an administrative review of an order "[a]t least once during each 12-month period beginning on the

---

[14] Pursuant to *Chevron*, the court must first determine "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. If Congress's intent is clear, "that is the end of the matter," and the court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. However, "if the statute is silent or ambiguous," the court must determine whether the agency's action "is based on a permissible construction of the statute." *Id.* at 843.

anniversary of the date of publication of a countervailing duty order under this subtitle." 19 U.S.C. § 1675(a)(1)(A). The Canadian Parties' argument turns, in part, on the notion that there is nothing in the statute that "precludes reviews prior to the anniversary of the publication of an order, limits reviews to only one per each twelve-month period, or limits what can be reviewed with respect to an order." Def.-Ints.' Opp'n Cmts. at 8. The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has, however, "squarely rejected" the argument that an agency may rely on statutory silence to conduct a proceeding in years other than those provided by statute. *Lumber III*, 483 F. Supp. 3d at 1264–65 (discussing *FAG Italia S.p.A. v. United States*, 291 F.3d 806 (Fed. Cir. 2002), a case in which the appellate court rejected Commerce's reliance on statutory silence to conduct a duty absorption inquiry in years other than those identified in 19 U.S.C. § 1675(a)(4)). Section 1675(a)(1) plainly governs reviews beginning no sooner than one year following the date of publication of an order; thus, it cannot confer authority for a CVD expedited review proceeding initiated just two months after publication of an order. *See* 19 C.F.R. § 351.214(k)(1)–(2) (discussing deadlines governing requests for and initiation of CVD expedited reviews); Remand Results at 20–21 (noting the differing timelines for administrative reviews and CVD expedited reviews).

Section 1675(b)(1) governs changed circumstances reviews. Commerce may grant a request for such a review of a countervailing duty investigation determination when there are "changed circumstances sufficient to warrant a review." 19 U.S.C. § 1675(b)(1). Absent good cause, however, Commerce may not conduct a changed circumstances review of a determination sooner than "24 months after the date of

publication of notice of that determination." *Id.* § 1675(b)(4). In prior briefing, the Governments of Canada and Québec argued, *inter alia*, that a non-individually examined company "can show 'good cause' that circumstances have changed" to the extent the company's assigned rate "bears little resemblance to the company's actual subsidy rate." Jt. Canada Br. at 26. Setting aside the fact that the period of review for a CVD expedited review matches the period of investigation used in the investigation, 19 C.F.R. § 351.214(k)(3)(i), and Commerce therefore uses some of the same data, *see Preamble*, 62 Fed. Reg. at 27,321, the regulation does not contain a "good cause" requirement necessary to merit excusal from the statutory timeline, 19 C.F.R. § 351.214(k)(1) (stating the requirements for a request for a CVD expedited review). Thus, Commerce reasonably interpreted section 1675(b)(1) as not providing authority for the regulation.

Commerce also rejected 19 U.S.C. § 1671d as a basis for its regulation. *See* Remand Results at 19–21. Section 1671d governs final investigation determinations. The Governments of Canada and Québec pointed to statutory language requiring Commerce to "determine an estimated individual countervailable subsidy rate for each exporter and producer individually investigated," 19 U.S.C. § 1671d(c)(1)(B)(i)(I), to argue that "nothing . . . in that language requir[es] such individual investigation to occur during the original investigation," Jt. Canada Br. at 26. The Governments of Canada and Québec take the quoted statutory language out of context. Section 1671d(c) governs the effect of final affirmative determinations issued pursuant to section 1671d(a). *See* 19 U.S.C. § 1671d(c)(1). Subsection (a) provides, in general, for a final

determination as to "whether or not a countervailable subsidy is being provided with respect to the subject merchandise" within 75 days of the preliminary determination. *Id.* § 1671d(a)(1). Commerce's preliminary determination, in turn, is generally due within 65 days following the date on which Commerce initiated an investigation. *Id.* § 1671b(b)(1). Section 1671d(c)(1)(B)(i)(I) therefore states the requirements for Commerce's subsidy calculations as part of its final investigation determination—not in some later-conducted and entirely separate segment of the proceeding. Accordingly, Commerce correctly interpreted 19 U.S.C. § 1671d as not providing authority for 19 C.F.R. § 351.214(k).[15]

The Canadian Parties also argue that Commerce correctly concluded that URAA § 103(b) authorized 19 C.F.R. § 351.214(k) and request the court to reconsider its position with respect to that provision. *See* Def.-Ints.' Opp'n at 12–19.[16]

---

[15] The Canadian Parties do not present (or incorporate by reference) any arguments addressing Commerce's findings with respect to 19 U.S.C. § 1677f-1 functioning as sole authority for CVD expedited reviews or Commerce's inherent authority to reconsider prior determinations. *See* Remand Results at 11, 19–21.

[16] The Canadian Parties fail to identify any relevant rule or standard governing the court's reconsideration with respect to this issue. *See* Def.-Ints.' Opp'n at 12–19. Plaintiff argues that the Canadian Parties' request for reconsideration "is equivalent to a motion for reconsideration under USCIT Rule 59." Pl.'s Reply Cmts. at 8. Rule 59(e), which permits the court to consider "[a] motion to alter or amend a judgment" which is served "no later than 30 days after the entry of the judgment," USCIT Rule 59(e), is inapplicable to a non-final order, *see Cabot Corp. v. United States*, 788 F.2d 1539, 1542 (Fed. Cir. 1986) (noting the general rule that "[a]n order remanding a matter to an administrative agency for further findings and proceedings is not final," and, therefore, not appealable) (citation omitted). Nevertheless, pursuant to USCIT Rule 54(b), "any order or other decision . . . that adjudicates fewer than all the claims . . . does not end the action as to any of the claims . . . and may be revised at any time before the entry of a judgment adjudicating all the claims . . . ." Accordingly, the Canadian Parties' request is properly considered under USCIT Rule 54(b). *See ABB Inc. v. United States*, 42 CIT

As noted, section 103(b) authorized the issuance of "[a]ny interim regulation necessary or appropriate to carry out any action proposed in the [SAA] . . . to implement an agreement described in section 3511(d)(7), (12), or (13) of [Title 19]," 19 U.S.C. § 3513(b), which includes the SCM Agreement, *see id.* § 3511(d)(12). The court previously considered the language of section 103(b) in response to the argument that this provision's authorization of an interim regulation indicated that Commerce had equal authority to issue the regulation as a final regulation pursuant to section 103(a). *See Lumber III*, 483 F. Supp. 3d at 1267. The court rejected the premise of that argument "because the SAA does not propose any action to implement CVD expedited reviews" that would meet the requirements of section 103(b). *Id.*

Regardless of the degree of discretion accorded by Congress's use of the term "appropriate" to modify "interim regulation," *see* Def.-Ints.' Opp'n Cmts. at 14–15,[17] the

---

___, ___, 375 F. Supp. 3d 1348, 1352 (2019) (considering a motion for reconsideration pursuant to USCIT Rule 54(b) instead of USCIT 59(e) when the motion pertained to an opinion remanding the matter to Commerce that was nonfinal and, thus, not appealable).

[17] The Canadian Parties argue that the court should give "greater deference" to Commerce's interpretation of section 103(b) than it did for section 103(a) because section 103(b) accords Commerce "substantial" discretion and applies solely to Commerce and the U.S. International Trade Commission. Def.-Ints.' Opp'n Cmts. at 14 & n.31 (citing *Lumber III*, 483 F. Supp. 3d at 1262 n.16). The Canadian Parties fail to identify what level of deference the court should accord Commerce's interpretation of section 103(b) in the event the court finds the pertinent language ambiguous. While the Canadian Parties cite to *City of Arlington v. FCC*, 569 U.S. 290, 297–97 (2013), Def.-Ints.' Opp'n Cmts. at 14 n.32, in that case, the U.S. Supreme Court held that *Chevron* deference should be accorded to an agency's "construction of a[n ambiguous] jurisdictional provision of *a statute it administers*," *City of Arlington*, 569 U.S. at 301 (citation omitted) (emphasis added). Commerce is not the administering authority for section 103(b). *See Lumber III*, 483 F. Supp. 3d at 1262 n.16 (discussing relevant provisions). In any event, the pertinent language in section 103(b) unambiguously

court is not persuaded by Commerce's Remand Results or Parties' briefing to reconsider its finding that the "SAA does not propose any [relevant] action" for purposes of the phrase "action proposed in the [SAA]." *See Lumber III*, 483 F. Supp. 3d at 1267; Remand Results at 22; Def.-Ints' Opp'n Cmts. at 14; Def.'s Reply Cmts. at 8.[18]

The Canadian Parties argue that "the SAA anticipated that there would be an expedited review procedure" and, thus, that the requirement for a proposed action is met. Def.-Ints' Opp'n Cmts. at 15. An attempt "to re-litigate . . . arguments . . . previously raised" is not, however, a basis for reconsideration. *Totes-Isotoner Corp. v. United States*, 32 CIT 1172, 1173, 580 F. Supp. 2d 1371, 1374 (2008) (citation omitted); *see also Lumber III*, 483 F. Supp. 3d at 1267 (rejecting the argument that "the reference to expedited reviews pursuant to Article 19.3 in the SAA constitutes a 'proposed action'" for purposes of section 103(b)).

The court also is not persuaded to reconsider its finding with respect to section 103(b) as a result of Congress's statement of approval of the SCM Agreement in URAA §101(a). *See* Def.-Ints.' Opp'n Cmts. at 15–16. The Canadian Parties appear to suggest that the court should interpret the language of section 103(b) more broadly given Congress's approval. *See id.* However, the statement of congressional approval was a statutory requirement pursuant to the legislative mechanism utilized for

---

precludes the Canadian Parties' interpretation; thus, the court need not resolve this issue.

[18] Parties also do not address what implications, if any, might arise from the fact that Commerce did not promulgate 19 C.F.R. § 351.214(k) as an interim regulation or within the time prescribed for interim regulations, but, instead, issued section 351.214(k) as part of its final regulations well after the time period provided in section 103(b). *See supra* pp. 9–10.

congressional implementation of the Uruguay Round Agreements. *See* 19 U.S.C. § 2191(b)(1)(A); 19 U.S.C. § 3511(a) (cross-referencing 19 U.S.C. § 2191). Further, the statement of congressional approval was required *in addition to* any new or amended statutory "provisions[] necessary or appropriate to implement [the Uruguay Round Agreements]." 19 U.S.C. § 2191(b)(1)(C). The SAA discusses what statutory "changes" Congress considered necessary "to implement the requirements of Article 19.3 of the [SCM] Agreement," SAA at 941, *reprinted in* 1994 U.S.C.C.A.N. at 4250, and a CVD expedited review process as conceived by Commerce was not among them, *see id.* at 941–42, *reprinted in* 1994 U.S.C.C.A.N. at 4251. Thus, the Canadian Parties' reliance on URAA § 101(a) to read into the SAA, and, thus, into URAA § 103(b), authority for an action that is unsupported by the text of the SAA lacks merit.

The court's finding that Congress intended the phrase "action proposed in the [SAA]" in section 103(b) to encompass the statutory changes discussed in connection with the implementing bill harmonizes section 103(b) with section 103(a), the scope of which is limited to enacted provisions. *See Lumber III*, 483 F. Supp. 3d at 1271. Finding authority in section 103(b) for a regulation that is plainly not authorized by section 103(a) would instead introduce a conflict between the provisions, which should be avoided. *See, e.g.*, *Maracich v. Spears*, 570 U.S. 48, 68 (2013) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory. . . . [T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously.") (quoting Antonin Scalia & Bryan A. Garner, Reading

Law: The Interpretation of Legal Texts 180 (2012)) (alterations original).[19] Accordingly, the court declines to reconsider its finding with respect to section 103(b).

In sum, the court will sustain Commerce's determination that the potential sources of authority considered on remand do not supply a legal basis for the adoption of 19 C.F.R. § 351.214(k) or Commerce's conduct of CVD expedited reviews.

## II. Commerce's Treatment of Entries Made by the Subject Companies

### A. Parties' Contentions

Plaintiff contends that the phrase "set aside" in 5 U.S.C. § 706 means "vacate" and, thus, the court should vacate 19 C.F.R. § 351.214(k) and the *Final Results of Expedited Review*. Pl.'s Opp'n Cmts. at 4 (citing *V.I. Tel. Corp. v. FCC*, 444 F.3d 666, 671 (D.C. Cir. 2006)). Plaintiff further contends that the court should restore the "cash deposit collection and liquidation status of the companies . . . to a state reflective of what would already be in place had Commerce not acted *ultra vires*." *Id.* at 7. Plaintiff also contends that section 1516a(c)(1) does not apply because a CVD expedited review is not a determination enumerated under that subsection. *See id.* at 7–8.

Plaintiff requests the court to order Commerce or Customs, as appropriate, to: (1) suspend the liquidation of unliquidated entries of subject merchandise produced or exported by the companies subject to the CVD expedited review; (2) include subject

[19] Having found no ambiguity in the scope of interim rulemaking authority conferred by section 103(b), the Canadian Parties' arguments that the *Charming Betsy* doctrine favors their interpretation of ambiguous language within that provision are immaterial. *See* Def.-Ints.' Opp'n Cmts. at 16. In any event, as with section 103(a), section 103(b) "does not . . . directly implement the United States' international obligations" but, instead, authorizes interim regulations implementing actions proposed in the SAA. *Lumber III*, 483 F. Supp. 3d at 1267. "Thus, *Charming Betsy* is inapposite." *Id.*

merchandise produced by the excluded companies in the *CVD Order*; (3) "[e]ffective as of the date of the [c]ourt's judgment, collect cash deposits on imports of subject merchandise produced and/or exported by the expedited review companies at that rate that would have been applicable to each of these companies had the [*Final Results of Expedited Review*] not been issued," which rate Plaintiff identifies as the rate "determined by the most recently completed and requested segment of the *CVD Order* for each of the expedited review companies"; and (4) "assess countervailing duties on the subject merchandise produced and/or exported by the expedited review companies" pursuant to "19 C.F.R. § 351.212 but without regard to the [*Final Results of Expedited Review*]." *Id.* at 11.[20]

The Canadian Parties contend that voiding the *Final Results of Expedited Review* would result in the assessment of countervailing duties in excess of the net countervailable subsidy conferred on the companies in violation of 19 U.S.C. §§ 1671(a), 1671e(a)(1). *See* Def.-Ints' Opp'n Cmts. at 19–22. The Canadian Parties further contend that principles of equity require that the subject companies retain the status and rates determined in the CVD expedited review even if the court vacates the regulation. *See id.* at 23 & n.57 (citing 28 U.S.C. § 1585);[21] *see also id.* at 24 (stating that equity requires this decision to have "no [e]ffect" on the subject companies, such

[20] Relevant here, section 351.212 governs the assessment of countervailing duties pursuant to an administrative review or new shipper review. *See* 19 C.F.R. § 351.212(b)(2).

[21] Pursuant to 28 U.S.C. § 1585, "[t]he Court of International Trade shall possess all the powers in law and equity of, or as conferred by statute upon, a district court of the United States."

that the excluded companies remain excluded from the *CVD Order* and the court should resolve the remaining challenges of the non-excluded companies); *id.* at 31 (arguing that rescission may leave the subject companies in a worse position than if they had not requested a CVD expedited review because the all-others rate from the investigation (14.9 percent) is higher than the all-others rate from the first administrative review (7.26 percent and 7.42 percent for 2017 and 2018, respectively).

The Canadian Parties also contend that Commerce's conduct of the review amounted to harmless error because Plaintiff is unharmed by the *de minimis* margins received by the excluded companies or to which the non-excluded companies would be entitled pending their challenges. *See id.* at 32. Lastly, the Canadian Parties contend that, if the court vacates the *Final Results of Expedited Review*, the court "should order Commerce to initiate new reviews under the appropriate authority (e.g., a changed circumstances review) and adopt the substantive results from the expedited review, after allowing the other appeal issues to be heard." *Id.* at 32–33.

The Government contends that Commerce is not prohibited from implementing the court's judgment consistent with 19 U.S.C. § 1516a(c)(1) even if such action is not required. Def.'s Reply Cmts. at 12. The Government further contends that because no statutory provision addresses how Commerce should treat the subject entries, the court should accord *Chevron* deference to Commerce's decision to rely on section 1516a(c)(1). *See id.* at 12–13. Following this approach, the excluded companies "will be brought back into the order prospectively at the 14.19 percent all-others rate calculated in the investigation" and the non-excluded companies "will receive

prospectively either the all-others rate from the investigation, or the rate received in the most recently completed administrative review in which the company participated." *Id.* at 13–14.[22] The Government also argues that formal revocation of 19 C.F.R. § 351.214(k) is unnecessary because the action is nonfinal pending all appeals and, "if the Remand Results are sustained after all appeals, Commerce would cease conducting expedited reviews." *Id.* at 16.

The Government further relies on the court's decision in *Lumber I* not to enter a preliminary injunction to infer that the court contemplated solely prospective relief. *See id.* at 14. According to the Government, retroactive application of the all-others rate determined in the investigation "would raise concerns about the procedure afforded" because the "excluded companies had no reason to request administrative reviews of their entries" and the non-excluded companies that "were satisfied with" the rates obtained in the *Final Results of Expedited Review* "also had no reason to request administrative reviews." *Id.* at 14–15. The Government also contends that the Canadian Parties' reliance on 19 U.S.C. §§ 1671(a) and 1671e(a)(1) is misplaced because those provisions govern investigations and, thus, Commerce would not violate

---

[22] The non-excluded companies were included in the second administrative review of the *CVD Order*. *See* Def.-Ints.' Reply Cmts. at 3 n.8. All subject companies (excluded and non-excluded) were included in the third administrative review of the *CVD Order*. *See id.*; Def.-Ints.' Opp'n Cmts. at 30 n.77.

those provisions by rescinding the results of the review and imposing countervailing duties. *See id.* at 10.[23]

In their reply comments, the Coalition contends that Commerce's statutory authority to assign an all-others rate to companies that are not individually investigated undermines the Canadian Parties' argument that Commerce may not impose countervailing duties in excess of those determined in the *Final Results of Expedited Review*. *See* Pl.'s Reply Cmts. at 9–10. The Coalition also contends that the Canadian Parties' reliance interests are irrelevant in light of the rule of retroactivity applicable to judicial decisions. *See id.* at 10–14 (citing, *inter alia*, *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749 (1995), and *Harper v. VA Dep't of Taxation*, 509 U.S. 86, 97 (1993)). As to the asserted reliance interests, the Coalition also contends that it "raised the issue of statutory authority multiple times during the Commerce proceeding, including before Commerce initiated the review," and, thus, the subject companies were on notice of the issue and "participated . . . at their own risks." *Id.* at 13 n.4 (citing Obj. to the Dep't's Conduct of Expedited Reviews (Jan. 23, 2018), PR 12, PRJA Tab 1).

The Coalition further contends that Commerce's promulgation of the regulation and completion of the CVD expedited review are not amenable to a harmless error analysis because they are not procedural defects but, rather, "substantive unlawful

[23] The Government asserts that Plaintiff waived its request for "reliquidation of already liquidated entries" because it never requested that relief in its complaint. Def.'s Reply Cmts. at 15. The Government does not cite to the location of any such request, and the court does not understand Plaintiff to seek reliquidation. While Plaintiff argues that nullification of the *Final Results of Expedited Review* should reach previously entered but unliquidated entries of subject merchandise, Pl.'s Opp'n Cmts. at 9, 11, Plaintiff has not requested (or presented arguments supporting) reliquidation of liquidated entries.

agency action." *Id.* at 15. Lastly, the Coalition contends that the court may not order Commerce to complete a new review adopting the results of the CVD expedited review given that Commerce lacked authority to conduct the review. *See id.*

The Canadian Parties filed reply comments in which they support Commerce's reliance on 19 U.S.C. § 1516a(c)(1) and Commerce's position that any relief should be prospective. *See* Def.-Ints.' Reply Cmts. at 4–5. The Canadian Parties contend that prospective application of the court's judgment is supported by the "presumption of correctness" that applies to Commerce findings and the expectations of the parties that make business decisions in reliance on those findings. *Id.* at 5–6. The Canadian Parties also contend that, to the extent there is a *statutory* requirement for retroactivity, the court can use its "equitable powers to provide otherwise." *Id.* at 8–9 (citations omitted); *see also id.* at 11–12. Lastly, the Canadian Parties request the court to "stay the enforcement of its decision" pending all appeals if it does not allow the subject companies to retain the benefit of the *Final Results of Expedited Review*. *Id.* at 13.

**B. Analysis**

There are three issues before the court: (1) whether the court should vacate 19 C.F.R. § 351.214(k); (2) whether the court should vacate the *Final Results of Expedited Review*; and (3) in the event the court vacates the *Final Results of Expedited Review*, whether the vacatur should operate prospectively or retroactively. The court addresses each issue, in turn.

### 1. Commerce's Regulation, 19 C.F.R. § 351.214(k), Will Be Vacated

With respect to the regulation, the issue is relatively straightforward. The court is guided by the standard of review set forth in the APA, which states that the court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).[24] "'Set aside' usually means 'vacate.'" *V.I. Tel. Corp.*, 444 F.3d at 671–72 (citing Black's Law Dictionary 1404 (8th ed. 2004)).[25] Thus, "'[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not [just] that their application to the individual petitioners is proscribed.'" *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C. Cir. 1989));[26] *see also Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 & n.5 (D.C. Cir.

---

[24] "'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

[25] The U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") interpreted the phrase "set aside" as it appeared in the FCC's regulations pursuant to which the FCC vacated an order and "restored the *status quo ante*," but noted that "[t]he result would be the same as if a court" had set aside the order "pursuant to . . . 5 U.S.C. § 706(2)." *V.I. Tel. Corp.*, 444 F.3d at 671–72.

[26] The opinions of the D.C. Circuit are not binding on this court. However, to the extent the Federal Circuit has not addressed any aspect of the issue of remedy pending before the court, the court finds judicial precedent from the D.C. Circuit instructive in light of the court's expertise in the area of administrative law. *See, e.g.*, *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 535 n.14 (1978) (observing that "the vast majority of challenges to administrative agency action are brought to the [D.C. Circuit]"); *see generally* Richard J. Pierce, Jr., *The Special Contributions of the D.C. Circuit to Administrative Law*, 90 GEO. L.J. 779 (2002). The Federal Circuit has done likewise. *See Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1367–68, 1379–81 (Fed. Cir. 2001) (following *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993)).

2014) (characterizing vacatur as the "normal remedy" when an agency action is unlawful and finding it "clearly appropriate . . . under the APA"); *Chlorine Chemistry Council v. EPA*, 206 F.3d 1286, 1291 (D.C. Cir. 2000) (vacating a rule the court found to be arbitrary and capricious and in excess of statutory authority under the APA); *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 51–52 (D.D.C. 2020) (rejecting the argument that vacatur was "not appropriate in [that] case as a matter of the equities" and stating that "vacatur is the norm whe[n], as here, the deficiencies that the court has identified are substantively fatal") (citation omitted). Indeed, the Federal Circuit has vacated an agency action in part—a precedential general counsel opinion issued by the U.S. Department of Veterans Affairs ("VA")—when an opinion expressed therein incorrectly interpreted a statute and therefore exceeded the VA's authority pursuant to 5 U.S.C. § 706(2)(A) and (C). *See Splane v. West*, 216 F.3d 1058, 1062, 1070 (Fed. Cir. 2000).[27]

Accordingly, the court concludes that vacatur of the regulation is appropriate.[28]

---

[27] In *Dorbest Ltd. v. United States*, the Federal Circuit "invalidate[d]" 19 C.F.R. § 351.408(c)(3) based on the appellate court's finding that it was inconsistent with 19 U.S.C. § 1677b(c)(4)(A), the statute pursuant to which Commerce promulgated the regulation. 604 F.3d 1363, 1372 (Fed. Cir. 2010). Section 351.408(c)(3) remains in the Code of Federal Regulations. *See* 19 C.F.R. § 351.408(c)(3) (2020). The facial attack on section 351.408(c)(3) at issue in *Dorbest* arose under 19 U.S.C. § 1516a as part of a challenge to a Commerce antidumping duty investigation determination. *See* 604 F.3d at 1366. The Federal Circuit thus had no occasion to address the requirements of the APA and did not explain its choice of terminology or the difference—if any—between vacating a regulation and invalidating it.

[28] The Government asserts that Plaintiff has waived any request for the court to order formal revocation of the regulation because Plaintiff failed to request such relief in its complaint. Def.'s Reply Cmts. at 15; *see also* Pl.'s Opp'n Cmts. at 8–9, 10–11 (requesting the court to order Commerce to withdraw the regulation). Because "notice

Case 1:19-cv-00122-MAB Document 193 Filed 08/18/21 Page 34 of 48



### 2. The *Final Results of Expedited Review* Will Be Vacated

Turning to the second issue, while vacatur of the regulation "restore[s] the prior *regulatory* status quo," *D.A.M. v. Barr*, 486 F. Supp. 3d 404, 415–16 (D.D.C. 2020) (citing *Env't Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004); *Nat'l Parks Cons. Ass'n v. Jewell*, 62 F. Supp. 3d 7, 21 (D.D.C. 2014)), vacatur does not necessarily "erase[] from legal existence all *past* adjudications under the vacated rule," *id.* at 415 (citing *Heartland By-Prods., Inc. v. United States*, 568 F.3d 1360, 1366–67 (Fed. Cir. 2009)).[29] It is, however, "uncontroversial . . . that, when a court with jurisdiction finds that the plaintiffs before it were harmed by an agency decision issued under an illegal rule, the court should vacate that wrongful decision as a remedy." *Id.* at 416 (citing *W.C. v. Bowen*, 807 F.2d 1502 (9th Cir. 1987), a case in which the U.S. Court of Appeals for the Ninth Circuit vacated adverse decisions issued to a class of Social Security claimants pursuant to an invalid review program).[30]

---

and comment procedure is not required whe[n] a court vacates a rule after making a finding on the merits," *Nat'l Parks Cons. Ass'n v. Salazar*, 660 F. Supp. 2d 3, 5 (D.D.C. 2009) (citing *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 872 (D.C. Cir. 2001)), the court declines to order Commerce to formally repeal 19 C.F.R. § 351.214(k).

[29] In *Heartland*, a case brought pursuant to the court's jurisdiction under 1581(h) for pre-importation review of customs rulings in certain limited circumstances, the Federal Circuit held that a prior related decision "was retroactive with respect to entries made before the date the mandate issued in [that case]," but that did "not mean that final judicial or administrative decisions are to be reopened," for example, liquidations that have since become final. 568 F.3d at 1366–67.

[30] *D.A.M.* addressed the propriety of a temporary restraining order barring removal of asylum seekers from the United States pursuant to an order of expedited removal issued under an invalid agency rule. *See* 486 F. Supp. 3d at 407. The *D.A.M.* court explained that vacatur of the rule meant that the government could not "issue any more orders of removal under that rule, but it [did] not mean that petitioners' removal orders (along with thousands of others) were automatically extinguished by operation of [that]

Accordingly, courts have invalidated specified agency actions taken pursuant to an invalid rule. *See, e.g.*, *Kiakombua*, 498 F. Supp. 3d at 57–59 (requiring new credible fear determinations for plaintiffs negatively affected by prior determinations conducted in accordance with an invalid agency manual); *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 35–37 (D.D.C. 2020) (setting aside removal orders for the five plaintiffs before the court while declining to set aside orders for non-parties); *Waterkeeper All., Inc. v. Wheeler*, No. CV 18-2230 (JDB), 2020 WL 1873564, at *6–*7 (D.D.C. Apr. 15, 2020) (vacating agency approval of a state regulatory program following the D.C. Circuit's vacatur of an agency policy necessary to the program's approval); *W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1085–89 (D. Idaho 2020) (vacating provisions of a land management policy and setting aside certain affected lease sales).

While examples in the trade context are few, those that exist are consistent with the foregoing cases. In *Dorbest*, for example, the Federal Circuit required Commerce to recalculate normal value without regard to the labor valuation regulation the court held to be invalid. *See* 604 F.3d at 1272–73. In *FAG Italia S.p.A. v. United States*, the CIT remanded an administrative review determination to Commerce "to annul all findings and conclusions made pursuant to [a] duty absorption inquiry" the agency lacked statutory authority to perform. 24 CIT 587, 596 (2000), *aff'd in part*, 291 F.3d 806 (Fed. Cir. 2002).

---

judgment." *Id.* at 416. The court ultimately declined to invalidate the removal orders based on the conclusion that the court lacked subject matter jurisdiction to do so. *See id.* at 416–19.

Case: 22-1021 Document: 35 Page: 140 Filed: 12/20/2021



Accordingly, the court will vacate the *Final Results of Expedited Review*. The court must, however, address the implications of vacatur of the underlying determination.

### 3. Rescission Shall Operate Prospectively

In looking for judicial guidance with respect to how the court should direct implementation of its decision to vacate the *Final Results of Expedited Review*, the court has found *National Fuel Gas Supply Corp. v. FERC*, 59 F.3d 1281 (D.C. Cir. 1995), to be useful. Therein, the D.C. Circuit confronted the question whether the Federal Energy Regulatory Commission ("FERC") erred in retroactively applying a prior appellate court decision that vacated an earlier FERC order. *Id.* at 1282–83. Upon review of judicial precedent concerning retroactive application of federal court decisions, the D.C. Circuit held that FERC's decision to apply retroactively the appellate court's vacatur of its order was lawful and that none of the recognized exceptions to retroactivity were met. *See id.* at 1286–90.

In so holding, the D.C. Circuit rejected the argument that an earlier three-part test[31] providing for prospective application of a federal court decision "survived as a remedial doctrine under which [the court] could grant relief to a party that had acted in

[31] The three-part test was announced in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–08 (1971), and considered: "(1) whether the decision announced 'a new principle of law'; (2) whether non-retroactive application would undermine the purpose of that decision; and (3) whether retroactive application would work a significant inequity." *Nat'l Fuel*, 59 F.3d at 1284 (citation omitted); *see also Chevron Oil*, 404 U.S. at 106–07.

reliance upon the law as it stood prior to [its] decision supposedly announcing a new rule of law." *Id.* at 1287–88. The appellate court explained:

> In *Hyde*, the Supreme Court clearly held that retroactive application of a judicial decision cannot, *except in certain limited and specifically defined circumstances*, be blunted at the remedial stage. The plaintiff in *Hyde* acknowledged that her case was governed by *Harper* and that a prior decision of the Supreme Court had "retroactively invalidated the tolling provision that [made] her suit timely." She nevertheless asked the Court to allow her suit to go forward, "not[ing] the possibility of recharacterizing *Chevron Oil* as a case in which the Court simply took reliance interests into account in tailoring an appropriate remedy for a violation of federal law." The Court per Justice Breyer, squarely rejected that argument . . . .

*Id.* at 1288 (quoting *Hyde*, 514 U.S. at 749, 752) (first and second alterations in original) (emphasis added) (citations omitted).[32] The appellate court concluded that *Hyde* generally prevents a court from departing, "even at the remedial stage, from the rule of *Harper* requiring that a judicial decision be applied retroactively." *Id.* Thus, when "*Harper* is applicable," prospective "application of a prior decision can be awarded only in four specific circumstances," *id.*, such as when

> [a] court may find (1) an alternative way of curing the constitutional violation, (2) a previously existing, independent legal basis (having nothing to do with retroactivity) for denying relief, or (3) as in the law of qualified immunity, a well-established legal rule that trumps the new rule of law, which general rule reflects both reliance interests and other significant policy justifications, or (4) a principle of law . . . that limits the principle of retroactivity itself.

[32] *Harper* holds that the "Court's application of a rule of federal law to the parties before the Court requires every court to give retroactive effect to that decision." 509 U.S. at 90; *see also id.* at 97 ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."). In *Hyde*, the Court recognized that "*Harper* overruled *Chevron Oil* insofar as the case (selectively) permitted the prospective-only application of a new rule of law." 514 U.S. at 752.

*Id.* (quoting *Hyde*, 514 U.S. at 759) (second alteration in original).

The D.C. Circuit then turned to the question whether *Harper* and *Hyde* apply in the context of agency action. *See id.* The court explained that although the rule of retroactivity has constitutional dimensions, it is also based on the principle "that the 'selective application of new rules violates the principle of treating similarly situated parties the same.'" *Id.* at 1289 (quoting *Harper*, 509 U.S. at 95). Thus, the appellate court could "see no reason why that pre-constitutional rationale would apply with any less force when it falls to an agency rather than a court to apply a judicial decision." *Id.* (citation omitted). The appellate court distinguished "between an administrative agency's retroactive application of a judicial decision," at issue in *National Fuel*, "and [an] agency's retroactive application of its own adjudicative decision," as to which an agency may have greater flexibility. *Id.* With respect to the former circumstance, the D.C. Circuit concluded that, absent compelling reasons, "the decision of a federal court must be given retroactive effect regardless whether it is being applied by a court or an agency." *Id.*[33]

[33] The court elaborated that,

> [b]ecause the decision of an Article III court . . . announces the law "as though [it] were finding it[,] discerning what the law is, rather than decreeing what it is . . . changed to, or what it will tomorrow be," all parties charged with applying that decision, whether agency or court, state or federal, must treat it as if it had always been the law. The agency must give retroactive effect to the ruling of a federal court because of the nature of that court.

*Nat'l Fuel*, 59 F.3d at 1289 (quoting *James B. Beam Distilling Co. v. Ga.*, 501 U.S. 529, 549 (1991) (Scalia, J., concurring in the judgment)).

Accordingly, the court considers, consistent with *Hyde*, *Harper*, and *National Fuel*, whether there are compelling reasons to depart from the presumption that Commerce must apply retroactively this court's decision to vacate the *Final Results of Expedited Review* by restoring the cash deposit and liquidation status of the subject companies and, in particular, their prior entries, to the position they would have been in had the proceeding never occurred. To that end, Congress has enacted a detailed statutory scheme governing AD/CVD proceedings which provides for both retrospective and prospective effect with respect to both Commerce and court decisions under specified circumstances. While this case is atypical given the lack of statutory authority for CVD expedited reviews, the court nevertheless finds that application of that congressionally approved scheme particular to trade cases, providing for prospective relief, is merited.

When Commerce finds that "countervailable subsidization is occurring," 19 C.F.R. § 351.210(a) (defining "final determination[s]"), Commerce must determine an estimated individual countervailable subsidy rate for each exporter and producer individually investigated as well as an "estimated all-others rate for all exporters and producers not individually investigated." 19 U.S.C. § 1671d(c)(1)(B)(i)(I). Commerce must then "order the posting of a cash deposit, bond, or other security . . . for each entry of the subject merchandise in an amount based on the estimated individual countervailable subsidy rate, the estimated all-others rate, or the estimated countrywide subsidy rate." *Id.* § 1671d(c)(1)(B)(ii). "[T]he cash deposit rates established in an investigation are prospective because they affect future entries, 'not just those made

within a specific time period.'" *Lumber I*, 393 F. Supp. 3d at 1278 (quoting *NSK Corp. v. United States*, 31 CIT 1962, 1965 (2007)).

Contrary to the prospective nature of cash deposits and "[u]nlike the systems of some other countries, the United States uses a 'retrospective' assessment system under which final liability for antidumping and countervailing duties is determined after merchandise is imported." 19 C.F.R. § 351.212(a). This retrospective approach requires that "the amount of duties to be assessed is determined in a review of the order covering a discrete period of time." *Id.* When an administrative "review is not requested, duties are assessed at the rate established in the completed review covering the most recent prior period or, if no review has been completed, the cash deposit rate applicable at the time merchandise was entered." *Id.*

While assessment is therefore retrospective because it covers past entries, a decision of the CIT or the Federal Circuit "not in harmony with" Commerce's determination in a CVD investigation or administrative review is prospective unless the court grants an interested party's request for injunctive relief. 19 U.S.C. § 1516a(c)(1) (cross-referencing subsection (c)(2)).[34] In this case, the court denied Plaintiff's request

[34] Specifically, section 1516a(c)(1) provides for the liquidation of entries subject to certain Commerce determinations in accordance with the agency determination "if they are entered, or withdrawn from warehouse, for consumption on or before the date" on which Commerce publishes a *Timken* Notice in the Federal Register, unless "such liquidation is enjoined by the court" pursuant to subsection (c)(2). 19 U.S.C. § 1516a(c)(1); *see also supra* note 5 (defining "*Timken* Notice"). Prospective application of adverse court decisions is rooted in the presumption of correctness that attaches to agency determinations. *See* H.R. Rep. No. 96-317, 96th Cong., 1st Sess. 182 (1979). While the presumption of correctness was "modified" when Congress authorized the CIT to enter statutory injunctions, section 1516a(c)(1) continues to reflect that presumption. *Id.*

for preliminary injunctive relief. *See Lumber I*, 393 F. Supp. 3d at 1280.[35] Although the liquidation provisions set forth in 19 U.S.C. § 1516a(c)(1) are not directly applicable to CVD expedited reviews because they are not proceedings enumerated under section 1516a(a) (and otherwise lack statutory authority), the statute nevertheless reflects unambiguous congressional intent concerning the circumstances under which prospective relief is appropriate in trade cases.[36]

The court finds that the principle of prospective application of a court decision not in harmony with Commerce AD/CVD determinations absent an injunction constitutes a sufficient limit on the retroactive application of the court's decision herein. *See Hyde*, 514 U.S. at 759 (providing for the identification of legal principles operating to "limit[] the principle of retroactivity itself"); *id.* at 761 (Kennedy, J., concurring) (stating that the majority opinion did not foreclose solely prospective effect in "exceptional cases"). Indeed, when the court denied Plaintiff's motion for a preliminary injunction, the court

---

[35] The court considered Plaintiff's motion for a preliminary injunction pursuant to the traditional four factors set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). *See Lumber I*, 393 F. Supp. 3d at 1276. Consistent with the court's exercise of jurisdiction pursuant to 28 U.S.C. § 1581(i), Plaintiff did not, strictly speaking, request statutory injunctive relief.

[36] This case is governed by the APA as a result of the failure to ground CVD expedited reviews in the provisions of the URAA; however, the case otherwise reflects the characteristics of a trade case. *See, e.g.*, Order (Nov. 4, 2019), ECF No. 92 (requiring, with Parties' consent, the "filing and confidentiality protections afforded to all documents forming the administrative record underlying the challenged administrative determination" to "follow the procedures set forth in Rule 73.2" and the disposition of this case to "follow the procedures set forth in Rule 56.2"). Rules 56.2 and 73.2 generally apply to actions described in 28 U.S.C. § 1581(c), which includes actions arising pursuant to 19 U.S.C. § 1516a. *See* CIT Rule 56.2 ("Judgment on an Agency Record for an Action Described in 28 U.S.C. § 1581(c)"); CIT Rule 73.2 ("Documents in an Action Described in 28 U.S.C. § 1581(c), Except an Action Described in Section 517(g) of the Tariff Act of 1930, or (f)").

permitted the liquidation of subject entries in accordance with the *Final Results of Expedited Review*. The court anticipated that, if Plaintiff prevailed on count one of its complaint, the excluded companies "would be reinstated in the *CVD Order* with the concomitant collection of cash deposits and suspension of liquidation," *Lumber I*, 393 F. Supp. 3d at 1278,[37] and future entries "would be subject to the all-others rate established in the *CVD Order* pending a subsequent review," *id.* at 1279. The potential for retroactive collection of cash deposits and assessment of duties on past entries by the companies excluded by the *Final Results of Expedited Review* is solely a function of the fact that entries remain unliquidated by virtue of the suspension of liquidation in place in connection with the corresponding administrative review of the antidumping duty order on certain softwood lumber from Canada.[38] As discussed below, it is simply

---

[37] This expectation is consistent with the statutory scheme. When Commerce issues a final affirmative determination following a CVD investigation but nevertheless excludes a company from the resulting CVD order, and the company is subsequently reinstated in the order following judicial review, Commerce does not collect cash deposits retroactively. Rather, pursuant to 19 U.S.C. § 1516a(c)(1), an erroneously excluded company's entries made before Commerce's publication of a *Timken* Notice would liquidate exclusive of countervailing duties. Following publication of the *Timken* Notice, the excluded companies would be reinstated in the relevant CVD order with the associated suspension of liquidation and collection of cash deposits on future entries in accordance with the CVD rate established in the investigation determination (subject to revision on judicial review). While CVD expedited reviews are not investigation determinations issued pursuant to Commerce's authority under 19 U.S.C. § 1671d, "the results of an expedited review are akin to a final investigation determination," *Lumber I*, 393 F. Supp. 3d at 1278, because they "provide a noninvestigated exporter with its own cash deposit rate prior to the arrival of the first anniversary month of the order, at which point the exporter may request an administrative review," *id.* (quoting *Preamble*, 62 Fed. Reg. at 27,321).

[38] In November 2017, Commerce issued a final affirmative determination in its antidumping duty investigation of certain softwood lumber products from Canada. *See Certain Softwood Lumber Products From Canada*, 82 Fed. Reg. 51,806 (Dep't

not possible to fully "unscramble the egg" for the unliquidated entries. *Cf. Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) (declining to vacate unlawful agency action when the court had denied preliminary relief, leading to the establishment of a defective agency program pursuant to which land was plowed under; observing that "[t]he egg has been scrambled and there is no apparent way to restore the status quo ante").[39]

Plaintiff argues that the court must endeavor to place the subject companies—the "part[ies] subject to the agency action"—"in the position [they] would have been in, but for the wrongful agency action." Pl.'s Opp'n Cmts. at 6.[40] That is, however, impossible. Through the passage of time, opportunities to request administrative reviews have come and gone with concomitant consequences. The excluded

---

Commerce Nov. 8, 2017) (final aff. determination of sales at less than fair value and aff. final determination of critical circumstances); *see also Certain Softwood Lumber Products From Canada*, 83 Fed. Reg. 350 (Dep't Commerce Jan. 3, 2018) (antidumping duty order and partial am. final determination).

[39] *Sugar Cane Growers* addressed the separate though related question of remand versus vacatur and declined to vacate the unlawful agency action when it was not possible to restore the status quo ante and it was possible for the relevant agency to cure the defect. *See* 289 F.3d at 97–98. While in this case the court finds it appropriate to vacate the *Final Results of Expedited Review* because the deficiency in Commerce's regulation—a lack of statutory authority—cannot be cured on remand, the cases are analogous to the extent that subsequent events tied to the unlawful action have made full restoration impossible.

[40] Plaintiff cites to *Marshall v. HHS*, 587 F.3d 1310, 1317 (Fed. Cir. 2009), and *Kerr v. National Endowment for the Arts*, 726 F.2d 730, 733 (Fed. Cir. 1984), but those opinions address employment reinstatement and backpay following successful litigation of wrongful termination claims and are inapposite to whether retroactivity is required here. *See* Pl.'s Opp'n Cmts. at 60.

companies were unable to participate in the first or second administrative reviews,[41] and the non-excluded companies elected not to participate in the first administrative review based on the favorable rate obtained in the underlying proceeding.[42] *See* Def.-Int.'s Opp'n Cmts. at 29–30. Thus, applying a cash deposit rate based on either the all-others rate from the investigation or the final results of administrative review for the most recent review in which the company was reviewed constitutes the most appropriate means of effectuating the court's decision.

Additionally, while the court disagrees with the Government that *Chevron* provides the appropriate legal framework for resolving this issue, *see* Def.'s Reply Cmts. at 12,[43] there is some significance to the Government's position concerning

---

[41] Commerce rescinded the first administrative review for the excluded companies. *See Certain Softwood Lumber Products From Canada*, 85 Fed. Reg. 7,273, 7,274 (Dep't Commerce Feb. 7, 2020) (prelim. results and partial rescission of the [CVD] admin. Review; 2017-2018). For the second administrative review, Commerce declined to review entries of subject merchandise produced and exported by the excluded companies based on their exclusion from the *CVD Order*. *Initiation of [AD] and [CVD] Admin. Reviews*, 85 Fed. Reg. 13,860, 13,875 nn.7–11 (Dep't Commerce Mar. 10, 2020) ("*Initiation AR2*"). Commerce included all subject companies in the third administrative review, notwithstanding the fact that the excluded companies were not covered by the *CVD Order* at the time of initiation. *See Initiation of [AD] and [CVD] Admin. Reviews*, 86 Fed. Reg. 12,599 (Dep't Commerce Mar. 4, 2021). However, the court recognizes that the third administrative review was initiated after Commerce issued the Remand Results.

[42] The Coalition also withdrew its request for the non-excluded companies to be included in the first administrative review. *See Lumber I*, 393 F. Supp. 3d at 1278–79. The non-excluded companies were included in the second administrative review of the *CVD Order*, *Initiation AR2*, 85 Fed. Reg. at 13,862–64, as well the third administrative review, as noted above.

[43] This is not a situation in which the statute is silent or ambiguous with respect to Commerce's treatment of entries covered by a CVD expedited review and Commerce gets to fill that "gap" subject to a *Chevron* prong two analysis. Rather, the court must address Commerce's treatment of entries subject to a determination subsequently

prospective relief given that the Government—not Plaintiff—is the recipient of any duties ultimately assessed on the subject entries. *Cf. Lumber I*, 39 F. Supp. 3d at 1278–79 (finding no irreparable harm to Plaintiff from the liquidation of subject entries based, in part, on the absence of any "direct financial stake in the rate at which entries would be liquidated" and noting that Plaintiff "is not the recipient of the duties"). The interplay between the tripartite interests of domestic producers, foreign exporters/producers, and the U.S. government is a characteristic of trade cases and sets trade cases apart from other cases addressing the principle of retroactivity in which the proponent of retroactivity has a direct stake in its application. *See, e.g.*, *Harper*, 509 U.S. at 91–92 (noting that petitioners sought tax refunds based on the retroactive application of a prior U.S. Supreme Court opinion that struck down a tax provision discriminating between retirement benefits paid by the federal government as compared to the state government and its subdivisions); *Hyde*, 514 U.S. at 751 (noting that the petitioner had avoided a lawsuit based on retroactive application of a prior Court decision that rendered the respondent's action untimely). This distinction, while not dispositive, further supports prospective relief.

In sum, the court finds that prospective application of the vacatur of the *Final Results of Expedited Review* is merited. Accordingly, upon entry of judgment, Commerce must issue a *Timken*-like Notice rescinding the *Final Results of Expedited Review*, consistent with the requirements set forth in 19 U.S.C. § 1516a(c)(1), reinstate

vacated as without statutory authority. *Chevron* deference is not implicated in the court's resolution of this issue.

the excluded companies in the *CVD Order* prospectively and, for all companies that were covered by the *Final Results of Expedited Review*, impose a cash deposit requirement based on the all-others rate from the investigation or the company-specific rate determined in the most recently completed administrative review in which the company was reviewed.

The court declines to reach the remaining challenges asserted by the Canadian Parties. *See* Def.-Ints.' Opp'n Cmts. at 6. Those issues pertain to the cash deposit rates established by the *Final Results of Expedited Review*. The results of that expedited review are being vacated and will have no further force or effect.[44] The cash deposit rates applicable to these companies will be based on the rates determined in the most recently completed administrative review or the investigation.[45] The court recognizes that this may result in a disparate effect on the excluded and non-excluded companies because the excluded companies remain free from countervailing duties until Commerce's publication of the *Timken* Notice;[46] however, the non-excluded

---

[44] Likewise, the court declines to reach the Coalition's challenges to the substantive aspects of the *Final Results of Expedited Review*, except to the extent indicated below. *See* Pl.'s Mem. at 33–47; *infra note* 46.

[45] To the extent the Canadian Parties assert that the non-excluded companies "would be entitled to" a *de minimis* margin if the court resolved their substantive challenges to Commerce's determination and, thus, exclusion from the *CVD Order*, Def.-Ints.' Opp'n Cmts. at 32, that argument is unpersuasive because the court is vacating the review and ordering the excluded companies to be reinstated in the *CVD Order*.

[46] In its Rule 56.2 Motion, Plaintiff also argued that Commerce violated 19 C.F.R. § 351.214(k)(3)(iii) when it ordered CBP to refund cash deposits paid by the excluded companies because the regulation provides that a determination issued pursuant to subsection (k) "will not be the basis for the assessment of countervailing duties." Pl.'s Mem. at 32. Subsection (k)(3)(iv) permitted Commerce to exclude from an order a company that obtained a zero or *de minimis* rate. *See* 19 C.F.R. § 351.214(k)(3)(iv).

companies cannot claim entitlement to the benefit of a correctly calculated CVD rate based on a review proceeding that is not grounded in the law.

The court has reviewed the Canadian Parties' remaining arguments and finds that they do not require a different outcome.[47] Further, the court declines to order Commerce to conduct a changed circumstances review and adopt the rates calculated in the *Final Results of Expedited Review*. *See* Def.-Ints.' Opp'n Cmts. at 32–33. It is for the agency to decide, in the first instance, whether a changed circumstances review is

---

Regulations, like statutes, must be read "as a whole." *Am. Fiber & Finishing, Inc. v. United States*, 39 CIT ___, ___, 121 F. Supp. 3d 1273, 1282–83 & n.33 (2015) (citations omitted). Thus, taking account of the court's denial of Plaintiff's motion for preliminary injunction, the nature of the prospective relief being provided, and notwithstanding the vacatur of the regulation, Plaintiff's argument lacks merit.

[47] The Canadian Parties' reliance on *Dep't of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), to support the court's consideration of the subject companies' reliance on Commerce's past conduct of CVD expedited reviews is misplaced. *See* Def.-Ints.' Opp'n Cmts. at 24 & nn.61–62. In that case, the U.S. Supreme Court held that the Government's rescission of the Deferred Action for Childhood Arrivals ("DACA") program was arbitrary and capricious because it failed to consider whether there were reliance interests and, if so, whether they were significant, and to weigh any such interests against competing policy interests. *See Homeland Sec.*, 140 S. Ct. at 1913–15. *Homeland Security* addresses the requirement that an agency engage in reasoned decision-making that is reviewable by a court pursuant to the "arbitrary and capricious" standard set forth in 5 U.S.C. § 706(2)(A) and explains that a prior illegality finding was limited to one aspect of the program (benefits) and did not consider whether another aspect of the program (forbearance) may have been treated separately. *See id.* at 1905, 1910-15. The Court's discussion of the importance of considering reliance interests must therefore be viewed in that context. *Homeland Security* does not address the circumstances under which an agency may apply prospectively a decision of this court to vacate an agency action.

Additionally, Commerce's conduct of the CVD expedited review was not harmless error. *See* Def.-Ints.' Opp'n Cmts. at 31–33. While the APA directs the court to take "due account . . . of the rule of prejudicial error, 5 U.S.C. § 706, an agency action will be "set aside" for "substantial procedural or substantive" errors. *Intercargo Ins. Co. v. United States*, 83 F.3d 391, 394 (Fed. Cir. 1996). The Canadian Parties' offer no authority for the notion that a regulation issued (and a proceeding conducted) *ultra vires* is not a substantial substantive error.

merited upon receipt of an appropriate request and consistent with the relevant statutory and regulatory criteria. Lastly, the Canadian Parties request the court to stay Commerce's enforcement of its decision. Def.-Ints.' Reply Cmts. at 12–13. Such requests are governed by USCIT Rule 62 and the Canadian Parties may file a motion for the court's consideration with briefing from all Parties at the appropriate time in accordance therewith.

## CONCLUSION

In accordance with the foregoing, Commerce's Remand Results will be sustained. Additionally, the court will vacate 19 C.F.R. § 351.214(k) and the *Final Results of Expedited Review*, with implementation consistent with this opinion.

With respect to the pending Rule 56.2 Motions, consistent with the court's disposition herein, the court will grant in part Plaintiff's motion with respect to Commerce's promulgation of 19 C.F.R. § 351.214(k) and deny Plaintiff's remaining arguments. The court will further deny as moot the Canadian Parties' respective Rule 56.2 Motions. Judgment will be entered accordingly.

/s/ Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: August 18, 2021
New York, New York

Slip Op. 20-167

**UNITED STATES COURT OF INTERNATIONAL TRADE**

COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS,

Plaintiff,

and

FONTAINE INC., ET AL.,

Consolidated Plaintiffs,

v.

UNITED STATES,

Defendant,

and

FONTAINE INC., ET AL.,

Defendant-Intervenors.

Before: Mark A. Barnett, Judge
Consol. Court No. 19-00122

**OPINION AND ORDER**

[Remanding the U.S. Department of Commerce's final results in the countervailing duty expedited review of certain softwood lumber products from Canada for reconsideration of the statutory basis upon which Commerce promulgated 19 C.F.R. § 351.214(k).]

Dated: November 19, 2020

Sophia J.C. Lin, Picard Kentz & Rowe LLP, of Washington, DC, argued for Plaintiff Committee Overseeing Action for Lumber International Trade Investigations or Negotiations. With her on the brief were Lisa W. Wang, Andrew W. Kentz, David A. Yocis, Nathanial M. Rickard, Whitney M. Rolig, Heather N. Doherty, and Zachary J. Walker.

Alan G. Kashdan, McDermott Will & Emery LLP, of Washington, DC, argued for Consolidated Plaintiff/Defendant-Intervenor Government of Canada. With him on the brief were Joanne E. Osendarp, Lynn G. Kamarck, Dean A. Pinkert, Daniel M. Witkowski, Julia K. Eppard, and Stephen R. Halpin, III, Hughes Hubbard & Reed LLP, of Washington, DC.

Nancy A. Noonan, Arent Fox LLP, of Washington, DC, argued for Consolidated Plaintiff/Defendant-Intervenor Government of Québec. With her on the brief were Matthew J. Clark and Aman Kakar.

Elliot J. Feldman and Mark B. Lehnardt, Baker Hostetler, LLP, of Washington, DC, for Consolidated Plaintiff/Defendant-Intervenor Fontaine Inc.

John R. Magnus, TradeWins LLC, of Washington, DC, for Consolidated Plaintiff/Defendant-Intervenor Mobilier Rustique (Beauce) Inc.

Stephen C. Tosini, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant United States. With him on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Nikki Kalbing, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Stephan E. Becker, Aaron R. Hutman, and Moushami P. Joshi, Pillsbury Winthrop Shaw Pittman LLP, of Washington, DC, for Defendant-Intervenor Government of New Brunswick.

Yohai Baisburd, Jonathan M. Zielinski, and James E. Ransdell, Cassidy Levy Kent (USA) LLP, of Washington, DC, for Defendant-Intervenor Scierie Alexandre Lemay & Fils Inc.

Edward M. Lebow, Haynes and Boone, LLP, of Washington, DC, for Defendant-Intervenors Les Produits Forestiers D&G Ltée and Marcel Lauzon Inc.

Richard L.A. Weiner, Rajib Pal, and Alex L. Young, Sidley Austin LLP, of Washington, DC, for Defendant-Intervenors North American Forest Products Ltd, Parent-Violette Gestion Ltée, and Le Groupe Parent Ltée.

Barnett, Judge: In this case, the court considers whether the U.S. Department of Commerce ("Commerce" or "the agency") was authorized to create an expedited review process to determine individual countervailing duty ("CVD") rates for exporters not

individually examined in an investigation.[1] This process is distinct from annual reviews, new shipper reviews, and sunset reviews that readers may often encounter and that are expressly provided for by statute. Here, Commerce established the expedited review process by regulation and the court must determine whether the statutory authority identified by Commerce provides a legal basis for that regulation. As discussed herein, the court concludes that the answer is no and remands the determination for Commerce to either identify an alternative basis for the regulation or take other action in conformity with this opinion.

This consolidated case is before the court on a motion for judgment on the agency record pursuant to U.S. Court of International Trade ("USCIT") Rule 56.2 filed by Plaintiff Committee Overseeing Action for Lumber International Trade Investigations or Negotiations ("Plaintiff" or "the Coalition"). Confidential Pl.'s Rule 56.2 Mot. for J. on the Agency R. and accompanying Confidential Mem. in Supp. of Pl.'s Rule 56.2 Mot. for J. on the Agency R. ("Coalition Br."), ECF No. 101. Plaintiff, an association of domestic manufacturers, producers, and wholesalers of softwood lumber products, Compl. ¶ 9, ECF No. 2, challenges Commerce's final results in the CVD expedited review of certain softwood lumber products from Canada, *see Certain Softwood Lumber Products From Canada*, 84 Fed. Reg. 32,121 (Dep't Commerce July 5, 2019) (final results of CVD expedited review) ("*Final Results of Expedited Review*"), ECF No. 99-5, and accompanying Issues and Decision Mem. ("I&D Mem."), C-122-858 (June 28, 2019),

---

[1] For ease of reference, the court characterizes the type of proceeding at issue in this case as a "CVD expedited review."

ECF No. 99-6.[2] Plaintiff argues, *inter alia*, that Commerce exceeded the congressional grant of rulemaking authority set forth in section 103(a) of the Uruguay Round Agreements Act ("URAA" or "the Act"), Pub. L. No. 103-465, 108 Stat. 4809 (1994), when the agency promulgated the regulation governing CVD expedited reviews, 19 C.F.R. § 351.214(k), pursuant to that statutory provision. Coalition Br. at 14–32; *see also* Pl. [Coalition's] Reply Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("Coalition Reply") at 2–12, ECF No. 127.

For the reasons discussed herein, the court agrees that Commerce exceeded its relied-upon authority and remands the matter to the agency for Commerce to reconsider the statutory basis for its regulation.[3]

[2] The administrative record is divided into a Public Administrative Record, ECF No. 99-2, and a Confidential Administrative Record, ECF Nos. 99-3, 99-4. Parties submitted joint appendices containing record documents cited in their briefs. *See* Public J.A., ECF No. 148; Confidential J.A., ECF No. 149.

[3] Because the validity of the regulation underlying Commerce's *Final Results of Expedited Review* remains open to question, the court declines to resolve Plaintiff's additional argument that the cash deposit and liquidation instructions that Commerce issued following the *Final Results of Expedited Review* violated 19 C.F.R. § 351.214(k)(iii). *See* Coalition Br. at 32–33. The court also declines to resolve the various challenges to Commerce's calculation of individual cash deposit rates raised by Plaintiff in its motion and by Consolidated Plaintiffs in their respective motions. *See id.* at 33–47; Mot. for J. Upon the Agency R. Under Rule 56.2 of Consol. Pl. Mobilier Rustique (Beauce) Inc., ECF No. 100, and accompanying Pl.'s Mem. in Supp. of Mot. for J. on the Agency R., ECF No. 100-1; Rule 56.2 Mot. of Fontaine[] Inc[.] for J. on the Agency R., ECF No. 103, and accompanying Confidential Corrected Mem. in Supp. of Rule 56.2 Mot. of Fontaine[] Inc[.] for J. on the Agency R., ECF No. 150; Consol. Pl. Gov't of Can.'s Rule 56.2 Mot. for J. on the Agency R., ECF No. 105, and accompanying Consol. Pl. Gov't of Can.'s Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 156; Consol. Pl. Gov't of Que.'s Rule 56.2 Mot. for J. on the Agency R., ECF No. 106, and accompanying Consol. Pl.'s Mem. in Supp. of Mot. for J. on the Agency R., ECF No. 145.

## BACKGROUND

### I. The Uruguay Round Agreements Act

Congress enacted the URAA on December 8, 1994. Pub. L. No. 103-465, 108 Stat. 4809 (1994). The Act, which became effective on January 1, 1995, amended the domestic antidumping ("AD") and CVD laws in connection with several international trade agreements referred to as the Uruguay Round Agreements. *See* 19 U.S.C. §§ 3511(a)(1), (d), & 3501(7). Relevant here, one such agreement is the Agreement on Subsidies and Countervailing Measures ("SCM Agreement"). *Id.* § 3511(d)(12); *see generally* Agreement Establishing the World Trade Organization, Apr. 15, 1994, 1869 U.N.T.S. 14, Annex 1A, SCM Agreement. Pursuant to Article 19.3 of the SCM Agreement:

> When a countervailing duty is imposed in respect of any product, such countervailing duty shall be levied, in the appropriate amounts in each case, on a non-discriminatory basis on imports of such product from all sources found to be subsidized and causing injury, except as to imports from those sources which have renounced any subsidies in question or from which undertakings under the terms of this Agreement have been accepted. *Any exporter whose exports are subject to a definitive countervailing duty but who was not actually investigated for reasons other than a refusal to cooperate, shall be entitled to an expedited review in order that the investigating authorities promptly establish an individual countervailing duty rate for that exporter*.

SCM Agreement, art. 19.3 (emphasis added).

The Statement of Administrative Action ("SAA") accompanying the URAA discussed the statutory amendments to Title VII of the Tariff Act of 1930 considered necessary to implement Article 19.3. *See* URAA, SAA, H.R. Doc. No. 103–316, vol.1, at 941–42 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4250–51. Prefacing those

changes, the SAA explained that, under pre-URAA law, "Commerce normally calculate[d] a country-wide [CVD] rate applicable to all exporters unless there [was] a significant differential in CVD rates between companies or if a state-owned company [was] involved." *Id.* at 941, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4250. The SAA further explained that, pursuant to Article 19.3 of the SCM Agreement, an "exporter whose exports are subject to a CVD order, but which was not actually investigated for reasons other than a refusal to cooperate, shall be entitled to an expedited review to establish an individual CVD rate for that exporter." *Id.* The SAA then discussed several changes to U.S. trade laws effected by sections 264, 265, and 269[4] of the URAA. *Id.* at 941–42, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4251. Those changes included Commerce's calculation of individual CVD rates for exporters and producers that were individually investigated in an investigation or administrative review, an all-others rate for those that were not individually examined, and, in certain circumstances, a country-wide CVD rate. *See id.* The SAA did not, however, discuss any implementation of CVD expedited reviews.[5]

---

[4] The SAA misattributes changes made by URAA § 269 to URAA § 265. *See* SAA at 941–42, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4251; URAA § 269(a) (amending 19 U.S.C. § 1677f-1 to add new subsection (e)).

[5] The portion of the SAA dedicated to discussing the statutory changes necessary to implement the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994 (otherwise referred to as "the Antidumping Agreement") contains a section regarding "new shipper reviews." SAA at 875–76, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4203. "New shippers are defined as exported and producers . . . that . . . : (1) did not export the merchandise to the United States . . . during the original period of investigation; and (2) are not affiliated with any exporter or producer who did . . . , including those not examined during the investigation." SAA at 875, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4203. During the Uruguay Round negotiations, "[t]he United

Congress expressly approved the SAA in the URAA. *See* 19 U.S.C. § 3511(a)(2). Further, the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act [i.e., the URAA] in any judicial proceeding in which a question arises concerning such interpretation or application." *Id.* § 3512(d).

## II. Implementing Regulations

Section 103 of the URAA delegated authority to Commerce, among others, to promulgate interim and final regulations implementing the provisions of the Act. 19 U.S.C. § 3513. This section provides:

> (a) Implementing actions
>
> After December 8, 1994—
>
> (1) the President may proclaim such actions, and
> (2) other appropriate officers of the United States Government may issue such regulations,
>
> as may be necessary to ensure that *any provision of this Act, or amendment made by this Act*, that takes effect on the date any of the Uruguay Round Agreements enters into force with respect to the United States *is appropriately implemented on such date*. Such proclamation or regulation may not have an effective date earlier than the date of entry into force with respect to the United States of the agreement to which the proclamation or regulation relates.

---

States agreed . . . to provide new shippers with an expedited review" in order to "establish individual dumping margins for such firms on the basis of their own sales." *Id.* Expedited reviews for new shippers apply to determinations of both AD and CVD duties. *See* 19 U.S.C. § 1675(a)(2)(B). However, such new shipper reviews are distinct from the CVD expedited review at issue here. *See Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States* ("*Lumber II*"), 43 CIT ___, ___, 413 F. Supp. 3d 1334, 1343–45 (2019) (discussing the differences).

(b) Regulations—

> Any interim regulation necessary or appropriate to carry out any action proposed in the statement of administrative action approved under section 3511(a) of this title to implement an agreement described in section 3511(d)(7), (12), or (13) of this title shall be issued not later than 1 year after the date on which the agreement enters into force with respect to the United States.

*Id.* (emphasis added).[6]

On May 11, 1995, Commerce issued interim regulations. *See Antidumping and Countervailing Duties*, 60 Fed. Reg. 25,130 (Dep't Commerce May 11, 1995) (interim regulations; request for cmts.). Commerce did not address CVD expedited reviews in those interim regulations. *See id.* at 25,130–33 (discussing the regulations).

On May 19, 1997, Commerce published its final agency regulations concerning the implementation of the URAA. *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (Dep't Commerce May 19, 1997) (final rule) ("*Preamble*"). These regulations finalized new provisions governing new shipper reviews. *Id.* at 27,318–22 (discussing 19 C.F.R. § 351.214). Subsection (k) of the new shipper regulation further provided for Commerce's implementation of CVD expedited reviews. *See* 19 C.F.R. § 351.214(k) (1998); *Preamble*, 62 Fed. Reg. at 27,321.

---

[6] With respect to implementing regulations, the SAA states:

> In practice, the Administration will endeavor to amend or issue the regulations required to implement U.S. obligations under the Uruguay Round [A]greements as soon as practicable after the time the obligations take effect. Section 103(a) of the [the URAA] provides the authority for such new or amended regulations to be issued, and for the President to proclaim actions implementing the provisions of the Uruguay Round [A]greements, on the date they enter into force for the United States.

SAA at 677, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4055–56.

Subsection (k) of the new shipper regulation permits a respondent that was not selected “for individual examination” or accepted “as a voluntary respondent” in a CVD investigation in which Commerce “limited the number of exporters or producers to be individually examined” to “request a review . . . within 30 days of the date of publication in the Federal Register of the [CVD] order.” 19 C.F.R. § 351.214(k)(1). A company requesting a CVD expedited review must certify that:

> (i) The requester exported the subject merchandise to the United States during the period of investigation;
> (ii) The requester is not affiliated with an exporter or producer that the [agency] individually examined in the investigation; and
> (iii) The requester has informed the government of the exporting country that the government will be required to provide a full response to the [agency’s] questionnaire.

*Id.* § 351.214(k)(1)(i)–(iii). If requested, an expedited review will be initiated “in the month following the month in which a request for review is due.” *Id.* § 351.214(k)(2)(i). Additionally, the expedited review will be conducted “in accordance with the provisions of this section applicable to new shipper reviews,” subject to certain exceptions. *Id.* § 351.214(k)(3).[7]

---

[7] Those exceptions are:

> (i) The period of review will be the period of investigation used by the [agency] in the investigation that resulted in the publication of the countervailing duty order;
> (ii) The [agency] will not permit the posting of a bond or security in lieu of a cash deposit under paragraph (e) of this section;
> (iii) The final results of a review under this paragraph (k) will not be the basis for the assessment of countervailing duties; and
> (iv) The [agency] may exclude from the countervailing duty order in question any exporter for which the [agency] determines an individual net countervailable subsidy rate of zero or de minimis . . . , provided that the [agency] has verified the information on which the exclusion is based.

19 C.F.R. § 351.214(k)(3) (citation omitted).

**III. The CVD Order and Expedited Review of the Order**

On January 3, 2018, following affirmative determinations of countervailable subsidization and material injury, Commerce published the CVD order on certain softwood lumber products from Canada. *See Certain Softwood Lumber Products From Canada*, 83 Fed. Reg. 347 (Dep't Commerce Jan. 3, 2018) (am. final aff. [CVD] determination and [CVD] order) ("*CVD Order*"). On March 8, 2018, in response to requests filed by certain Canadian producers, Commerce initiated an expedited review of the *CVD Order*. *See Certain Softwood Lumber Products From Canada*, 83 Fed. Reg. 9,833 (Dep't Commerce March 8, 2018) (initiation of expedited review of the [*CVD Order*]) ("*Initiation Notice*"). The companies subject to the expedited review (and their affiliates) are companies that were not selected for individual examination during the investigation and that had been assigned the "all-others" rate of 14.19 percent. *CVD Order*, 83 Fed. Reg. at 348–49. The "period of review" for the CVD expedited review was January 1, 2015, through December 31, 2015 (the same as the period of investigation in the original investigation). *Initiation Notice*, 83 Fed. Reg. at 9,833.

On July 5, 2019, Commerce issued the *Final Results of Expedited Review*, pursuant to which the agency calculated reduced or *de minimis* rates for the eight companies as follows: (1) Les Produits Forestiers D&G Ltée and its cross-owned affiliates ("D&G"): 0.21 percent; (2) Marcel Lauzon Inc. and its cross-owned affiliates ("Lauzon"): 0.42 percent; (3) North American Forest Products Ltd. and its cross-owned affiliates ("NAFP"): 0.17 percent; (4) Roland Boulanger & Cie Ltée and its cross-owned affiliates ("Roland"): 0.31 percent; (5) Scierie Alexandre Lemay & Fils Inc. and its cross-

Case: 22-1021 Document: 35 Page: 163 Filed: 12/20/2021



owned affiliates ("Lemay"): 0.05 percent; (6) Fontaine Inc. and its cross-owned affiliates ("Fontaine"): 1.26 percent; (7) Mobilier Rustique (Beauce) Inc. and its cross-owned affiliates ("Rustique"): 1.99 percent; and (8) Produits Matra Inc. and Sechoirs de Beauce Inc. and their cross-owned affiliate ("Matra"): 5.80 percent. 84 Fed. Reg. at 32,122.

The rates calculated for D&G, Lauzon, NAFP, Roland, and Lemay are considered *de minimis*; therefore, Commerce stated it would instruct CBP "to discontinue the suspension of liquidation and the collection of cash deposits of estimated countervailing duties on all shipments of softwood lumber produced and exported by" those companies that were entered on or after July 5, 2019; "liquidate, without regard to countervailing duties, all suspended entries of shipments of softwood lumber produced and exported by" those companies; and "refund all cash deposits of estimated countervailing duties collected on all such shipments." *Id.* As to the companies receiving a lower—but not *de minimis*—rate (Fontaine, Rustique, and Matra), Commerce stated it would instruct CBP "to collect cash deposits of estimated countervailing duties" at the lower rates calculated in the *Final Results of Expedited Review*. *Id.*

In the Issues and Decision Memorandum accompanying the *Final Results of Expedited Review*, Commerce explained that section 103(a) of the URAA authorized the agency to promulgate 19 C.F.R. § 351.214(k) and conduct CVD expedited reviews. I&D Mem. at 18–20. According to Commerce, section 103(a) affords Commerce "the authority to promulgate regulations to ensure that remaining obligations under the URAA which were not set forth in particular statutory provisions were set forth in the

Code of Federal Regulations." *Id.* at 19; *see also id*. at 20 (explaining that the regulation "ensures that United States law is consistent with [international] obligations").

**IV. Procedural History of This Case**

Plaintiff commenced this action on July 15, 2019. Summons, ECF No. 1. Plaintiff alleged jurisdiction pursuant to 28 U.S.C. § 1581(i)(4) (2018)[8] or, alternatively, 28 U.S.C. § 1581(c).[9] Compl. ¶¶ 3–6.

On July 26, 2019, the court vacated a temporary restraining order requested by the Coalition barring U.S. Customs and Border Protection ("CBP") from liquidating unliquidated entries of softwood lumber produced or exported by certain Canadian companies that received reduced or *de minimis* rates in the *Final Results of Expedited Review*. *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*, 43 CIT ___, 393 F. Supp. 3d 1271 (2019). The court also denied Plaintiff's motion for a preliminary injunction seeking the same relief. *See id.*

On November 4, 2019, the court denied the Government's motion to dismiss pursuant to USCIT Rule 12(b)(1) for lack of subject matter jurisdiction. *Lumber II*, 413 F. Supp. 3d at 1347. While exercising jurisdiction pursuant to 28 U.S.C. § 1581(i)(4),

---

[8] Pursuant to 28 U.S.C. § 1581(i)(4):

> [T]he Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for ... administration and enforcement with respect to the matters referred to in paragraphs (1)-(3) of this subsection and subsections (a)-(h) of this section.

[9] Pursuant to 28 U.S.C. § 1581(c), "[t]he Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516A or 517 of the Tariff Act of 1930," i.e., 19 U.S.C. §§ 1516a, 1517.

the court entered an order instructing, *inter alia*, that "the disposition of these cases shall follow the procedures set forth in Rule 56.2" of the rules of this court. Order (Nov. 4, 2019), ECF No. 92.[10]

On November 12, 2019, the court consolidated Court Nos. 19-00122, 19-00154, 19-00164, 19-00168, and 19-00170 under this lead action and set a scheduling order. Order (Nov. 12, 2019), ECF No. 93 (consolidation); Order (Nov. 12, 2019), ECF No. 94 (scheduling); *see also* Order (Apr. 6, 2020), ECF No. 113 (amending the scheduling order). Plaintiff subsequently filed the instant motion on December 19, 2019. *See* Coalition Br. Thereafter, Defendant United States ("Defendant" or "the Government") and Defendant-Intervenors filed their respective responses to the Coalition's arguments. Confidential Def.'s Resp. [to] Pls.' Mots. For J. on the Agency R. ("Gov't Resp."), ECF No. 110; Joint Br. of Def.-Ints. Gov't of Can. and Gov't of Que. in Opp'n to Pl.'s Mot. for J. on the Agency R. ("CGP Resp."), ECF No. 120;[11] *see also* [Resp.] of Def.-Ints. Les Produits Forestiers D&G Ltée and Marcel Lauzon Inc. in Opp'n to Pl.'s Rule 56.2 Mot. for J. on the Agency R. ("D&G/Lauzon Resp."), ECF No. 117;[12] Resp. of Def.-Int. Scierie Alexandre Lemay & Fils Inc. in Opp'n to Pl.'s Mot. for J. on the Agency R. ("Lemay

---

[10] Relatedly, the court waived the requirement for the Government to file an Answer in this case. Docket Entry (Nov. 19, 2019), ECF No. 98; *see also* USCIT Rule 7(a)(2) (requiring an "answer to a complaint" to be filed in any action other than one "described in 28 U.S.C. § 1581(c)").

[11] CGP stands for "Canadian Governmental Parties." The Canadian Governmental Parties consist of Defendant-Intervenors Government of Canada and Government of Québec. *See* CGP Resp. at 1.

[12] D&G and Lauzon support the arguments made by the CGP regarding Commerce's authority to promulgate 19 C.F.R. § 351.214(k) and offered no additional arguments on that issue. D&G/Lauzon Resp. at 1–2.

Resp.”), ECF No. 119;[13] Def.-Int. [NAFP’s] Resp. to Pl.’s Rule 56.2 Mot. for J. on the Agency R., ECF No. 125;[14] Resp. of Def.-Int. Gov’t of N.B. in Opp’n to Pl.’s Mot. for J. on the Agency R., ECF No. 141.[15] The Coalition has filed a reply. *See* Coalition Reply.

On September 16, 2020, the court heard oral argument on Commerce’s authority to promulgate 19 C.F.R. § 351.214(k). *See* Docket Entries, ECF Nos. 166, 168.

## JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(i)(4). The court reviews an action commenced pursuant to 28 U.S.C. § 1581(i)(4) in accordance with the standard of review set forth in the Administrative Procedure Act (“APA”), 5 U.S.C. § 706, as amended. *See* 28 U.S.C. § 2640(e). Section 706 directs the court, *inter alia*, to “hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.” 5 U.S.C. § 706(2)(C).

## DISCUSSION

Section 103(a) of the URAA delegates authority to “appropriate officers of the United States Government [to] issue such regulations, as may be necessary to ensure that any provision of this Act, or amendment made by this Act, . . . is appropriately implemented.” 19 U.S.C. § 3513(a)(2). At issue in this case is the scope of rulemaking authority granted by section 103(a). Statutory interpretation requires the court to

---

[13] Lemay adopted by reference the arguments made by other parties and raised no additional arguments. Lemay Resp. at 2.
[14] The NAFP did not comment on the issue addressed herein.
[15] The Government of New Brunswick did not comment on the issue addressed herein.

"carefully investigate the matter to determine whether Congress's purpose and intent on the question at issue is judicially ascertainable." *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881 (Fed. Cir. 1998). That inquiry involves an examination of "the statute's text, structure, and legislative history," applying, if necessary, "the relevant canons of interpretation." *Gazelle v. Shulkin*, 868 F.3d 1006, 1010 (Fed. Cir. 2017) (quoting *Heino v. Shinseki*, 683 F.3d 1372, 1378 (Fed. Cir. 2012)). When, as here, the court concludes that Congress's intent is clear, "that is the end of the matter," and the court "must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).[16]

## I. Parties' Contentions

The Coalition contends that Commerce's authority pursuant to section 103(a) is limited to enacted provisions and, because there is no statutory provision authorizing Commerce to establish CVD expedited reviews, Commerce exceeded its rulemaking

[16] Because the court finds that Congress's intent respecting the scope of rulemaking authority set forth in URAA § 103(a) is unambiguous, the court does not resolve what level of deference, if any, would apply to Commerce's interpretation of section 103(a) if congressional intent were ambiguous. Commerce does not administer the statutory provision and shares rulemaking authority with other "appropriate officers of the United States Government," all of whom may construe section 103(a) differently. 19 U.S.C. § 3513(a)(2) (codified in Title 19, Chapter 22 (Uruguay Round Trade Agreements), Subchapter 1); 19 U.S.C. § 1677(1) (defining Commerce as the "administering authority" for the domestic trade laws contained in Title 19, Chapter 4 (Tariff Act of 1930), Subtitle IV); *cf. City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 301 (2013) (holding that *Chevron* applies to an agency's "construction of a[n ambiguous] jurisdictional provision *of a statute it administers*") (citation omitted) (emphasis added); *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990) ("A precondition to deference under *Chevron* is a congressional delegation of administrative authority."). For the same reason, the court does not address Parties' arguments implicating deference under *Chevron* prong two. *See, e.g.*, Gov't Resp. at 6, 12–14; CGP Resp. at 4–5, 7–10.

authority when it promulgated 19 C.F.R. § 351.214(k). Coalition Br. at 14–19. The Coalition further argues that Commerce's interpretation of section 103(a) nullifies sections 123 and 129 of the URAA, which govern U.S. implementation efforts in response to adverse findings by a dispute settlement panel of the World Trade Organization ("WTO") or the WTO Appellate Body regarding the United States' compliance with the provisions of the Uruguay Round Agreements. *Id*. at 20. With respect to the legislative history, Plaintiff contends that "[t]he SAA summarized the changes Congress felt necessary to conform U.S. law to Article 19.3 of the SCM Agreement," *id.* at 22, and, thus, demonstrates that Congress considered the issue and decided against the establishment of CVD expedited reviews, *id.* at 22–23.

The Government concedes that the URAA does not contain an explicit provision for the administration of CVD expedited reviews. *See* Gov't Resp. at 7. Nevertheless, the Government contends that section 103(a) authorized Commerce to promulgate regulations implementing both the URAA and the international trade agreements the Act approved. *Id*. at 7–8. The Government rejects the Coalition's arguments implicating the procedural requirements of sections 123 and 129 as inapposite to an understanding of Commerce's authority under section 103(a). *Id.* at 9. The Government also disagrees with Plaintiff as to the significance of the relevant language in the SAA. According to the Government, the SAA represents evidence that Congress, through section 103(a), intended for Commerce to promulgate regulations implementing Article 19.3 of the SCM Agreement. *See id.* at 7–8.

The Canadian Governmental Parties advance substantially similar arguments to those of Defendant. CGP Resp. at 5–6, 10–12, 19. The Canadian Governmental Parties further assert that the text of section 103(b) authorizing interim regulations supports Commerce's interpretation of section 103(a). *Id*. at 12–13. The Canadian Governmental Parties also contend that Congress has acquiesced to Commerce's interpretation of section 103(a) as authorizing Commerce to conduct CVD expedited reviews. *Id*. at 18 n.11.

## II. Analysis

Examination of the statutory text, structure, and legislative history compel the court to conclude that Commerce exceeded its authority to the extent that it promulgated 19 C.F.R. § 351.214(k) pursuant to URAA § 103(a). The court further finds that Congress has not acquiesced to Commerce's interpretation of section 103(a).

### A. Statutory Text

The plain language of section 103(a)—specifically, the statutory reference to "this Act, or amendment made by this Act"—refers to the URAA. *See* URAA § 1 ("This Act may be cited as the 'Uruguay Round Agreements Act.'").[17] The text therefore grants Commerce regulatory authority with respect to enacted provisions, but extends no further to encompass perceived international obligations that Congress did not

[17] Notwithstanding the Government's and the Canadian Governmental Parties' respective arguments in support of Commerce's regulation, this interpretation of the text is not contested. The Canadian Governmental Parties explicitly concede that "this Act" refers to the URAA. *See* CGP Resp. at 6 ("[T]he language refers to 'any' provision of the URAA or 'any' amendment made by the URAA.").

implement through the URAA.[18] In matters of statutory interpretation, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). Otherwise, "[t]o permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress," which the court cannot do. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374–75 (1986).

*Louisiana Public Service Commission* addressed the lawfulness of the Federal Communication Commission's ("FCC") ruling that section 220 of the Communications Act of 1934 permitted the FCC to prescribe depreciation practices that served to pre-empt inconsistent state regulations. 476 U.S. at 362, 369. The Court held that a separate provision, section 152(b) of the Communications Act of 1934, constrained the FCC from displacing state law in that regard. *Id.* at 369–76. While that case involved "a congressional denial of power," the broader principle that "an agency literally has no power to act . . . unless and until Congress confers power upon it," *id.* at 374 (emphasis omitted), is applicable here. The opinion of the U.S. Court of Appeals for the Federal

[18] The Canadian Governmental Parties attempt to convert the court's analysis of the statutory language into one pursuant to *Chevron* prong two through the observation that "section 103(a) of the URAA is silent or ambiguous regarding how Congress intended for Commerce and other relevant administrative agencies to implement the general provisions of the URAA." CGP Resp. at 6. The court must not, however, be too quick to "throw up [its] hands and declare that Congress's intent is unclear." *Timex*, 157 F.3d at 882 (citation omitted). In this case, the focal point for the court's inquiry is whether Commerce had the authority to develop a methodology for conducting CVD expedited reviews in the first instance, not the reasonableness of Commerce's chosen method of conducting the reviews. Thus, the Canadian Governmental Parties' argument lacks merit.

Circuit ("Federal Circuit") in *FAG Italia S.p.A. v. United States*, 291 F.3d 806 (Fed. Cir. 2002) is instructive in this regard.

*FAG Italia* addressed Commerce's position that the agency had the authority to conduct a duty absorption inquiry[19] with respect to an antidumping duty order issued before January 1, 1995[20] in years other than the second or fourth year after publication of the transition order at issue. *Id.* at 808. As authority for its position, Commerce relied on the absence of an explicit statutory prohibition and corresponding silence in the legislative history "as to whether Commerce can conduct duty absorption inquiries in years other than years [two] and [four]." *Id.* at 815.

The Federal Circuit squarely rejected this view of agency authority. The appellate court explained that Congress only provided for duty absorption inquiries during an administrative review "initiated [two] years or [four] years after the publication of an antidumping duty order," *id.* at 814 (quoting 19 U.S.C. § 1675(a)(4) (2000)), and Commerce could not convert congressional silence regarding the administration of duty

---

[19] Duty absorption inquiries are governed by 19 U.S.C. § 1675(a)(4), which provides:

> During any review under this subsection initiated 2 years or 4 years after the publication of an antidumping duty order under section 1673e(a) of this title, [Commerce], if requested, shall determine whether antidumping duties have been absorbed by a foreign producer or exporter subject to the order if the subject merchandise is sold in the United States through an importer who is affiliated with such foreign producer or exporter. . . .

[20] Orders entered before January 1, 1995 are referred to as "transition orders." 19 U.S.C. § 1675(c)(6)(C). Commerce issued the order in question on May 15, 1989 and conducted the duty absorption review as part of its seventh administrative review, the results of which were published in 1997. *FAG Italia*, 291 F.3d at 812.

absorption reviews in other years into an authority to do so, *id.* at 815. The Federal Circuit reasoned that

> no case of which we are aware holds that an administrative agency has authority to fill gaps in a statute that exist because of the absence of statutory authority. To the contrary, the Supreme Court has noted that "an agency literally has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n*[, 476 U.S. at 374 (1986)], and has cautioned that "[t]o supply omissions [within a statute] transcends the judicial function[,]" *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991) (quoting *Iselin v. United States*, 270 U.S. 245, 250–51 (1926)).

*Id.* at 816 (first, third, and fourth alterations original); *see also id.* at 818 n.18 (stating that Commerce "lack[ed] general authority to act" in its chosen manner).[21]

The appellate court has since reaffirmed the principle that Commerce may not rely on statutory silence as a source of authority. *See Agro Dutch Indus. v. United States*, 508 F.3d 1024, 1033 (Fed. Cir. 2007) (addressing 19 U.S.C. § 1675(a)(4) and stating that, "while Congress may not have affirmatively intended to bar Commerce from conducting a duty absorption inquiry under the facts presented here, *Congress also did not authorize Commerce to do so, and under settled principles of statutory construction, the effect is the same*, as 'an agency literally has no power to act . . . unless and until Congress confers power upon it'") (quoting *La. Pub. Serv. Comm'n*, 476 U.S. at 374) (emphasis added). Applying the foregoing principle to the issue at hand compels the court to conclude that section 103(a), which limits Commerce's rulemaking authority to

---

[21] The Government attempts to distinguish *FAG Italia* on the basis that, in that case, both the statute and legislative history were silent as to whether Congress intended for Commerce to conduct duty absorption reviews on transition orders. Gov't Resp. at 11. Although the Federal Circuit noted, in passing, the absence of pertinent legislative history, the appellate court reached its ruling based primarily, if not entirely, on the absence of statutory authority. *See FAG Italia*, 291 F.3d at 814–17.

the URAA, does not provide a basis upon which Commerce may issue a regulation that fills a perceived gap between the United States' international obligations and domestic legislation.

Indeed, contrary to the Government's argument, *see* Gov't Resp. at 8, the notion of gap-filling refers to explicit and implicit legislative delegations of authority to an agency for the purpose of clarifying ambiguous—yet extant—statutory provisions, *see Chevron*, 467 U.S. at 843–44. Effectuating international obligations that Congress has not enacted into domestic law is not a permissible use of Commerce's gap-filling authority. *See id.* Accepting Commerce's interpretation of section 103(a) would significantly enlarge Commerce's authority beyond what the provision supports and turn *Chevron* on its head.[22]

[22] At oral argument, the Government of Canada argued that interpreting *FAG Italia* to preclude agency action not expressly authorized by Congress contravenes the requirement for *Chevron* deference in the face of statutory silence. Oral Arg. 44:16–45:16 (reflecting the time stamp from the recording), https://www.cit.uscourts.gov/audio-recordings-select-public-court-proceedings. The court disagrees. *Chevron* deference may apply when "*the statute* is silent or ambiguous with respect to *the specific issue*." 467 U.S. at 843 (emphasis added). Thus, for example, the court may accord deference when a statute is silent or ambiguous as to the methodologies Commerce must employ in calculating the duties contemplated by that statute. *See, e.g.*, *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1360–61 (Fed. Cir. 2010). Statutory silence regarding a specific issue is not, however, the same as the absence of statutory authority for an agency activity, in this case, CVD expedited reviews. *See Marine Harvest (Chile) S.A. v. United States*, 26 CIT 1295, 1309, 244 F. Supp. 2d 1364, 1379 (2002) (characterizing *FAG Italia* as drawing "a distinction between ambiguous statutory language that creates a 'gap' in the statute that an agency could reasonably fill and a silence in the statute from which an agency cannot create authority"). Accordingly, *FAG Italia*, and the court's interpretation thereof, is not inconsistent with *Chevron*.

The court's conclusion is, moreover, consistent with the non-self-executing nature of the Uruguay Round Agreements.[23] *See* 19 U.S.C. § 2903(a)(1) (providing the conditions pursuant to which certain trade agreements, including the Uruguay Round Agreements, "shall enter into force with respect to the United States");[24] S. Rep. 103–412, at 13 (1994) (explaining that the Uruguay Round Agreements "are not self-executing and thus their legal effect in the United States is governed by implementing legislation"). Thus, absent legislation implementing Commerce's interpretation of the requirements of Article 19.3, section 103(a) does not authorize Commerce to effectuate that interpretation. *See, e.g.*, *La. Pub. Serv. Comm'n*, 476 U.S. at 357 ("As we so often admonish, only Congress can rewrite this statute.").[25]

---

[23] The Government agrees that the Uruguay Round Agreements are not self-executing. Oral Arg. 30:20–30:26.

[24] The URAA was enacted in accordance with 19 U.S.C. § 2903. *See* 19 U.S.C. § 3511(a). Pursuant to section 2903, certain trade agreements "shall enter into force with respect to the United States if (and only if)" enumerated conditions are met. *Id.* § 2903(a)(1). Those conditions consist of the following:

> (A) the President, at least 90 calendar days before the day on which he enters into the trade agreement, notifies the House of Representatives and the Senate of his intention to enter into the agreement, and promptly thereafter publishes notice of such intention in the Federal Register;
> (B) after entering into the agreement, the President submits a document to the House of Representatives and to the Senate containing a copy of the final legal text of the agreement, together with--
>> (i) a draft of an implementing bill,
>> (ii) a statement of any administrative action proposed to implement the trade agreement, and
>> (iii) the supporting information described in paragraph (2); and
>
> (C) the implementing bill is enacted into law.

*Id.*

[25] The Canadian Governmental Parties argue that if "the provisions of the URAA had been intended to spell out everything that was required by international agreements, there would have been no need for the SAA," discussed *infra*, "to speak to both the

The judicial canon of statutory construction referred to as the *Charming Betsy* doctrine does not compel a different outcome. *See generally Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804). *But see* CGP Resp. at 27–28. *Charming Betsy* instructs, *inter alia*, that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." 6 U.S. at 118. Section 103(a) does not, however, directly implement the United States' international obligations. Instead, the provision authorizes actions otherwise provided for in the URAA. Thus, *Charming Betsy* is inapposite to the court's interpretation of section 103(a).

In sum, section 103(a) provides limited rulemaking authority to Commerce which does not encompass CVD expedited reviews. Further examination of the statutory structure and legislative history do not demonstrate a contrary intent.

**B. Statutory Structure**

The statutory scheme does not demonstrate congressional intent either to establish CVD expedited reviews specifically or, more broadly, to permit Commerce to promulgate regulations untethered to the URAA. Parties' arguments in this regard focus on sections 103(b), 123, and 129 of the URAA.

As noted, section 103(b) authorized the issuance of "[a]ny interim regulation necessary or appropriate to carry out any action proposed in the [SAA] . . . to implement

---

interpretation and application of those provisions." CGP Resp. at 11–12. The court disagrees. The completion of the SAA was a statutory requirement in accordance with the legislative mechanism utilized for congressional enactment of the Uruguay Round Agreements. *See* 19 U.S.C. § 2903(a)(1). Thus, the existence of the SAA cannot justify or excuse the absence of statutory implementing legislation.

an agreement described in section 3511(d)(7), (12), or (13) of [Title 19]." 19 U.S.C. § 3513(b). The Canadian Governmental Parties argue that the reference to expedited reviews pursuant to Article 19.3 in the SAA constitutes a "proposed action" implementing the SCM Agreement which is identified in 19 U.S.C. § 3511(d)(12). CGP Resp. at 12. The Canadian Governmental Parties argue that it is therefore "reasonable to interpret the specific authorization to issue interim regulations as authorizing such final regulations." *Id*. at 12–13. The premise of the Canadian Governmental Parties' argument fails, however, because the SAA does not propose any action to implement CVD expedited reviews. While the SAA provides that "[s]everal changes must be made to the Act to implement the requirements of Article 19.3 of the [SCM Agreement]," the subsequent discussion does not propose any actions to implement expedited reviews. *See* SAA at 941–42, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4251.

Sections 123 and 129 of the URAA govern the implementation of adverse findings by a WTO dispute settlement panel or the WTO Appellate Body regarding the United States' compliance with the provisions of the Uruguay Round Agreements. *See* 19 U.S.C. §§ 3533(f)–(g), 3538(b). Generally, sections 123 and 129 prohibit Commerce from implementing such an adverse decision until, among other things, specified consultations with congressional committees, and others, have taken place. *See Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1349 (Fed. Cir. 2005). Both sections 123(g) and 129(b), in particular, prescribe several steps that must precede the publication of any final rule or modification to agency practice or determination of Commerce to render a prior action not inconsistent with WTO obligations. 19 U.S.C.

§§ 3533(g)(1), 3538(b). In each case, Commerce and other trade officials are required to consult with relevant congressional committees prior to taking action in response to such an adverse WTO dispute settlement report. *See id.*

As the Government correctly notes, in this case, there is no adverse WTO dispute settlement report that would trigger the consultation and other requirements in sections 123 and 129. *See* Gov't Resp. at 9. Nevertheless, while Commerce's interpretation of section 103 as authorizing implementation of WTO obligations not otherwise provided for in the URAA might not nullify sections 123 and 129 of the URAA (particularly when such a WTO report occurs), the consultation requirements of those sections are consistent with the broader statutory scheme of preserving Congress's role in the implementation of WTO obligations. Section 102 of the URAA provides both that "[n]o provision of any of the Uruguay Round Agreements . . . that is inconsistent with any law of the United States shall have effect," 19 U.S.C. § 3512(a)(1), and the converse, that "[n]othing in this Act shall be construed . . . to amend or modify any law of the United States . . . unless specifically provided for in this Act," *id.* § 3512(a)(2). Thus, while the respective arguments are not outcome determinative either way, the court does find limited merit in the Coalition's argument that sections 123 and 129 of the URAA counsel against the Government's expansive interpretation of section 103 of the URAA.

**C. Legislative History**

Parties' disagreements respecting the legislative history focus on the significance of the SAA's reference to the second sentence of Article 19.3 entitling a non-

investigated exporter to "an expedited review to establish an individual CVD rate for [that] exporter." SAA at 941, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4250.[26] As noted, the Government and Canadian Governmental Parties point to that reference as evidence that Congress intended for Commerce to conduct CVD expedited reviews. Gov't Resp. at 7–8; CGP Resp. at 10–11. The Coalition argues that the SAA demonstrates congressional awareness of the requirements of Article 19.3 and a rejection of the notion that CVD expedited reviews were needed to fulfill U.S. obligations. Coalition Br. at 23–24.

This dispute is tangential, however, to the court's inquiry, which is to discern congressional intent respecting the scope of section 103(a). On that point, the SAA speaks to the timing of the implementing regulations promulgated pursuant to section 103(a), noting that the provision provides the authority for regulations to be issued on the date the provisions of the Uruguay Round Agreements enter into force for the United States. SAA at 677, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4055–56. Nothing in the relevant portion of the SAA suggests that section 103(a) is intended to authorize regulatory action beyond the substantive provisions otherwise included in the URAA.

Moreover, accepting the Government's position would require the court to accept the proposition that Article 19.3 requires CVD expedited reviews. During oral argument,

---

[26] The SAA was prepared by the Executive Branch, *see* SAA at 656, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4040, and approved by Congress "as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act," *see* 19 U.S.C. § 3512(d). The court may therefore consult the SAA for indications of congressional intent.

however, Parties agreed that interpreting the text and requirements of Article 19.3 is beyond the scope of this litigation. Oral Arg. 52:50–54:48. For that reason, congressional intent is best discerned from the SAA's discussion of the actual statutory changes considered relevant to implementing the requirements of Article 19.3. As previously noted, that discussion is devoid of any provision explicitly providing for CVD expedited reviews. This omission—both in the statute and the SAA—is consistent with other legislative history indicating that, regardless of any unarticulated congressional view as to whether Article 19.3 required additional procedures, Congress did not include any such procedures in the implementing legislation. *See* S. Rep. 103-412, at *98 (1994) (explaining that URAA § 264, which requires Commerce "to determine an estimated countervailable subsidy rate for each exporter and producer individually investigated, and an estimated 'all-others' rate for those not individually investigated and for new exporters and producers, . . . implement[s] the requirements of Article 19.3 of the [SCM] Agreement").

Accordingly, on balance, the legislative history supports Plaintiff's interpretation of the text of section 103(a). To the extent the legislative history is ambiguous as to Congress's views on the administration of CVD expedited reviews, that ambiguity cannot override Congress's clear statutory limitation on Commerce's rulemaking authority. *See Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) (stating that while "clear evidence of congressional intent" in the legislative history "may illuminate ambiguous [statutory] text," the court cannot "allow[] ambiguous legislative history to muddy clear statutory language").

### D. Congressional Acquiescence

The Canadian Governmental Parties argue that congressional acquiescence to Commerce's interpretation provides evidence that Congress intended Commerce to conduct CVD expedited reviews. CGP Resp. at 18 n.11. The Canadian Governmental Parties assert that Commerce has conducted CVD expedited reviews since 2003, and Congress did not prohibit CVD expedited reviews in recent amendments to the Tariff Act of 1930. *Id.* (discussing the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114–125, § 421, 130 Stat. 122, 161 (2016)). At oral argument, the Government likewise pressed the court to sustain Commerce's regulation in light of congressional acquiescence. Oral Arg. 26:50–28:45.

Assuming, *arguendo*, that subsequent congressional acquiescence is relevant to discerning prior congressional intent, *see Barnhart v. Walton*, 535 U.S. 212, 220 (2002) (stating that circumstances in which "Congress has frequently amended or reenacted the relevant provisions without change" in response to an agency's interpretation "provide further evidence . . . that Congress intended [that agency's] interpretation, or at least understood the interpretation as statutorily permissible"),[27] "the Supreme Court has repeatedly made clear that an important foundation of acquiescence is that

[27] The U.S. Supreme Court has also stated that "the doctrine of legislative acquiescence is at best only an auxiliary tool for use in interpreting *ambiguous* statutory provisions." *Jones v. Liberty Glass Co.*, 332 U.S. 524, 533–534 (1947) (emphasis added); *see also Helvering v. Reynolds*, 313 U.S. 428, 431–32 (1941) (stating that the doctrine of congressional acquiescence to an agency's construction of a statutory term "is no more than an aid in statutory construction" and, "[w]hile it is useful at times in resolving statutory *ambiguities*, it does not mean that the prior [agency] construction has become so embedded in the law that only Congress can effect a change") (emphasis added).

Congress as a whole was made aware of the administrative construction or interpretation and did not act on contrary legislation despite having this knowledge," *Schism v. United States*, 316 F.3d 1259, 1297 (Fed. Cir. 2002) (en banc) (discussing cases); *see also, e.g.*, *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1311–12 & n.10 (Fed. Cir. 2001). "Past practice does not, by itself, create power, but 'long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent.'" *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (quoting *United States v. Midwest Oil Co*., 236 U.S. 459, 474 (1915)) (alterations original).

Here, there is no indication that Commerce's administration of CVD expedited reviews *or* Commerce's interpretation of URAA § 103(a) as permitting the agency to regulate matters outside the URAA has been brought to Congress's attention. Nevertheless, at oral argument, the Government pointed to two U.S. Supreme Court cases as taking a purportedly different view and further argued that the existence of 19 C.F.R. § 351.214(k) gives rise to a presumption of congressional awareness regarding Commerce's administration of CVD expedited reviews. Oral Arg. 26:42–28:03, 28:30–28:51 (mentioning *Haig v. Agee*, 453 U.S. 280 (1981), and *Norwegian Nitrogen Prods. v. United States*, 288 U.S. 294, 304 (1933)). The referenced cases do not compel a different outcome.

*Haig* concerned the Secretary of State's authority to promulgate rules in relation to the granting, issuance, and verification of passports pursuant to the Passport Act of 1926, 22 U.S.C. § 211a ("the 1926 Act"). 453 U.S. at 289–90. The Secretary of State

had issued a regulation authorizing the revocation of passports on grounds related to national security and foreign policy, and the recipient of a revocation notice challenged the regulation as statutorily unauthorized. *Id.* at 286–87. The Court relied on the "broad rule-making authority granted in the [1926] Act," *id.* at 291 (citation omitted) (alteration original), to support the proposition that "a consistent administrative construction of that statute must be followed by the courts unless there are compelling indications that it is wrong," *id.* (citation omitted). In finding that the construction was not wrong, the Court pointed to the Secretary's consistent application of the challenged regulation when circumstances called for revocation and relevant legislative action, which included an amendment to the Passport Act of 1926 that omitted any changes to the scope of the statute's rule-making authority. *Id.* at 300–03.

*Norwegian Nitrogen* addressed whether language contained in the Tariff Act of 1922 requiring the United States Tariff Commission ("Tariff Commission"), *inter alia*, to "give reasonable public notice of its hearings" and a "reasonable opportunity to parties interested to be present, to produce evidence, and to be heard" before changing duty rates required the Tariff Commission to disclose business confidential information to an affected importer. 288 U.S. at 302–03. The Court found that neither the text of the statute, which afforded the Tariff Commission discretion in this regard, nor the legislative history of the statute, required such extensive disclosure. *Id.* at 304–08. The Court further pointed to administrative practice pre- and post-enactment in 1922 and congressional attention directed towards the role and function of the Tariff Commission to find that Congress had acquiesced to the challenged practice. *Id.* at 311–15.

*Haig* and *Norwegian Nitrogen* are readily distinguished. First, both cases addressed administrative practice closely connected to the authorizing statute the respective entities administered and pursuant to which they each exercised substantial discretion. *Haig*, 453 U.S. at 289–91; *Norwegian Nitrogen*, 288 U.S. at 302–03. Here, Commerce does not rely on any statute it administers as authority for CVD expedited reviews; rather, as noted, it relies on the general grant of rulemaking afforded U.S. government agencies in connection with the URAA. I&D Mem. at 19 & n.123 (citing 19 U.S.C. § 3513(a)).

More importantly, while the Government and the Canadian Governmental Parties urge the court to find that Congress has acquiesced to the administration of CVD expedited reviews specifically, that argument loses sight of the inquiry before the court—discerning congressional intent with respect to the scope of section 103(a). In other words, the court must consider whether Congress has acquiesced to the agency's construction of section 103(a) as permitting Commerce to conduct CVD expedited reviews. Although Commerce has been conducting CVD expedited reviews since at least 2003, *see Certain Softwood Lumber Products from Canada*, 68 Fed. Reg. 24,436 (Dep't Commerce May 7, 2003) (final results of [CVD] expedited reviews), Commerce only recently announced its reliance on section 103(a) as authority for the regulation governing such reviews, *see Irving Paper Ltd., et al. v. United States, et al.*, Court No. 17-cv-00128 (Jan. 30, 2018), ECF No. 53 (the United States' response to the court's questions concerning the court's jurisdiction to entertain an action challenging the results of a CVD expedited review and Commerce's authority to promulgate 19 C.F.R.

§ 351.214(k)).[28] Thus, in contrast to *Haig* and *Norwegian Nitrogen*, there has been little time or opportunity for Congress to acquiesce to Commerce's interpretation of section 103(a) particularly when, as here, that interpretation was only announced after the most recent set of amendments to the Tariff Act of 1930.

Lastly, and perhaps most importantly, the court cannot find congressional acquiescence to an agency's construction of a statute when "there are compelling indications that [the construction] is wrong." *Haig*, 453 U.S. at 291. "True indeed it is that administrative practice does not avail to overcome a statute so plain in its commands as to leave nothing for construction." *Norwegian Nitrogen*, 288 U.S. at 315; *see also Brown v. Gardner*, 513 U.S. 115, 122 (1994) ("A regulation's age [alone] is no antidote to clear inconsistency with a statute . . . ."). Here, as discussed, section 103(a) plainly limits Commerce's rulemaking authority to the implementation of the relevant provisions of the URAA. Under these circumstances, any argument for a more expansive interpretation of section 103(a) that is grounded in congressional acquiescence lacks merit.

In view of the foregoing, the court finds that Congress unambiguously constrained the scope of rulemaking authority conferred by section 103(a) to the enacted provisions of the URAA. Commerce therefore exceeded its statutory authority pursuant to section 103(a) when it promulgated 19 C.F.R. § 351.214(k). *See* 5 U.S.C. § 706(2)(C).

---

[28] Plaintiffs dismissed *Irving Paper* prior to the court's resolution of the matters raised in the court's questions to the parties. *See Irving Paper Ltd., et al. v. United States, et al.*, Court No. 17-cv-00128 (July 31, 2018), ECF No. 76 (Order of Dismissal).

### E. The *Final Results of Expedited Review* are Remanded for Reconsideration

In briefing and during oral argument, the Government and Canadian Governmental Parties offered various *post hoc* justifications for Commerce's regulation and the agency's administration of CVD expedited reviews. *See, e.g.*, Gov't Resp. at 9–10 (arguing that 19 C.F.R. § 351.214(k) may properly be characterized as an "interim regulation[]" issued pursuant to URAA § 103(b)); Gov't Resp. at 12–13 (pointing to Commerce's inherent authority "to reconsider previously closed proceedings"); CGP Resp. at 7–10 (arguing that section 103(a) authorized Commerce to issue 19 C.F.R. § 351.214(k) in order to ensure that URAA § 101, which reflects congressional approval of the Uruguay Round Agreements and their entry into force, is appropriately implemented); CGP Resp. at 15–18, 22–27 (discussing 19 U.S.C. §§ 1671d, 1675, and 1677f-1 as alternate statutory authorities for CVD expedited reviews).

At oral argument, the Government requested a remand to the agency for consideration of these alternative bases in the event the court concludes that section 103(a) did not authorize Commerce to promulgate 19 C.F.R. § 351.214(k). Oral Arg. 1:44:40–1:46:14 (requesting the court to afford Commerce one further attempt to articulate a lawful basis for the regulation before invalidating the regulation). The court agrees that a remand to the agency for consideration of these alternative bases for the regulation is more appropriate than judicial review of *post hoc* justifications. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (explaining that when the court cannot sustain an agency action, "the proper course, except in rare circumstances, is to

remand to the agency for additional investigation or explanation”).[29] Further, in certain circumstances, the court may remand a regulation for further consideration while allowing the regulation to remain in effect. *See Nat’l Org. of Veterans’ Advocates, Inc. v. Sec’y of Veterans Affairs* (“*NOVA*”), 260 F.3d 1365, 1367–68, 1379–81 (Fed. Cir. 2001).[30] Accordingly, the court remands the *Final Results of Expedited Review* to Commerce for reconsideration of the statutory basis authorizing the agency’s promulgation of 19 C.F.R. § 351.214(k). The court declines to invalidate Commerce’s regulation pending Commerce’s remand redetermination.

---

[29] The U.S. Supreme Court in *Florida Power & Light* made this statement in the course of evaluating whether initial review of a decision by the Nuclear Regulatory Commission to deny, without holding a hearing, a petition requesting a proceeding to suspend an operating license should be located in the appropriate district court or court of appeals. 470 U.S. at 731. In locating initial review in the court of appeals, the Court explained that the factfinding capacity of the district court was unnecessary because in the event the record did not support the agency action, the “proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.” *Id.* at 744. Although the Court was not conducting APA review of the challenged action, its comments are nevertheless instructive.

[30] In *NOVA*, the Federal Circuit adopted the standard first set forth by the U.S. Court of Appeals for the D.C. Circuit as to whether a regulation should remain in effect when the regulation is remanded for further consideration. 260 F.3d at 1380 (“[A]n inadequately supported rule . . . need not necessarily be vacated.”) (second alteration original) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm’n*, 988 F.2d 146, 151 (D.C. Cir. 1993)). In deciding whether to vacate, the court considers “the seriousness of the [regulation’s] deficiencies . . . and the disruptive consequences of an interim change that may itself be changed.” *Id.* (quoting *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995)); *see also Allied-Signal*, 988 F.2d at 150–51. Parties have not briefed this issue. Nevertheless, while the court has serious questions about the validity of the regulation, the disruptive consequences of invalidation appear likely to be significant, particularly when the possibility remains, however slight, that the regulation may ultimately be upheld. Thus, the court declines to vacate the regulation at this time.

## CONCLUSION & ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's *Final Results of Expedited Review* are remanded to the agency for reconsideration consistent with this opinion; it is further

**ORDERED** that Commerce shall file its remand results on or before February 17, 2021; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000 words.

/s/ Mark A. Barnett
Mark A. Barnett, Judge

Dated: November 19, 2020
New York, New York

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 22-1021, -1068, -1078

**Short Case Caption:** Committee Overseeing Action for Lumber v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 13915 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ________ lines of text.
- [ ] the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 12/20/2021

Signature: /s/ Joanne E. Osendarp

Name: Joanne E. Osendarp

Save for Filing