**2022-1021, -1068, -1078**

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

**COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS,**
***Plaintiff-Appellee,***

**FONTAINE INC., GOVERNMENT OF CANADA, MARCEL LAUZON INC., LES PRODUITS FORESTIERS D&G LTEE, NORTH AMERICAN FOREST PRODUCTS LTD., PARENT-VIOLETTE GESTION LTEE, LE GROUPE PARENT LTEE, SCIERIE ALEXANDRE LEMAY & FILS INC., GOVERNMENT OF QUEBEC, MOBILIER RUSTIQUE (BEAUCE) INC., GOVERNMENT OF THE PROVINCE OF NEW BRUNSWICK**

***Plaintiffs-Appellants,***

**v.**

**UNITED STATES,**

***Defendant-Appellee.***

**Appeals from the United States Court of International Trade in Nos. 1:19-cv-00122-MAB, 1:19-cv-00164-MAB, 1:19-cv-00168-MAB, and 1:19-cv-00170-MAB, Chief Judge Mark A. Barnett.**

# BRIEF OF PLAINTIFF-APPELLEE COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS

Sophia J.C. Lin
Andrew W. Kentz
David A. Yocis
Nathaniel Rickard
Zachary Walker
Whitney M. Rolig

**PICARD KENTZ & ROWE LLP**
1750 K Street, N.W., Suite 800
Washington, DC 20006
(202) 331-4040

January 31, 2022

# Certificate of Interest
(Filed October 18, 2021)

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1021

**Short Case Caption** Mobilier Rustique (Beauce) Inc. v. US

**Filing Party/Entity** Defendant-Appellee Committee Overseeing Action for Lumber International Trade Investigations or Negotiations

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/18/2021

Signature: /s/ Sophia J.C. Lin

Name: Sophia J.C. Lin

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Committee Overseeing Action for Lumber International Trade Investigations or Negotiations | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Lisa W. Wang | Picard Kentz & Rowe LLP | Appeared in the originating court, but will not appear in this court. |
| Heather N. Doherty | Picard Kentz & Rowe LLP | Appeared in the originating court, but will not appear in this court. |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Fed. Cir. Docket No. 2022-1068 | Committee Overseeing Action for Lumber v. US | This case also appeals the final judgment and order in CIT 19-00122, entered on Aug. 18, 2021. |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

**TABLE OF CONTENTS** .......... i

**TABLE OF AUTHORITIES** .......... iii

**STATEMENT OF RELATED CASES** .......... 1

**JURISDICTIONAL STATEMENT** .......... 1

**STATEMENT OF THE ISSUE** .......... 3

**STATEMENT OF THE CASE** .......... 3

**I. COMMERCE'S CVD EXPEDITED REVIEW REGULATION** .......... 3

**II. HISTORY OF COMMERCE'S PROMULGATION OF THE CVD EXPEDITED REVIEW REGULATION** .......... 4

**III. COMMERCE PROCEEDING IN THE LUMBER CVD EXPEDITED REVIEW** .......... 6

**IV. PROCEEDINGS BEFORE THE COURT OF INTERNATIONAL TRADE** .......... 8

**SUMMARY OF THE ARGUMENT** .......... 12

**ARGUMENT** .......... 13

**I. STANDARD OF REVIEW** .......... 13

**II. SECTION 103(A) OF THE URAA DOES NOT PROVIDE STATUTORY AUTHORITY FOR CVD EXPEDITED REVIEWS** .......... 14

A. Chevron Step One: Congressional Intent Is Clear that Congress Does Not Intend to Establish CVD Expedited Reviews .......... 14

1. The Statute Is Clear and Unambiguous that Congress Did Not Intend to Establish "CVD Expedited Reviews" .......... 15

2. Congress Did Not Authorize the Promulgation of CVD Expedited Reviews by Approving the SCM Agreement.........................18

3. The SAA Confirms that Congress Did Not Intend to Establish the "CVD Expedited Review" Procedure Described in Commerce's Regulation..........................................................................................24

4. Cases Cited by the Canadian Parties Are Inapposite Because the Statute Is Clear and Unambiguous..........................................................31

5. Congress Cannot and Did Not Acquiesce to Commerce's Conduct of CVD Expedited Reviews......................................................35

B. Chevron Step Two: No Deference Is Owed to Commerce's Interpretation that Section 103(a) of the URAA Provides the Agency Statutory Authority ..........................................................................41

**III. SECTION 103(B) DOES NOT PROVIDE STATUTORY AUTHORITY FOR CVD EXPEDITED REVIEWS.....................44**

**IV. CONCLUSION..........................................................................47**

# TABLE OF AUTHORITIES

## Cases

Agro Dutch Indus., Ltd., v. United States, 508 F.3d 1024 (Fed. Cir. 2007)………...
........................................................................................... ……..13, 16, 31

AK Steel Corp. v. United States, 226 F.3d 1361 (Fed. Cir. 2000) ..........................31

Algoma Steel Corp. v. United States, 865 F.2d 240 (Fed. Cir. 1989).............. 24, 34

Allegheny Ludlum Corp. v. United States, 367 F.3d 1339 (Fed. Cir. 2004) ..........34

AMG Cap. Mgmt. LLC v. FTC, 141 S. Ct. 1341 (2021) .......................................41

Ass'n v. Civil Serv. Comm'n, 463 U.S. 582 (1983)...............................................37

Atl. City Elec. Co. v. FERC, 295 F.3d 1 (D.C. Cir. 2002) ......................................17

Bestfoods v. United States, 165 F.3d 1371 (Fed. Cir. 1999)............................ 32, 33

Bob Jones Univ. v. United States, 461 U.S. 574 (1983).........................................39

Bowen v. Georgetown Univ. Hosp., 488 U.S. 204 (1988) ......................................43

Brown v. Gardner, 513 U.S. 115 (1994)..................................................................40

Butterbaugh v. DOJ, 336 F.3d 1332 (Fed. Cir. 2003) ............................................39

Changzhou Trina Solar Energy Co. v. United States, 975 F.3d 1318 (Fed. Cir.
2020) .............................................................................................................. 43, 47

Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837 (1984)....................................... 13, 14

ClearCorrect Operating, LLC v. ITC, 810 F.3d 1283 (Fed. Cir. 2015)...................15

Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations
v. United States, 413 F. Supp. 3d 1334 (Ct. Int'l Trade 2019)..............................2

Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations
v. United States, 483 F. Supp. 3d 1253 (Ct. Int'l Trade 2020).................... passim

Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations
v. United States, 535 F. Supp. 3d 1336 (Ct Int'l Trade 2021).........................2, 12

Conn. Nat'l Bank v. Germain, 503 U.S. 249 (1992) ....................................................18

Corus Staal BV v. DOC, 395 F.3d 1343 (Fed. Cir. 2005)...........................................20

Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612 (2018)........................................................43

Exxon Mobil Corp. v. Allapattah Services, Inc., 545 U.S. 546 (2005)...................16

F.W. Woolworth Co. v. United States, 91 F.2d 973 (2nd Cir. 1937).......................41

Fag Italia S.P.A. v. United States, 291 F.3d 806 (Fed. Cir. 2002) .................. 14, 16

Federal-Mogul Corp. v. United States, 63 F.3d 1572 (Fed. Cir. 1995)............ 33, 34

Foster v. Neilson, 27 U.S. 253 (1829) ........................................................................23

Fund for Animals, Inc. v. Kempthorne, 472 F.3d 872 (D.C. Cir. 2006)……………
........................................................................................................ 22, 27, 34, 35

Girouard v. United States, 328 U.S. 61 (1946)............................................................39

Haig v. Agee, 453 U.S. 280 (1981)...............................................................................38

Hamdan v. Rumsfeld, 548 U.S. 557 (2006)..................................................................22

Helvering v. Reynolds, 313 U.S. 428 (1041)...............................................................37

In re Rath, 402 F.3d 1207 (Fed. Cir. 2005) ..................................................................20

INS v. Chadha, 462 U.S. 919 (1983)............................................................................37

Jones v. Liberty Glass Co., 332 U.S. 524 (1947) ........................................................37

Killip v. Office of Personnel Management, 991 F.2d 1564 (Fed. Cir. 1993).........37

King v. Burwell, 135 S. Ct. 2480 (2015).......................................................................31

Kisor v. Wilkie, 139 S. Ct. 2400 (2019)........................................................................37

LA Public Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986)....................................16

Medellin v. Texas, 552 U.S. 491 (2008)............................................... 21, 22, 23, 46

Milner v. Dep't of Navy, 562 U.S. 562 (2011)..............................................................18

Muwwakkil v. Office of Personnel Management, 18 F.3d 921 (Fed. Cir. 1994)....15

Nat'l Fedn. of Indep. Bus. v. DOL, 2022 U.S. LEXIS 496 (S. Ct. Jan. 13, 2022)..37

Norsk Hydro Can., Inc. v. United States, 472 F.3d 1347 (Fed. Cir. 2006) ............20

Norwegian Nitrogen Prods. v. United States, 288 U.S. 294 (1933).......................38

Schindler Elevator Corp. v. United States, 563 U.S. 401 (2011) ...........................45

Schism v. United States, 316 F.3d 1259 (Fed. Cir. 2002) .......................... 35, 38, 39

Solid Waste Agency of N. Cook Cnty v. United States Army Corps of Eng'rs,……
531 U.S. 159 (2001)......................................................................... 39, 40

Suramericana de Aleaciones Laminadas v. United States, 966 F.2d 660 (Fed. Cir.
1992) ........................................................................................ 24, 31, 34

Timex V.I. v. United States, 157 F.3d 879 (Fed. Cir. 1998) ............................ 15, 18

United States v. Gibson-Thomsen Co., 27 C.C.P.A. 267 (1940) ..................... 32, 33

United States v. Riverside Bayview Homes, 474 U.S. 121 (1985) .........................39

United States v. Ron Pair Enters., 489 U.S. 235 (1989).........................................15

United States v. Rutherford, 442 U.S. 544 (1979).................................................38

Usinor Industeel, S.A. v. United States, 112 Fed. Appx. 59 (Fed. Cir. 2004) ........18

Usinor Industeel, S.A. v. United States, 215 F. Supp. 2d 1356 (Ct. Int'l Trade
2002) ......................................................................................................18

VF Jeanswear LP v. EEOC, 140 S. Ct. 1202 (2020).............................................37

Viraj Group, Ltd. v. United States, 343 F.3d 1371 (Fed. Cir. 2003).......................42

Weddel v. Sec'y of Dep't of Health and Human Servs., 23 F.3d 388 (Fed. Cir.
1994) ......................................................................................................18

Whitney v. Robertson, 124 U.S. 190 (1888) ..........................................................21

Zuber v. Allen, 396 U.S. 168 (1969) ......................................................................39

## Statutes

19 U.S.C. § 1304 .......... 32

19 U.S.C. § 3511 .......... 4, 5

19 U.S.C. § 3512 .......... 5, 19, 20

19 U.S.C. § 3513 .......... 8, 45

28 U.S.C. § 1295 .......... 2

28 U.S.C. § 1581 .......... 2

Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) .......... 31

## Regulations

19 C.F.R. § 351.214 .......... 3, 4

## Administrative Determinations

Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7308 (Dep't Commerce Feb. 27, 1996) .......... 5, 6

Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,321 (Dep't Commerce May 19, 1997) .......... 4, 6, 46

Brass Sheet and Strip From Germany: Final Results of the Full Third Five-Year ("Sunset") Review of the Antidumping Duty Order, 77 Fed. Reg. 4,762 (Dep't Commerce Jan. 31, 2012) .......... 21

Certain Cased Pencils From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015, 82 Fed. Reg. 24,675 (Dep't Commerce May 30, 2017) .......... 21

Certain Lined Paper Products From India: Final Results of Countervailing Duty Administrative Review; 2016, 84 Fed. Reg. 23,765 (Dep't Commerce May 23, 2019) .......... 21

Certain Softwood Lumber Products From Canada: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order, 83 Fed. Reg. 347 (Dep't Commerce Jan. 3, 2018) .......... 6

Certain Softwood Lumber Products From Canada: Final Results of Countervailing Duty Expedited Review, 84 Fed. Reg. 32,121 (Dep't Commerce, July 5, 2019) ..........1

Certain Softwood Lumber Products From Canada: Initiation of Expedited Review of the Countervailing Duty Order, 83 Fed. Reg. 9,833 (Dep't Commerce Mar. 8, 2018) ..........7

**Others**

Interim, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/interim. ..........45

Proclamation 6821, 109 Stat. 1813 (Sept. 12, 1995) ..........5

S. Rep. No. 103-412 (1994) ..........19

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. DOC. NO. 103-316 (2d. Sess. 1994).......... passim

# RESPONSE BRIEF OF COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS (PLAINTIFF-APPELLEE)

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. Rules 47.5 and 28(a)(4), counsel for the Plaintiff-Appellee Committee Overseeing Action for Lumber International Trade Investigations or Negotiations ("COALITION") hereby states:

1) there has been no other appeal in or from the same civil action or proceeding in the lower court previously before this or any other appellate court;

2) counsel is not aware of any case to be pending in this or any other court or agency that will directly affect or be directly affected by the Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The COALITION filed an action with the Court of International Trade ("CIT"), challenging the U.S. Department of Commerce's ("Commerce") final results of the countervailing duty ("CVD") expedited review covering softwood lumber products from Canada. See Certain Softwood Lumber Products From Canada: Final Results of Countervailing Duty Expedited Review, 84 Fed. Reg. 32,121 (Dep't Commerce, July 5, 2019) ("Final Results"), and the accompanying unpublished Issues and Decision Memorandum ("IDM"), Joint Appendix ("Appx") 1105-1212. Specifically, the COALITION alleged that Commerce lacks statutory

authority to issue the CVD expedited review regulation and conduct CVD expedited reviews. The CIT found that it had jurisdiction pursuant to 28 U.S.C. § 1581(i). Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States, 413 F. Supp. 3d 1334, 1346-47 (Ct. Int'l Trade 2019) ("Coalition II"). On August 18, 2021, the CIT issued a final judgment and order sustaining Commerce's Final Results of Redetermination Pursuant to Court Remand ("Remand Redetermination"), where the agency concluded that it does not have statutory authority to promulgate the CVD expedited review regulation and issue the Final Results. Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States, 535 F. Supp. 3d 1336 (Ct Int'l Trade 2021) ("Coalition IV"), Appx0001 (Judgment), Appx0004-51 (Opinion).

Mobilier Rustique (Beauce) Inc., Fontaine Inc., as well as the Government of Canada, Marcel Lauzon Inc., Les Produits Forestiers D&G Ltee, North American Forest Products Ltd., Parent-Violette Gestion Ltee, Le Groupe Parent Ltee, Scierie Alexandre Lemay & Fils Inc., Government of Quebec, Mobilier Rustique (Beauce) Inc., Government of the Province of New Brunswick (collectively, the "Canadian Parties") filed their notices of appeal to this Court. The Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## STATEMENT OF THE ISSUE

This brief responds to one single issue presented by the Canadian Parties in their opening brief: whether the CIT erred in holding that Commerce lacks statutory authority to promulgate 19 C.F.R. § 351.214(k) (now at 19 C.F.R. § 351.214(l)) and conduct "CVD expedited reviews."[1]

## STATEMENT OF THE CASE

### I. COMMERCE'S CVD EXPEDITED REVIEW REGULATION

Commerce created a "CVD expedited review" process through its regulation at 19 C.F.R. § 351.214(k) (now located at 19 C.F.R. § 351.214(l)) for any "exporter that the Secretary did not select for individual examination." 19 C.F.R. § 351.214(l)(1). Companies that request such a review must do so "within 30 days of the date of publication in the Federal Register of the countervailing duty order," and provide a certification affirming that, among other things, the requester exported the subject merchandise to the United States during the period of investigation ("POI") and that "the requester is not affiliated with an exporter or producer that the Secretary individually examined in the investigation." Id. Commerce "will initiate a review in the month following the month in which a request for review is due." 19 C.F.R. § 351.214(l)(2)(i). The period of review

[1] The Canadian Parties listed four other issues in their "Statement of Issues," but did not provide arguments for these issues. See Canadian Parties Opening Br. at 5.

("POR") will be the POI used in the investigation. 19 C.F.R. § 351.214(l)(3)(i). The objective of the CVD expedited reviews is to "provide a noninvestigated exporter with its own cash deposit rate prior to the arrival of" the first administrative review. Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,321 (Dep't Commerce May 19, 1997) ("Final Regulations"). However, "{t}he Secretary may exclude from the countervailing duty order in question any exporter for which the Secretary determines an individual net countervailable subsidy rate of zero or de minimis, provided that the Secretary has verified the information on which the exclusion is based." 19 C.F.R. § 351.214(l)(3)(iv) (internal citation omitted).

## II. HISTORY OF COMMERCE'S PROMULGATION OF THE CVD EXPEDITED REVIEW REGULATION

In 1994, Congress passed the Uruguay Round Agreements Act ("URAA") to implement a number of trade agreements (collectively "WTO agreements"), including the Agreement on Subsidies and Countervailing Measures ("SCM Agreement"), resulting from the Uruguay Round of multilateral trade negotiations. 19 U.S.C. § 3511(a), (d)(12). Specifically, "{i}n the URAA, Congress made numerous amendments to the antidumping and countervailing duty provisions of the Tariff Act of 1930" in order to fulfill the United States' obligations under the WTO agreements. IDM at 18, Appx1122. Congress also approved the Statement of Administrative Action ("SAA"), 19 U.S.C. § 3511(a)(2), and made clear that the

SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d); see Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. DOC. NO. 103-316 (2d. Sess. 1994) ("SAA").

On September 12, 1995, then President Clinton issued a proclamation declaring that the WTO agreements entered into force for the United States on January 1, 1995. Proclamation 6821, 109 Stat. 1813 (Sept. 12, 1995); see 19 U.S.C. § 3511(b).[2] On February 27, 1996, Commerce published its proposed regulations, "to conform to the statutory amendments made by the URAA." Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7308 (Dep't Commerce Feb. 27, 1996) ("Proposed Regulations"). The Proposed Regulations included the addition of section 214(k) for "CVD expedited reviews." Id. at 7318-19. Commerce explained that it promulgated this section to implement Article 19.3 of the SCM Agreement:

> To implement Article 19.3 of the SCM Agreement, paragraph (k) expands the new shipper review procedure to cover exporters that were not individually examined in a countervailing duty investigation where

---

[2] Section 101 of the URAA states that the President may determine the date on which the Uruguay Round Agreements enter into force with respect to the United States. 19 U.S.C. § 3511(b).

> the Secretary limited the investigation under section 777A(e)(2)(A) of the Act.

Proposed Regulations, 61 Fed. Reg. at 7318.

The final regulations were published on May 19, 1997. See Final Regulations, 62 Fed. Reg. 27,296.

## III. COMMERCE PROCEEDING IN THE LUMBER CVD EXPEDITED REVIEW

On January 3, 2018, Commerce published the countervailing duty order on softwood lumber products from Canada. Certain Softwood Lumber Products From Canada: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order, 83 Fed. Reg. 347 (Dep't Commerce Jan. 3, 2018) ("CVD Order"). That same month, a number of Canadian producers of softwood lumber that were not selected as mandatory or voluntary respondents in the CVD investigation filed requests for a CVD expedited review pursuant to 19 C.F.R. § 351.214(k). In response to these requests, the COALITION argued that Commerce must deny any request for a CVD expedited review due to the agency's lack of statutory authority to conduct such a review. See Letter from Picard Kentz & Rowe LLP to Commerce, "Objection to the Department's Conduct of Expedited Reviews," C-122-858 (Expedited Review) (Jan. 23, 2018) ("Objection to the CVD Expedited Review"), Appx0706-0759. Nonetheless, on March 8, 2018, Commerce initiated a CVD expedited review. Certain Softwood Lumber Products From

Canada: Initiation of Expedited Review of the Countervailing Duty Order, 83 Fed. Reg. 9,833 (Dep't Commerce Mar. 8, 2018), Appx0783-0784. Commerce issued its Final Results on June 28, 2019, and notice thereof was published in the Federal Register on July 5, 2019. Final Results, 84 Fed. Reg. at 32,121.

In the context of different administrative proceedings, Commerce has provided multiple bases for its promulgation of the CVD expedited review regulation. For example, Commerce has "cited to section 751(a) of the {Tariff} Act as granting 'authority' for the 'conduct of'" "CVD expedited reviews" under section 214(k) in Lumber IV, Supercalendered Paper from Canada, and CTL Plate from China. IDM at 28-29, Appx1132-1133. However, in the IDM accompanying the Final Results, Commerce found that its previous citation to section 751 of the Tariff Act was "legally erroneous," id. at 28, Appx1132, and "a result of confusion over the somewhat unique legal sources which provide the authority to conduct an expedited CVD review . . . ." Id. at 29, Appx1133. Instead, Commerce stated that "19 CFR 351.214(k) derives its authority from section 103(a) of the URAA, and not the {Tariff} Act." Id. at 29, Appx1133 (emphasis added).

Specifically, Section 103(a) of the URAA states:

> **(a) Implementing actions**
> After December 8, 1994—
> (1) the President may proclaim such actions, and
> (2) other appropriate officers of the United States Government may issue such regulations,

> as may be necessary to ensure that any provision of this Act, or amendment made by this Act that takes effect on the date any of the Uruguay Round Agreements enters into force with respect to the United States is appropriately implemented on such date. Such proclamation or regulation may not have an effective date earlier than the date of entry into force with respect to the United States of the agreement to which the proclamation or regulations relates.

19 U.S.C. § 3513(a). Commerce argued that Article 19.3 of the SCM Agreement requires the "CVD expedited reviews" described under the agency's regulation. IDM at 18, Appx1122. However, Congress failed to "implement the particular requirement in Article 19.3 of the SCM Agreement for expedited CVD reviews." Id., Appx1122. As such, Commerce exercised the authority to promulgate regulations under section 103(a) of the URAA to "ensure{} that United States law is consistent with" the United States' obligation under Article 19.3 of the SCM Agreement. Id. at 20, Appx1124.

## IV. PROCEEDINGS BEFORE THE COURT OF INTERNATIONAL TRADE

The COALITION appealed the Final Results, arguing that section 103(a) does not confer statutory authority for CVD expedited reviews, because the provision only authorized agencies to promulgate regulations as "necessary to ensure that any provision of this Act," i.e., the URAA, is appropriately implemented. See COALITION CIT Opening Br. at 17-18 (Dec. 12, 2019), Appx0271-0272. As the United States Government (the "Government") has

acknowledged, no provisions of the URAA provide explicit or implicit authority for Commerce to establish a "CVD expedited review" process. Id. at 18, Appx0272; see IDM at 18, Appx1122; CIT First Oral Arg. Tr. at 36-37 (Aug. 22, 2019), Appx0213-0214 (when asked to identify the specific statutory provision that provides for "CVD expedited reviews," counsel for Commerce responded, "I can't point to words that are not there"). In response to the COALITION's argument, the Government advanced additional theories of statutory authority. First, the Government stated that aside from section 103(a), section 103(b) of the URAA also confers authority for the agency to conduct CVD expedited reviews. U.S. Gov. CIT Resp. Br. at 9-11 (Mar. 18, 2020), Appx0320-0322. The agency also argued that it could lawfully conduct CVD expedited reviews under the agency's inherent authority to "reconsider previous decisions." U.S. Gov. CIT Resp. Br. at 12, Appx0323. Alternatively, the Government asserted that "{s}o long as there is no clear statutory prohibition to expedited reviews, then Commerce's 'interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.'" U.S. Gov. CIT Resp. Br. at 13 (internal citation omitted), Appx0324. Finally, during oral argument, the Government argued that Commerce has authority to conduct CVD expedited reviews through congressional acquiescence. CIT Second Oral Arg. Tr. at 20-21 (Jan 12, 2021), Appx0469-0470.

In addition, the Governments of Canada and Quebec, as Defendant-Intervenors, provided a myriad of theories for Commerce's statutory authority. For example, they argued that sections 777A(e)(2), 751(a)(1), 751(b), 705(c) of the Tariff Act provide statutory authority for CVD expedited reviews. Canadian Gov. Parties CIT Resp. Br. at 22-27 (Apr. 10, 2020), Appx0389-0394.

The CIT found that the plain language of sections 103(a) and (b) of the URAA does not confer statutory authority for CVD expedited reviews. See Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States, 483 F. Supp. 3d 1253 (Ct. Int'l Trade 2020) ("Coalition III"), Appx0052-0086. Specifically, the CIT held that section 103(a) "grants Commerce regulatory authority with respect to enacted provisions, but extends no further to encompass perceived international obligations that Congress did not implement through the URAA." Id. at 1264, Appx0068-0069. The CIT reasoned that this holding is "consistent with the non-self-executing nature of the Uruguay Round Agreements." Id. at 1266, Appx0073. In other words, "absent legislation implementing Commerce's interpretation of the requirements of Article 19.3, section 103(a) does not authorize Commerce to effectuate that interpretation." Id., Appx0073. With respect to section 103(b) of the URAA, the CIT explained that the provision "authorized the issuance of 'any interim regulation necessary or appropriate to carry out any action proposed in the SAA . . . .'" Id. at 1267,

Appx0074. This provision does not confer authority because the SAA "does not propose any actions to implement CVD expedited reviews." Id., Appx0075.

The CIT further found that the statutory scheme and legislative history "{do} not demonstrate congressional intent either to establish CVD expedited reviews specifically or, more broadly, to permit Commerce to promulgate regulations untethered to the URAA." Id. at 1267-69, Appx0074-0078. In addition, the CIT found that Congress did not and cannot acquiesce to Commerce's construction of section 103(a) of the URAA in promulgating 19 C.F.R. § 351.214 (k). Id. at 1269-71, Appx0079-0083. However, the CIT noted that the "Government and Canadian Governmental Parties offered various post hoc justifications for Commerce's regulation and the agency's administration of CVD expedited reviews." Id. at 1271-72, Appx0084. As such, the CIT remanded the Final Results to Commerce for "consideration of these alternative bases." Id. at 1272, Appx0085.

On remand, Commerce determined that the agency does not have authority to promulgate CVD expedited review regulations and conduct CVD expedited reviews. See Remand Redetermination, Appx0547-0576. Specifically, Commerce concluded that "Commerce's inherent authority to reconsider prior decisions, and lack of an explicit prohibition on CVD expedited reviews, do not equate to specific statutory authorization under the URAA to conduct CVD expedited reviews and

promulgate CVD expedited review regulations." Id. at 10-11, Appx0556-0557. Commerce "d{id} not find that the general reference under section 101 of the URAA to Congress's approval of the SCM Agreement equates to express authority to promulgate the CVD expedited review regulations under 19 CFR 351.214(k) through section 103(a) of the URAA." Id. at 11, Appx0557. Finally, Commerce found that, contrary to the Governments of Canada and Quebec's assertion, sections 705(c), 751(a), 751(b), and/or 777A(e) of the Tariff Act did not confer any statutory authority for CVD expedited reviews. Id. at 11, Appx0557.

The CIT found that Commerce properly "explained its reasons for finding that the provisions do not support the regulations." Coalition IV, 535 F. Supp. 3d at 1348, Appx0023. Accordingly, the CIT sustained Commerce's Remand Redetermination and ordered Commerce's CVD expedited review regulation and the Final Results to be vacated. Id. at 1355-57, Appx0035-0039.

## SUMMARY OF THE ARGUMENT

The CIT correctly found that Congress did not confer statutory authority on Commerce to promulgate the CVD expedited review regulation and conduct CVD expedited reviews. The statutory language in sections 103(a) and (b) of the URAA does not support an argument that Congress clearly and unambiguously intended for Commerce to establish a procedure for CVD expedited reviews, as described in the agency's regulation. The legislative history further demonstrates that Congress

did not anticipate that additional administrative proceedings, such as CVD expedited reviews, were needed to fulfill U.S. obligations under Article 19.3 of the SCM Agreement. Accordingly, the Court should, consistent with the CIT's judgment and decision, find that Commerce promulgated the CVD expedited review regulation and issued the Final Results in excess of its statutory authority.

## ARGUMENT

### I. STANDARD OF REVIEW

The Court reviews de novo whether Commerce's interpretation of the statue is in accordance with law. See Agro Dutch Indus., Ltd. v. United States, 508 F.3d 1024, 1029-30 (Fed. Cir. 2009). The Court conducts such an inquiry within the two-step framework established in Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837 (1984). Id. Under Chevron, the Court must first ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43. In analyzing Chevron step one, the Court looks at whether there is "clear direction from the statute." Fag Italia S.P.A. v. United States, 291 F.3d 806, 815 (Fed. Cir. 2002). The court then asks "whether there is ambiguous statutory language that might authorize the agency to fill a statutory gap." Id. Only when there is ambiguity in the statute will the court proceed to step two of the Chevron test,

which asks whether the agency's "interpretation of ambiguous language is based on a permissible interpretation of the statute." Fag Italia S.P.A., 291 F.3d at 815; see also Chevron, 467 U.S. at 843.

## II. SECTION 103(A) OF THE URAA DOES NOT PROVIDE STATUTORY AUTHORITY FOR CVD EXPEDITED REVIEWS

### A. Chevron Step One: Congressional Intent Is Clear that Congress Does Not Intend to Establish CVD Expedited Reviews

In its opening brief, the Canadian Parties argue that the CIT erred, first, in holding that the statutory text, structure, and legislative history all demonstrate that there was no congressional intent to establish CVD expedited reviews and, second, in holding that nothing in the statute would "permit Commerce to promulgate regulations untethered to the URAA." See Canadian Parties Opening Br. at 22; Coalition III, 483 F. Supp. 3d at 1263-69, Appx0068-0078. Specifically, the Canadian Parties assert that when applying step one of the Chevron analysis, the CIT should not have focused "on the absence of a statutory provision in the URAA itself that expressly addresses expedited reviews, and on the absence in the SAA of a specific proposed action regarding expedited reviews." Canadian Parties Opening Br. at 25 (emphases omitted). Instead, the CIT should have examined "sections 101(a), 102(d), and 103 of the URAA, and those provisions' express approval of the SAA, and Article 19.3 of the SCM Agreement" "as a whole" to

find that "Congress authorized Commerce to establish an expedited review process." Id. As explained below, the Canadian Parties' arguments are meritless.

### 1. The Statute Is Clear and Unambiguous that Congress Did Not Intend to Establish "CVD Expedited Reviews"

It is axiomatic that under Chevron step one, "{t}he first and foremost 'tool' to be used {in statutory construction} is the statute's text, giving it its plain meaning." Timex V.I. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998); see also ClearCorrect Operating, LLC v. ITC, 810 F.3d 1283, 1290 (Fed. Cir. 2015) ("'In construing a statute, {the court} begin{s} with its literal text, giving it its plain meaning.'") (internal citation omitted). "Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter." Timex, 157 F.3d at 882 (citing Muwwakkil v. Office of Personnel Management, 18 F.3d 921, 924 (Fed. Cir. 1994) ("When statutory interpretation is at issue, the plain and unambiguous meaning of a statute prevails.")). "{W}here . . . the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms{;}'" "reference to legislative history . . . is hardly necessary." United States v. Ron Pair Enters., 489 U.S. 235, 241 (1989) (internal citation omitted). This is because "the authoritative statement is the statutory text, not the legislative history or any other extrinsic material." Exxon Mobil Corp. v. Allapattah Services, Inc., 545 U.S. 546, 568 (2005).

As the CIT found, and the Canadian Parties acknowledge, the statute "does not contain an explicit provision for the administration of CVD expedited reviews." Coalition III, 483 F. Supp. 3d at 1263, Appx0067; Canadian Parties Opening Br. at 30 ("there was no statutory provision in the URAA itself or in any amendment made by the URAA that expressly addressed expedited reviews"). Particularly, the "Canadian Governmental Parties explicitly concede that 'this Act' {in section 103(a) of the URAA} refers to the URAA." Coalition III, 483 F. Supp. 3d at 1264, n.17, Appx0068. As such, the text of the URAA "grants Commerce regulatory authority with respect to enacted provisions, but extends no further to encompass perceived international obligations that Congress did not implement through the URAA." Id. at 1264, Appx0068-0069.

Further, it is axiomatic that "the absence of a statutory prohibition cannot be the source of agency authority," Fag Italia S.P.A., 291 F.3d at 816, because "an agency literally has no power to act . . . unless and until Congress confers power upon it." LA Public Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986); see also Agro Dutch Indus., Ltd., v. United States, 508 F.3d 1024, 1033 (Fed. Cir. 2007) (stating that while Congress may not have affirmatively barred Commerce from certain action, "Congress also did not authorize Commerce to do so, and under settled principles of statutory construction, the effect is the same"). "Indeed, agency authority may not be lightly presumed. 'Were courts to presume a

delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with Chevron, Mead, and quite likely with the Constitution as well.'" Atl. City Elec. Co. v. FERC, 295 F.3d 1, 9 (D.C. Cir. 2002) (internal quotation omitted).

The Canadian Parties contest the applicability of these cases, but fail to identify any statutory language that provides for CVD expedited reviews. See Canadian Parties Opening Br. at 45-48. Instead, they argue that this case differs from those relied upon by the CIT in that the legislative history, i.e., the SAA, demonstrates a congressional intent that is not otherwise exemplified through the clear and unambiguous language of the statute.[3] Canadian Parties Opening Br. at 47. And yet, the SAA is not enacted in the statute and does not appear anywhere in the U.S. Code. As such, at oral argument, Chief Judge Barnett appropriately observed that the SAA is not "a{n} authorizing document in and of itself," and therefore cannot create new, independent legal authority for agency action. CIT Second Oral Arg. Tr. at 32 (Jan. 1, 2021), Appx0481; Usinor Industeel, S.A. v. United States, 215 F. Supp. 2d 1356, 1358 (Ct. Int'l Trade 2002), aff'd per curiam,

[3] As discussed in Section II.3., the SAA does not demonstrate that Congress intended to establish "CVD expedited reviews" as described in Commerce's regulation. The SAA demonstrates the opposite – Congress considered the obligations under the SCM Agreement, and enacted what it perceived to be necessary to implement such obligations. And in Congress' view, these obligations did not include CVD expedited reviews.

112 Fed. Appx. 59 (Fed. Cir. 2004) ("The court does not read § 3512(d) to transform the SAA into a controlling 'statutory' provision that can trump the actual statute."); see also Weddel v. Sec'y of Dep't of Health and Human Servs., 23 F.3d 388, 391 (Fed. Cir. 1994) ("only language that meets the constitutional requirements of bicameralism and presentment has true legal authority"). The Court should not allow the SAA to "muddy clear statutory language." Milner v. Dep't of Navy, 562 U.S. 562, 572 (2011); see also Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) (declining to examine whether the legislative history points to a different result from that demonstrated by the unambiguous language of the statute).

"{A} statute's text is Congress's final expression of its intent," Timex, 157 F.3d at 882, and "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." Conn. Nat'l Bank, 503 U.S. at 253-54. Given that the statute's text answers the question on whether Congress conferred statutory authority, that should be the end of the Court's inquiry on the matter. See Timex, 157 F.3d at 882.

### 2. Congress Did Not Authorize the Promulgation of CVD Expedited Reviews by Approving the SCM Agreement

The Canadian Parties assert that congressional approval of the SCM Agreement in section 101(a)(2) of the URAA is sufficient to establish

congressional authorization for Commerce to implement regulations to comply with what the Canadian Parties believe to be the United States' obligations under Article 19.3 of the SCM Agreement. See Canadian Parties Opening Br. at 36. This argument, however, ignores the non-self-executing nature of the SCM Agreement.

It is well-established that WTO agreements, including the SCM Agreement, are not self-executing. See 19 U.S.C. § 3512(a) ("{n}o provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect," and "{n}othing in this Act shall be construed—to limit authority conferred under any law of the United States . . . unless specifically provided for in this Act"). This understanding is reflected in the legislative history of the URAA, where Congress explicitly stated that the WTO agreements "are not self-executing and thus their legal effect in the United States is governed by implementing legislation." S. Rep. No. 103-412, at 13 (1994).

Accordingly, the Court has found that WTO agreements are not self-executing. See, e.g., Corus Staal BV v. DOC, 395 F.3d 1343, 1348-1349 (Fed. Cir. 2005) ("'no provision of any of the Uruguay Round Agreements . . . , nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect.' 19 U.S.C. §

3512(a) (2000). Neither the {General Agreement on Tariffs and Trade ("GATT")} nor any enabling international agreement outlining compliance therewith . . . trumps domestic legislation; if U.S. statutory provisions are inconsistent with the GATT or an enabling agreement, it is strictly a matter for Congress.'"); In re Rath, 402 F.3d 1207, 1210 (Fed. Cir. 2005) (finding that 19 U.S.C. § 3512(a)(1) made clear that WTO agreements, such as the Trade-Related Aspects of Intellectual Property agreement in question in the case, are not self-executing); Norsk Hydro Can., Inc. v. United States, 472 F.3d 1347, 1360 (Fed. Cir. 2006) (finding that Article 19.4 of the SCM Agreement is not self-executing).

The U.S. Government has also explained that WTO agreements are not self-executing. For example, in the proceeding below, when specifically inquired by the CIT, the Government stated it "agree{s} that the agreements are not self-executing." CIT Second Oral Arg. Tr. at 22 (Jan. 1, 2021), Appx0471. This is consistent with Commerce's longstanding position in other cases. See, e.g., Certain Lined Paper Products From India: Final Results of Countervailing Duty Administrative Review; 2016, 84 Fed. Reg. 23,765 (Dep't Commerce May 23, 2019) and accompanying Issues and Decision Memorandum at 28-29 ("WTO agreements are not self-executing under U.S. law, unless adopted pursuant to a specified statutory scheme as established in the Uruguay Round Agreements Act. The authority exercised by Commerce is governed by the {Tariff} Act, as well as

Commerce's regulations."); Certain Cased Pencils From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015, 82 Fed. Reg. 24,675 (Dep't Commerce May 30, 2017) and accompanying Issues and Decision Memorandum at 18; Brass Sheet and Strip From Germany: Final Results of the Full Third Five-Year ("Sunset") Review of the Antidumping Duty Order, 77 Fed. Reg. 4,762 (Dep't Commerce Jan. 31, 2012) and accompanying Issues and Decision Memorandum at 8.

The Supreme Court has explained that when international agreements are "'not self-executing{,} they can only be enforced pursuant to legislation to carry them into effect.'" Medellin v. Texas, 552 U.S. 491, 505 (2008) (quoting Whitney v. Robertson, 124 U.S. 190, 194 (1888)). "The requirement that Congress, rather than the President, implement a non-self-executing treaty derives from the text of the Constitution, which divides the treaty-making power between the President and the Senate." Id. at 526 ("'the power to make the necessary laws is in Congress; the power to execute in the President'") (quoting Hamdan v. Rumsfeld, 548 U.S. 557, 591 (2006)). If the President wishes an international agreement to be self-executing, "the Senate must consent to the treaty by the requisite two-thirds vote, consistent with all other constitutional restraints." Id. at 526. In contrast, "the terms of a non-self-executing treaty can become domestic law only in the same way as any other law--through passage of legislation by both Houses of

Congress, combined with either the President's signature or a congressional override of a Presidential veto." Id. (emphasis added).

The Supreme Court made clear that this understanding regarding non-self-executing agreements "precludes the assertion that Congress has implicitly authorized the President—acting on his own—to achieve precisely the same result." Id. at 527. Put differently, Congress did not authorize the executive branch to "unilaterally to give the effect of domestic law to obligations under a non-self-executing treaty" simply by ratifying that treaty. Id. at 528; see also Fund for Animals, Inc. v. Kempthorne, 472 F.3d 872, 879 (D.C. Cir. 2006) ("{S}trictly, it is the implementing legislation, rather than the agreement itself, that is given effect as law in the United States. That is true even when a non-self-executing agreement is 'enacted' by, or incorporated in, implementing legislation.") (internal quotation omitted).

Here, given that the WTO agreements are not self-executing, Congress's approval of these agreements in section 101 of the URAA does not authorize the executive branch, including Commerce, to give the effect of domestic law through regulations to international obligations that the agency believes Congress failed to address. Medellin, 552 U.S. at 528. As discussed above, the URAA does not contain a provision that authorizes the procedure for "CVD expedited reviews," as described in Commerce's regulation. Allowing Commerce to nonetheless

effectuate administrative proceedings – like the "CVD expedited reviews" – through regulation would authorize the executive branch to make law while transforming a non-self-executing agreement into a self-executing one, an outcome specifically prohibited by the Supreme Court in Medellin. Id., 552 U.S. at 527. Vesting such authority with an administrative agency violates the constitutional principle that "the power to make the necessary laws is in Congress; the power to execute in the President." Id. at 526.

Indeed, "{t}he point of a non-self-executing treaty is that it 'addresses itself to the political, not the judicial department; and the legislature must execute the contract before it can become a rule for the Court.'" Medellin, 552 U.S. at 516 (quoting Foster v. Neilson, 27 U.S. 253, 314 (1829)). Based on the same reasoning, this Court has made clear that "{w}hile we acknowledge Congress's interest in complying with U.S. responsibilities under the GATT, we are bound not by what we think Congress should or perhaps wanted to do, but by what Congress in fact did. The GATT does not trump domestic legislation; if the statutory provisions at issue here are inconsistent with the GATT, it is a matter for Congress and not this court to decide and remedy." Suramericana de Aleaciones Laminadas v. United States, 966 F.2d 660, 667-668 (Fed. Cir. 1992) (citing Algoma Steel Corp. v. United States, 865 F.2d 240, 242 (Fed. Cir. 1989)). Accordingly, the Canadian Parties' assertion that the Court should consider the meaning of Article

19.3 of the SCM Agreement must fail. Canadian Parties Opening Br. at 35-37. The decision of what the United States' obligations were under the SCM Agreement is a matter for Congress to determine, not a federal agency. As discussed below, Congress has conformed the statutory language to what it perceived to be the United States' obligations under Article 19.3. However, "should there be a conflict, the United States legislation must prevail." Algoma Steel Corp., 865 F.2d at 242.

### 3. The SAA Confirms that Congress Did Not Intend to Establish the "CVD Expedited Review" Procedure Described in Commerce's Regulation

Because the express terms of the URAA are clear and unambiguous, the Court need not resort to legislative history to ascertain Congress's intent. However, a review of the SAA demonstrates that, contrary to the Canadian Parties' assertion, Congress did not intend to establish "CVD expedited reviews."

The SAA summarized the changes Congress felt necessary to conform U.S. law to Article 19.3 of the SCM Agreement. SAA, H.R. DOC. NO. 103-116 at 941-42. The relevant section of the SAA reads in full:

> **5. Company-Specific Subsidy Rates and Expedited Reviews**
>
> Pursuant to existing section 706(a)(2), Commerce normally calculates a country-wide rate applicable to all exporters unless there is a significant differential in CVD rates between companies or if a state-owned company is involved. Article 19.3 of the Subsidies Agreement provides that any exporter whose exports are subject to a CVD order, but which was not actually investigated for reasons other than a refusal

to cooperate, shall be entitled to an expedited review to establish an individual CVD rate for that exporter.

Several changes must be made to the Act to implement the requirements of Article 19.3 of the Subsidies Agreement. The Administration has used the amendments being made to implement the Antidumping Agreement as a model for amending the CVD law.

**a. Individual Countervailing Duty Rates**

Section 265(1) of the implementing bill repeals section 706(a)(2). It eliminates the presumption in favor of a single country-wide CVD rate and amends section 777A of the Act to establish a general rule in favor of individual CVD rates for each exporter or producer individually investigated. Section 777A(e)(2) provides for an exception from this general rule in cases involving a large number of exporters or producers. In such situations, Commerce may limit its examination to a reasonable number of exporters or producers by (1) using statistically valid sampling techniques or (2) examining those exporters and producers accounting for the largest volume of the subject merchandise that Commerce determines can be reasonably examined. In addition, instead of examining a limited number of individual exporters and producers, section 777A(e)(2)(B) would permit Commerce to calculate, on the basis of aggregate data, a single country-wide subsidy rate to be applied to all exporters and producers of the subject merchandise.

Section 264(a) of the bills amends section 703(d)(1) to provide that when Commerce issues an affirmative preliminary CVD determination, it will determine an individual countervailable subsidy rate to be applied to each exporter and producer individually investigated and an "all-others" rate to be applied to those exporters and producers who were not individually investigated. Where Commerce has used the approach authorized under section 777A(e)(2)(B), Commerce would apply a country-wide rate to all firms. Section 705(c)(1)(B) would apply similar rules to affirmative final CVD determinations.

**b. All-others Rate**

Section 264(b)(2) of the bill amends section 705(c) of the Act to establish rules for calculating the all-others rate and the country-wide

> subsidy rate. Where Commerce has examined a limited number of individual companies, section 705(c)(5)(A)(i) provides that the all-others rate would be an amount equal to the weighted average individual countervailable subsidy rates established for exporters and producers individually investigated, exclusive of zero and de minimis rates and any rates determined entirely on the basis of the facts available. Where the countervailable subsidy rates for all exporters and producers examined are zero or de minimis, or are determined entirely on the basis of the facts available, section 705(c)(5)(A)(ii) authorizes Commerce to use any reasonable method to establish an all-others rate. Where Commerce has used the approach authorized under section 777A(e)(2)(B), Commerce would calculate the single country-wide rate based on aggregate industry-wide data regarding the use of countervailable subsidies.

Id. (emphases added).

As the SAA's full discussion of the provision demonstrates, Congress was expressly aware of the obligation under Article 19.3 of the SCM Agreement to establish a procedure for the determination of an individual CVD rate for those exporters or producers that were not actually investigated, and Congress amended U.S. law to that effect. However, no changes to the Act were made authorizing Commerce to conduct "CVD expedited reviews" as described under Commerce's regulation.

"When the Legislative and Executive Branches have chosen not to incorporate certain provisions of a non-self-executing treaty into domestic law, we must assume that they acted intentionally." Fund for Animals, Inc., 472 F.3d at 880. Such is the case here. Congress's acknowledgement of U.S. obligations under Article 19.3 of the SCM Agreement and its determination to make no

amendment to the Act creating a new administrative process (i.e., "CVD expedited reviews") indicate that it did not believe that such a proceeding, or any additional administrative proceedings other than those already provided for under the URAA, were required to implement U.S. obligations. Put differently, Congress's inaction is appropriately understood as an express denial of the necessity of the creation of "CVD expedited reviews," rather than a delegation of broad authority for Commerce to establish processes or proceedings the agency deems appropriate. Contra Canadian Parties Opening Br. at 32-35.

The SAA and URAA demonstrate that Congress's understanding of the obligations of Article 19.3 of the SCM Agreement of the phrase "actually investigated" means both those "individually investigated" companies and all other companies that exported during the POI and that are assigned a CVD rate based on the results of Commerce's investigation. That is, as used by Congress in enacting the URAA, the phrases "actually investigated" and "individually investigated" are not synonymous.

Ultimately, the Canadian Parties' argument regarding the SAA boils down to an interpretation of the phrase "actually investigated" that is simply the one they prefer. The Canadian Parties believe that such a term is synonymous with "individually investigated" and thus, anyone not treated as a mandatory or voluntary respondent in a CVD investigation should therefore be entitled to a

"CVD expedited review." See Canadian Parties Opening Br. at 29 ("Article 19.3 of the SCM Agreement requires that exporters not individually examined in an investigation be granted an opportunity to demonstrate their specific level of subsidization") (emphasis added).

The SAA, however, establishes that Congress interpreted "not actually investigated," as used in Article 19.3 of the SCM Agreement, to mean those "new" exporters or producers who had not exported during the period of investigation. Such an understanding is consistent with the views of other WTO Members, particularly in the context of their prospective trade remedy systems. For example, in discussing potential changes to Article 19.3 of the SCM Agreement in the context of the WTO Negotiating Group on Rules, both Taiwan and the European Commission ("EC") explained that, in their view, the obligation in Article 19.3 relates specifically to "new shipper reviews." See Objection to the CVD Expedited Review at 14-15, n.33 (citing Countervailing Measures: Comments and Proposal from the Separate Customs Territory of Taiwan, Penghu, Kinmen and Matsu on the Paper Submitted by the European Communities on Countervailing Measures, WTO Negotiating Group on Rules, TN/RL/GEN/96 at 4-5 (Jan. 19, 2006)), Appx0719-0720.

**4. New shipper reviews**

(a) Explanation

> Article 19.3 of the ASCM provides that "any exporter whose exports are subject to a definitive countervailing duty but who was not actually investigated for reasons other than a refusal to cooperate, shall be entitled to an expedited review in order that the investigating authorities promptly establish an individual countervailing duty rate for that exporter." The language of this provision is substantially less detailed than its counterpart in Article 9.5 of the ADA.
>
> While The Separate Customs Territory of Taiwan, Penghu, Kinmen and Matsu agrees that there may be some ground to further elaborate on the conditions in which a new exporter is entitled to request a new shipper review, such conditions need to be balanced. In particular, while it may be legitimate to require evidence that the new exporter which requests the review has actually started to export after the period of investigation, it seems excessive to require evidence that such exports have been made in substantive quantities.
>
> The EC proposes a fast-track system for "new exporters" according to which the individual margin of subsidization of the new exporters will automatically correspond to the weighted average of the margins established for the investigated producers. While The Separate Customs Territory of Taiwan, Penghu, Kinmen and Matsu considers that it may be relevant to introduce a fast track new shipper review system resulting in an average countervailing duty being imposed, in order to avoid the burdens of an investigation, this should only constitute an alternative solution as each exporter should keep the right to ask for an individual examination and the imposition of an individual countervailing duty irrespective of whether or not sampling was used.

Id. (emphasis added), Appx0719-0720.

Taiwan then offered the following proposed change to Article 19.3 of the SCM Agreement to provide further clarity about the purpose of the obligation:

> Any exporter whose exports are subject to a definitive countervailing duty but who was not actually investigated for reasons other than a refusal to cooperate, shall be entitled to an expedited review in order that the investigating authorities promptly establish an individual countervailing duty rate for that exporter, provided that this exporter or

> producer can show that it is not related to any of the exporters or producers in the exporting country who are subject to the countervailing duties on the product and provided that it has exported or has committed to export the product concerned to the importing Member after the period of investigation.

Id. at 15 (emphasis added), Appx0720.

Further, in Mexico – AD Measures on Beef and Rice, the United States and Mexico discussed the obligations for new shipper reviews expressly under the relevant language of Article 19.3 of the SCM Agreement and Article 9.5 of the WTO Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994 ("AD Agreement"). See id. at 16-17, n.35 (citing Report of the Panel, Mexico – Definitive Antidumping Measures on Beef and Rice, WT/DS295/R at paras. 7.264-7.269 (June 6, 2005)), Appx0721-0722. The WTO dispute settlement panel described these obligations as follows: "in case a producer or exporter which (i) has not exported the product to the country concerned during the period of investigation and (ii) is not related to an exporter or producer already subject to the duty requests a new shipper review, the authority is required to promptly carry out such a review." Id., Appx0721-0722.

These materials demonstrate that Congress, in fact, has implemented what it perceived to be the United States' obligations under Article 19.3 of the SCM Agreement in sections 264 and 265 of the URAA. See Uruguay Round Agreements Act, Pub. L. No. 103-465, §§ 264, 265, 108 Stat. 4809, 4912-15

(1994); SAA, H.R. DOC. NO. 103-116 at 941. The Canadian Parties may believe otherwise. However, the Canadian Parties' interpretation of Article 19.3 does not establish an international obligation for the United States, and it does not provide Commerce the authority to promulgate regulations based on that interpretation. Given that Congress has spoken on the issue through clear and unambiguous statutory language, which is further supported by the SAA, "neither Commerce nor this Court is 'permitted to substitute its own definition for that of Congress.'" Agro Dutch Indus., 508 F.3d at 1033 (quoting AK Steel Corp. v. United States, 226 F.3d 1361, 1371 (Fed. Cir. 2000)). The Court "must enforce {the statutory language} according to its terms." King v. Burwell, 135 S. Ct. 2480, 2489 (2015); Suramericana de Aleaciones Laminadas, 966 F.2d at 667-668 ("we are bound not by what we think Congress should or perhaps wanted to do, but by what Congress in fact did").

**4. Cases Cited by the Canadian Parties Are Inapposite Because the Statute Is Clear and Unambiguous**

The Canadian Parties rely on Bestfoods v. United States, 165 F.3d 1371 (Fed. Cir. 1999) and Charming Betsy to support their position that Commerce has authority to promulgate the CVD expedited review regulation. However, these cases are not germane to the Court's analysis because they all concern agency interpretation of an ambiguous statute.

Specifically, the Canadian Parties attempt to analogize Bestfoods to the instant action in that both cases involve a congressional grant of regulatory authority to implement provisions in the implementing legislation of an international agreement. See Canadian Parties Opening Br. at 32-35. However, that is where the similarity ends. In Bestfoods, Customs' action was governed by the marking statute, which provided that "an article of foreign origin must 'be marked in a conspicuous place . . . in such manner as to indicate to an ultimate purchaser in the United States . . . the country of origin of the article.'" Bestfoods, 165 F.3d at 1372 (citing 19 U.S.C. § 1304). The statute did not define when a product constitutes "an article of foreign origin" so as to trigger the marking requirement. See Bestfoods, 165 F.3d at 1375; United States v. Gibson-Thomsen Co., 27 C.C.P.A. 267 (1940). The Court of Customs and Patent Appeals interpreted the statute and determined the test would be whether the product has undergone a "substantial transformation" by "having 'a new name, character and use.'" Bestfoods, 165 F.3d at 1373 (citing Gibson-Thomsen Co., 27 C.C.P.A. at 273).

After Congress implemented the North America Free Trade Agreement ("NAFTA") through the NAFTA Implementation Act, the Secretary of the Treasury promulgated its marking regulation for NAFTA goods, which applied a different test in determining when a product qualified as an article of foreign

origin. Bestfoods, 165 F.3d at 1374-75. The Bestfoods court determined that Treasury's marking regulation was lawful because the statute was ambiguous regarding what constitutes "an 'article of foreign origin.'" Bestfoods, 165 F.3d at 1375. As such, Treasury acted in accordance with its delegated authority.

Here, as discussed above, the statute is clear and unambiguous that Congress did not authorize Commerce to promulgate the CVD expedited review regulation and conduct CVD expedited reviews. Thus, the Bestfoods holding is inapposite.

Charming Betsy is similarly not germane to the Court's analysis, because it only applies when the statute is ambiguous. Contra Canadian Parties Opening Br. at 37-39. For example, in Federal-Mogul Corp. v. United States, 63 F.3d 1572 (Fed. Cir. 1995), the statute "presented Commerce with a choice between methodologies for calculating dumping margins that are tax-neutral, on the one hand, and methodologies that are not tax-neutral, on the other." Id., 63 F.3d at 1581. The court held that the methodology that was consistent with "international economic understandings, negotiated by this country, regarding fair trade policy" prevailed. Id. In Allegheny Ludlum Corp. v. United States, 367 F.3d 1339 (Fed. Cir. 2004), the court found that the statute did not specify when a past countervailable subsidy continued to be countervailable after a change of ownership. Id., 367 F.3d at 1343-44. Thus, "absent contrary indications in the

statutory language or its legislative history," an interpretation that is consistent with international obligations was favored. Id., 63 F.3d at 1348.

In contrast, the Court has made clear that an unambiguous statute must prevail over any international concern. See, e.g., Suramericana de Aleaciones Laminadas, 966 F.2d at 667-68 ("The GATT does not trump domestic legislation; if the statutory provisions at issue here are inconsistent with the GATT, it is a matter for Congress and not this court to decide and remedy."); Algoma Steel Corp., 865 F.2d at 242 ("Should there be a conflict {between the international agreement and the domestic legislation}, the United States legislation must prevail."); see also Fund for Animals, Inc., 472 F.3d at 878 ("plaintiffs cite the canon of construction that ambiguous statutes should not be construed to abrogate treaties. That argument lacks merit. The canon applies only to ambiguous statutes.").[4] Given that the URAA is not ambiguous, Charming Betsy does not apply in this case.

---

[4] Justice Kavanaugh, then a judge at the D.C. Circuit, penned the majority opinion in Fund for Animals, Inc. In addition, he wrote a concurring opinion cautioning against applying Charming Betsy to "non-self-executing treaties" in general, given that these documents "have no force as a matter of domestic law." Fund for Animals, Inc., 472 F.3d at 880. Specifically, he explained:

> When the Legislative and Executive Branches have chosen not to incorporate certain provisions of a non-self-executing treaty into domestic law, we must assume that they acted intentionally. Given such a deliberate decision by the Legislative and Executive Branches, basic principles of judicial restraint counsel courts to refrain from

### 5. Congress Cannot and Did Not Acquiesce to Commerce's Conduct of CVD Expedited Reviews

"{T}he Supreme Court has repeatedly made clear that an important foundation of acquiescence is that Congress as a whole was made aware of the administrative construction or interpretation and did not act on contrary legislation despite having this knowledge." Schism v. United States, 316 F.3d 1259, 1297 (Fed. Cir. 2002). The Canadian Parties ask the Court to find that "Congress acquiesced to Commerce's expedited review regulations and the conduct of expedited reviews." Canadian Parties Opening Br. at 39. The CIT considered and correctly rejected this argument, because there is "no indication that Commerce's administration of CVD expedited reviews or Commerce's interpretation of URAA § 103(a) . . . has been brought to Congress's attention." Coalition III, 483 F. Supp. 3d at 1270 (emphasis in original), Appx0080. This is particularly so because "Commerce only recently announced its reliance on section 103(a) {of the URAA} as an authority governing such reviews" in 2018. Id. at 1271, Appx0082. As such,

---

> bringing the non-self-executing treaty into domestic law through the back door (by using the treaty to resolve questions of American law). In other words, because non-self-executing treaties have no legal status in American courts, there seems to be little justification for a court to put a thumb on the scale in favor of a non-self-executing treaty when interpreting a statute. Doing so would not reflect the appropriate judicial deference to the Legislative and Executive Branches in determining if, when, and how to incorporate treaty obligations into domestic law.

Id.

Congress did not enjoy much "time or opportunity" to potentially acquiesce to Commerce's recent interpretation of the statute. Id., Appx0083.

The Canadian Parties do not dispute that Commerce's reliance on section 103(a) is recent and therefore does not support a finding for congressional acquiescence. However, they posit that the CIT erred by focusing on the agency's statutory interpretation for the source of its authority, and should instead have examined whether Congress was aware of "the expedited review regulation and Commerce's practice to conduct expedited reviews." Canadian Parties Opening Br. at 41 (emphasis added). This argument is meritless.

As an initial matter, the Canadian Parties' argument that Congress may acquiesce to an agency practice without the existence of an authorizing statute is equivalent to the assertion that, under certain circumstances, an agency may act without a statute conferring authority upon it. This argument violates the well-established principle of administrative law that all "administrative agencies are creatures of statute." Nat'l Fedn. of Indep. Bus. v. DOL, 2022 U.S. LEXIS 496, *7 (S. Ct. Jan. 13, 2022); see also VF Jeanswear LP v. EEOC, 140 S. Ct. 1202, 1204 (2020) (Thomas, J., dissenting from the denial of certiorari) ("all administrative agencies 'are creatures of statute, bound to the confines of the statute that created them'"); Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 614 (1983) (Rehnquist, J., concurring) (same); Killip v. Office of Personnel Management, 991

F.2d 1564, 1569 (Fed. Cir. 1993) (same). The Constitution establishes a "single, finely wrought" procedure for enacting and amending statutes: bicameralism and presentment. See INS v. Chadha, 462 U.S. 919, 951 (1983); Kisor v. Wilkie, 139 S. Ct. 2400, 2434 (2019). Congress cannot enact a statute without following that procedure. In other words, Congress, by itself, cannot confer authority to Commerce, or any other agencies. Only a statute that has met the bicameralism and presentment requirements can do so.

It is for the same reason that "the doctrine of legislative acquiescence is at best only an auxiliary tool for use in interpreting ambiguous statutory provisions," where there has been some grant of authority to the agency, and congressional acquiescence is used to help the reviewing court discern the parameters of that authority. Jones v. Liberty Glass Co., 332 U.S. 524, 533-34 (1947) (emphasis added); see Helvering v. Reynolds, 313 U.S. 428, 431-32 (1041) (stating that congressional acquiescence "is no more than an aid in statutory construction" that may at times be useful "in resolving statutory ambiguities") (emphasis added). As such, the CIT correctly held that it "cannot find congressional acquiescence to an agency's construction of a statute when 'there are compelling indications that the construction is wrong.'" Coalition III, 483 F. Supp. 3d at 1271 (quoting Haig v. Agee, 453 U.S. 280, 291 (1981)), Appx0083. "'True indeed it is that administrative practice does not avail to overcome a statute so plain in its

commands as to leave nothing for construction.'" Id. (quoting Norwegian Nitrogen Prods. v. United States, 288 U.S. 294, 315 (1933)). Put differently, Congress cannot acquiesce to an agency action that has plainly exceeded the agency's statutory authority.

For these reasons, the Canadian Parties' argument that Congress, on its own without an authorizing statute of any kind, may confer authority to Commerce through acquiescence must fail.

Further, even if the Court were to consider the theory of congressional acquiescence to an agency's practice untethered from any statute, it cannot find that Congress has acquiesced to Commerce's practice of CVD expedited reviews. "The Supreme Court has repeatedly cautioned against using congressional silence alone to infer approval of an administrative interpretation." Schism, 316 F.3d at 1295 (citing United States v. Rutherford, 442 U.S. 544, 554, n.10 (1979) ("To be sure, it may not always be realistic to infer approval of a judicial or administrative interpretation from congressional silence alone."); United States v. Riverside Bayview Homes, 474 U.S. 121, 137 (1985) ("We are charry to attributing significance to Congress' failure to act . . . ."); Bob Jones Univ. v. United States, 461 U.S. 574, 600 (1983) ("Non-action by Congress is not often a useful guide . . . ."); Solid Waste Agency of N. Cook Cnty v. United States Army Corps of Eng'rs, 531 U.S. 159, 169 (2001) ("Although we have recognized congressional

acquiescence to administrative interpretations of a statute in some situations, we have done so with extreme care.”). Indeed, as the Court has explained, “congressional inaction is perhaps the weakest of all tools for ascertaining legislative intent, and courts are loath to presume congressional endorsement unless the issue plainly has been the subject of congressional attention.” Butterbaugh v. DOJ, 336 F.3d 1332, 1342 (Fed. Cir. 2003); see also Zuber v. Allen, 396 U.S. 168, 185 (1969) (“Legislative silence is a poor beacon to follow in discerning the proper statutory route.”); Zuber, 396 U.S. at 185, n.11 (“Congressional inaction frequently betokens unawareness, preoccupation, or paralysis.”); Schism, 316 F.3d at 1294 (rejecting the claim that because “congressmen . . . did not intervene {it} amounts to an implied ratification of the practice”); Girouard v. United States, 328 U.S. 61, 69 (1946) (“It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law.”).

Here, as support for their argument regarding congressional acquiescence, the Canadian Parties point to congressional inaction despite (1) the notice and comment period that preceded Commerce’s issuance of the regulation, (2) the duration for which the agency has administered expedited reviews, and (3) its enactment of various amendments to the Tariff Act. Canadian Parties Opening Br. at 39-41. However, the Canadian Parties have identified no caselaw or other

precedent that supports the assertion that congressional awareness of an issue, for the purpose of congressional acquiescence, can be established merely by the agency's fulfillment of the notice and comment requirement.

In addition, neither time nor amendments to other parts of the statute conclusively indicate that Congress, as a whole, knew and approved of an agency's practice that occurs beyond the realm of its actual authority. Indeed, the Supreme Court has cautioned against a finding of congressional acquiescence based on such factors. In Brown v. Gardner, 513 U.S. 115 (1994), the Supreme Court found that "{a} regulation's age {alone} is no antidote to clear inconsistency with a statute{.}" Id. at 122. Separate and isolated amendments also do not equate to actual congressional approval of an agency's action. See, e.g., Solid Waste Agency, 531 U.S. at 169-71 (rejecting the argument that Congress's "failure to pass legislation that would have overturned the . . . {agency's} regulations" indicate congressional acquiescence); AMG Cap. Mgmt. LLC v. FTC, 141 S. Ct. 1341, 1351 (2021) (declining to find congressional acquiescence based on Congress's isolated amendments to the statute as they did not concern the scope of the exact provision at issue) (internal citations omitted); see also F.W. Woolworth Co. v. United States, 91 F.2d 973, 976 (2nd Cir. 1937) ("To suppose that Congress must particularly correct each mistaken construction under penalty of incorporating it into the fabric of the statute appears to us unwarranted.").

Here, the Canadian Parties have pointed to no congressional hearings on Commerce's conduct of CVD expedited reviews, or identified proposed amendments concerning CVD expedited reviews. Accordingly, the "40 occasions on which Congress amended the Tariff Act" identified by the Canadian Parties that are unrelated to the administrative proceeding invented from whole cloth and, as such, speak nothing to Congress' awareness of Commerce's expedited review regulation and conduct of CVD expedited reviews. Canadian Parties Opening Br. at 44, n.11. Given the lack of evidence of congressional awareness, the Court cannot find that Congress acquiesced to Commerce's practice.

### B. Chevron Step Two: No Deference Is Owed to Commerce's Interpretation that Section 103(a) of the URAA Provides the Agency Statutory Authority

Because there is no ambiguity in the statute, the Court need not proceed to step two of the Chevron analysis. The Canadian Parties posit that "Commerce's determination that the statute permits expedited reviews is entitled to deference," if the Court finds section 103(a) of the URAA to be ambiguous. Canadian Parties' Opening Br. at 48. This argument fails on multiple grounds.

First and foremost, Commerce's finding in the Final Results regarding its statutory authority under section 103(a) deserves no deference because the agency itself has abandoned that interpretation. Specifically, in the Remand Redetermination, Commerce determined that "section 103(a) of the URAA, as well

as the other legal authorities presented to the CIT, cannot be the basis for the promulgation of the CVD expedited review regulation under 19 CFR 351.214(k) and thus, Commerce lacks the statutory authority to conduct CVD expedited reviews." Remand Redetermination at 3, Appx0549. Commerce did not reach this finding under protest and Commerce did not appeal the CIT's decision sustaining its Remand Redetermination. See Remand Redetermination; Viraj Group, Ltd. v. United States, 343 F.3d 1371, 1376 (Fed. Cir. 2003) (holding that Commerce may only appeal a final decision sustaining its remand results if the agency adopted such final results under protest). In fact, the agency has specifically notified the Court of its decision "not to participate in this appeal" and "not {to} fil{e} a brief in this matter or participat{e} in oral argument." Letter from U.S. Department of Justice to Clerk of the Court, "Committee Overseeing Action for Lumber v. United States," ECF No. 42 (Jan. 19, 2022). In other words, the only parties asserting that section 103(a) affords Commerce statutory authority for CVD expedited reviews are the Canadian Parties. As this Court made clear, "{it} do{es} not apply Chevron 'to an agency counsel's interpretation of a statute,' much less a defendant-intervenor's, 'where the agency itself has articulated no position on the question.'" Changzhou Trina Solar Energy Co. v. United States, 975 F.3d 1318, 1330 (Fed. Cir. 2020) (quoting Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212 (1988)).

Further, "{t}he Chevron Court justified deference on the premise that a statutory ambiguity represents an 'implicit' delegation to an agency to interpret a 'statute which it administers.'" Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1629 (2018). However, the Supreme Court has specifically said that "on no account might we agree that Congress implicitly delegated to an agency authority to address the meaning of a . . . statute it does not administer. One of Chevron's essential premises is simply missing here." Id. (emphasis added). This is because:

> An agency eager to advance its statutory mission, but without any particular interest in or expertise with a second statute, might (as here) seek to diminish the second statute's scope in favor of a more expansive interpretation of its own —effectively "bootstrapping itself into an area in which it has no jurisdiction." Adams Fruit Co. v. Barrett, 494 U. S. 638, 650 (1990). All of which threatens to undo rather than honor legislative intentions. To preserve the balance Congress struck in its statutes, courts must exercise independent interpretive judgment.

Id. at 1629.

The Canadian Parties argue that Commerce administers the Tariff Act. Canadian Parties Opening Br. at 49-51. However, the statutory interpretation at issue here is not the language of the Tariff Act. Commerce has made clear throughout this litigation that its statutory authority does not stem from the Tariff Act. See IDM at 26, Appx1130. Instead, the question is whether section 103(a) of the URAA provides the agency statutory authority. As the CIT aptly pointed out, "Commerce does not administer the statutory provision and shares rulemaking

authority with other 'appropriate officers of the United States Government,' all of whom may construe section 103(a) differently." Coalition III, 483 F. Supp. 3d at 1262, n.16, Appx0066. As such, no deference is owed to Commerce's interpretation of section 103(a) of the URAA.

## III. SECTION 103(B) DOES NOT PROVIDE STATUTORY AUTHORITY FOR CVD EXPEDITED REVIEWS

The Canadian Parties assert that section 103(b) of the URAA provides Commerce authority to promulgate the CVD expedited review regulation. Canadian Parties Opening Br. at 52-61. This theory runs afoul of a number of limits expressly imposed by the statute.

Section 103(b) states:

> Any interim regulation necessary or appropriate to carry out any action proposed in the statement of administrative action approved under section 3511(a) of this title to implement an agreement described in section 3511(d)(7), (12), or (13) of this title shall be issued not later than 1 year after the date on which the agreement enters into force with respect to the United States.

19 U.S.C. § 3513(b).

Commerce's promulgation of the CVD expedited review regulation directly contravenes the statutory language because it was not promulgated within one year

after the WTO agreements entered into force. See 19 U.S.C. § 3513(b);[5] Canadian Parties Opening Br. at 53, n.13.

Further, section 103(b) only applies to "interim regulation{s}." See 19 U.S.C. § 3513(b). Although the statute did not define the word "interim," undefined terms in a statute are deemed to have their ordinarily understood meaning. See, e.g., Schindler Elevator Corp. v. United States, 563 U.S. 401, 407 (2011). The common dictionary meaning of "interim" is "temporary and intended to be used or accepted until something permanent exists." Interim, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/interim. The CVD expedited review regulation, however, is not an "interim" or "temporary" regulation, and was never intended to be one. It has been in place for more than 20 years since Commerce published the regulation as part of its Final Regulations on May 19, 1997. See Final Regulations, 62 Fed. Reg at 27,296 (stating that the regulations published therein represents the "final rules").

In addition, section 103(b) authorizes agencies to issue "interim regulation{s} necessary or appropriate to carry out any action proposed in the {SAA}." 19 U.S.C. § 3513(b) (emphasis added). As the Canadian Parties

[5] The WTO agreements entered into force for the United States on January 1, 1995. Commerce published its proposed regulations which included section 214(k) for "CVD expedited reviews" on February 27, 1996, and the final regulations were published on May 19, 1997.

themselves acknowledge, the SAA did not propose any action regarding the "CVD expedited review" procedure described in Commerce's regulation. See Canadian Parties Opening Br. at 25 (faulting the CIT for focusing "on the absence in the SAA of a specific proposed action regarding expedited reviews"). Nonetheless, the Canadian Parties appear to argue that because the "chapeau" of the SAA language at issue includes the word "action," every word in the section that follows should be construed as an "action." See Canadian Parties Opening Br. at 53-54. Such an argument is attempting to interpolate words into the plain language of the SAA. As discussed above, the SAA recognized the language of Article 19.3 of the SCM Agreement, stated that "several changes must be made to the Act to implement the requirements" of this provision, and went on to describe the specific changes made. See SAA, H.R. DOC. NO. 103-116 at 941-42. In other words, the language of the SAA shows that the drafters know how to propose an action when they wish to do so. See Medellin, 552 U.S. at 522 ("Congress knows how to accord domestic effect to international obligations when it desires such a result"). The "changes" that "must be made" to fulfill Article 19.3 of the SCM Agreement simply do not include the CVD expedited review procedure described in Commerce's regulation. As such, the Canadian Parties' argument in this regard must fail.

Finally, the Canadian Parties ask the Court to defer to Commerce on the interpretation of section 103(b) under step two of the Chevron framework. Canadian Parties Opening Br. at 58. However, Commerce did not rely on section 103(b) for its statutory authority – it did not do so in the Final Results, and it did not do so in the Remand Redetermination. Commerce's counsel raised this argument for the first and only time in its response brief submitted to the CIT, U.S. Gov. CIT Resp. Br. at 9-10, Appx0320-0321, which is a circumstance this Court made clear deserves no deference. Changzhou Trina Solar Energy Co., 975 F.3d at 1330 ("we do not apply Chevron 'to an agency counsel's interpretation of a statute'").

The Canadian Parties focus extensively on how Commerce's CVD expedited review regulation is "necessary or appropriate." Canadian Parties Opening Br. at 56-57. However, whether it is "necessary or appropriate" in the Canadian Parties' view is irrelevant to the Court's inquiry. Given that the CVD expedited review regulation contravenes the plain statutory language on multiple fronts, section 103(b) simply cannot be the source of authority for CVD expedited reviews.

## IV. CONCLUSION

For the foregoing reasons, the COALITION respectfully requests that this Court affirm the judgment of the Court of International Trade.

Respectfully submitted,

/s/ Sophia J.C. Lin

Sophia J.C. Lin

**PICARD KENTZ & ROWE LLP**
1750 K Street, N.W., Suite 800
Washington, DC 20006
(202) 331-5040

*Counsel to Plaintiff-Appellee COALITION*

January 31, 2022

# PUBLIC CERTIFICATE OF SERVICE

**COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS v. UNITED STATES, 2022-1021, -1068, -1078**

I hereby certify under penalty of perjury that on this 31st day of January, 2022, a copy of the foregoing BRIEF OF PLAINTIFF-APPELLEE COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS was filed electronically.

_X__ This filing was served electronically to all parties by operation of the Court's electronic filing system.

____ A copy of this filing was served via:

____ hand delivery

____ mail

____ third-party commercial carrier for delivery within 3 days

____ electronic means, with written consent of the party being served to the following addresses:

/s/ Sophia J.C. Lin

Sophia J.C. Lin

**PICARD KENTZ & ROWE LLP**
*Counsel For Plaintiff-Appellee Committee Overseeing Action For Lumber International Trade Investigations or Negotiations*

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2022-1021, -1068, -1078

**Short Case Caption:** Committee Overseeing Action for Lumber v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☐X the filing has been prepared using a proportionally-spaced typeface and includes 11,055 words.

☐ the filing has been prepared using a monospaced typeface and includes __________ lines of text.

☐ the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 1/31/2022

Signature: [signature]

Name: Sophia J.C. Lin

Save for Filing