Nos. 2022-1021, -1068, -1078

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS

*Plaintiff-Appellee*

FONTAINE INC., GOVERNMENT OF CANADA, MARCEL LAUZON INC., LES PRODUITS FORESTIERS D&G LTÉE, NORTH AMERICAN FOREST PRODUCTS LTD., PARENT-VIOLETTE GESTION LTÉE, LE GROUPE PARENT LTÉE, SCIERIE ALEXANDRE LEMAY & FILS INV., GOVERNMENT OF QUÉBEC, MOBILIER RUSTIQUE (BEAUCE) INC., GOVERNMENT OF THE PROVINCE OF NEW BRUNSWICK

*Plaintiffs-Appellants*

V.

UNITED STATES

*Defendant*

Appeal from the United States Court of International Trade
in Consolidated Court No. 19-00122,
Chief Judge Mark A. Barnett

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

Joanne Osendarp
Lynn G. Kamarck
Alan Kashdan
Tim Hruby
Conor Gilligan

MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20009
Tel: (202) 756-8349
Email: josendarp@mwe.com
*Counsel for Government of Canada*

March 8, 2022

(Counsels continue on next page)

Stephan E. Becker
Aaron R. Hutman
Moushami P. Joshi
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 17th Street, NW
Washington, DC 20036
Tel: (202) 663-8277
Email: stephan.becker@pillsburylaw.com
*Counsel for Government of the Province of New Brunswick*

Matthew J. Clark
Nancy A. Noonan
Aman Kakar
ARENTFOX SCHIFF LLP
1717 K Street, N.W.
Washington, DC 20006
Tel: (202) 857-6000
Email: matthew.clark@afslaw.com
*Counsel for Government of Québec*

Edward M. Lebow
Angela Oliver
HAYNES AND BOONE, LLP
800 17th Street, NW, Suite 500
Washington, DC 20006
Tel: (202) 654-4514
Email: ed.lebow@haynesboone.com
*Counsel for Les Produits Forestiers D&G Ltée* and *Marcel Lauzon, Inc.*

John R. Magnus
TRADEWINS LLC
1330 Connecticut Ave. NW
Washington, DC 20036
Tel: (202) 744-0386
Email: jmagnus@tradewinsllc.net
*Counsel for Mobilier Rustique (Beauce) Inc.*

Richard L.A. Weiner
Rajib Pal
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Tel: (202) 736-8075
Email: rweiner@sidley.com
*Counsel for North American Forest Products Ltd.*, *Parent-Violette Gestion Ltée* and *Le Groupe Parent Ltée*

Yohai Baisburd
Jonathan M. Zielinski
James E. Ransdell
Cassidy Levy Kent (USA) LLP
900 19th Street, NW, Suite 400
Washington, DC 20006
Tel: (202) 567-2319
Email: ybaisburd@cassidylevy.com
*Counsel for Scierie Alexandre Lemay & Fils Inc.*

Mark B. Lehnardt
LAW OFFICES OF DAVID L. SIMON, PLLC
1025 Connecticut Ave., N.W. Ste. 1000
Washington, D.C. 20036
Tel: (202) 642-4850
Email: marklehnardt@dlsimon.com
*Counsel for Fontaine Inc.*

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 6

A. Contrary to the COALITION's Arguments, the URAA Considered as a Whole Authorizes Agency Action in this Case .......... 6

B. Congress's Understanding of the United States' Article 19.3 Obligations, Expressed in the SAA, Encompasses CVD Expedited Reviews .......... 11

C. Congressional Acquiescence Demonstrates that Congress Understands CVD Expedited Reviews to Be Part of the Powers Congress Granted to Commerce in the URAA .......... 17

D. The COALITION's Argument that Commerce Is Not Due Deference Under *Chevron* Step Two Misstates the Record and Is Foreclosed by Precedent .......... 20

E. The COALITION's Arguments Regarding Section 103(b) Are Meritless, and Do Not in Any Way Undermine the Fact that Section 103(b) Independently Authorizes Expedited Review Regulations .......... 24

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Apex Frozen Foods Private Ltd. v. United States*,
862 F.3d 1337 (Fed. Cir. 2017)....................1

*Barnhart v. Peabody Coal Co.*,
537 U.S. 149 (2003)....................25

*Bestfoods v. United States*,
165 F.3d 1371 (Fed. Cir. 1999)....................3, 9, 28–29

*Bob Jones University v. United States*,
461 U.S. 574 (1983)....................19

*Brock v. Pierce County,*
476 U.S. 253, 265 (1986)....................25

*Changzhou Trina Solar Energy Co. v. United States*,
975 F.3d 1318 (Fed. Cir. 2020)....................30

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
467 U.S. 837 (1984)....................1

*Clear Correct Operating, LLC v. Int'l Trade Comm'n*,
810 F.3d 1283 (Fed. Cir. 2015)....................6

*Comm. Overseeing Action for Lumber International Trade Investigations or Negots. v. United States*,
483 F. Supp. 3d 1253 (Ct. Int'l Trade 2020)....................22–23

*Dolan v. United States*,
560 U.S. 605 (2010)....................24–25

*Federal-Mogul Corp. v. United States*,
63 F.3d 1572....................22

*Fitzgerald v. Dep't of Homeland Sec.*,
837 F.3d 1346 (Fed. Cir. 2016)....................18

*Florida Dep't of Revenue v. Picadilly Cafeterias, Inc.*,
554 U.S. 33 (2008) .......... 29

*Liesegang v. Sec'y of Veterans Affairs*,
312 F.3d 1368 (Fed. Cir. 2002) .......... 25

*Mac-Lean Fogg Co. v. United States*,
753 F.3d 1237 (Fed. Cir. 2014) .......... 12–13

*Microsoft Corp. v. i4i Ltd. Partnership*,
564 U.S. 91 (2011) .......... 14

*Milner v. Dep't of Navy*,
562 U.S. 562 (2011) .......... 10, 11

*Schism v. United States*,
316 F.3d 1259 (Fed. Cir. 2002) .......... 18

*United States v. Mendoza*,
464 U.S. 154 (1984) .......... 22

*United States v. Rutherford*,
442 U.S. 544 (1979) .......... 20

*United States v. Eurodif S.A.*,
555 U.S. 305 (2009) .......... 11

**STATUTES AND REGULATIONS**

5 U.S.C. § 553(b)(B) .......... 26

19 U.S.C. § 1671d(c)(5) .......... 28

19 U.S.C. § 1671e(a)(2) (1988) .......... 28

19 U.S.C. § 1673d(c)(5) .......... 28

19 U.S.C. § 1675(a)(2)(B) .......... 14

19 U.S.C. § 1677f-1(e) .......... 28

19 U.S.C. §§ 2901–2906 .......... 7

19 U.S.C. § 2902(d) .......... 19

19 U.S.C. § 3511(a) ("section 101(a)" of the URAA).........................................7, 8

19 U.S.C. § 3511(a)(2) ("section 101(a)(2)" of the URAA) ..................................11

19 U.S.C. § 3511(d)(12) ..........................................................................................7

19 U.S.C. § 3512(d) ("section 102(d)" of the URAA) .......................................8, 11

19 U.S.C. § 3513(a) ("section 103(a)" of the URAA) ..........................................2

19 U.S.C. § 3513(b) ("section 103(b)" of the URAA) . ..................................24, 29

Uruguay Round Agreements Act, Pub. L. 103-465, 108 Stat. 409 (1994)("URAA") ........................................................................................*passim*

**REGULATIONS**

19 C.F.R. § 351.204 .........................................................................................14

19 C.F.R. § 351.214(a).......................................................................................13

19 C.F.R. § 351.214(l) .......................................................................................23

*Antidumping Duties; Counterviling Duties*, 62 Fed. Reg. 27,296 (Dep't Commerce May 19, 1997) ("Final Rule")............................................18–19

*Countervailing Duties*, 45 Fed. Reg. 4,932 (Dep't Commerce, Jan. 22, 1980)......................................................................10

*Countervailing Duties*, 53 Fed. Reg. 52,306 (Dep't Commerce, Dec. 27, 1988)....................................................................10

**OTHER AUTHORITIES**

*Office of the Federal Register, A Guide to the Rulemaking Process*, https://www.federalregister.gov/uploads/2011/01/the_rulemaking_process.pdf.........................................................................................26

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. 1 (1994), reprinted in U.S.C.C.A.N. 4040 ("SAA")......................................................*passim*

S. REP. NO. 103-412 – Uruguay Round Agreements Act (1994) ......................10, 19

WTO Agreement on Subsidies and Countervailing Measures, Apr. 14, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex lA, 1869 U.N.T.S. 14 ("SCM Agreement")..................*passim*

WTO Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trades, Apr. 14, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex lA, 1869 U.N.T.S. 14 ("Antidumping Agreement") ....................................................15

# INTRODUCTION

Pursuant to Fed. R. App. P. 28(c), Plaintiffs-Appellants, the Canadian Parties, submit this brief in reply to the January 31, 2022 Brief of Plaintiff-Appellee, the Committee Overseeing Action for Lumber International Trade Investigations or Negotiations ("COALITION"), petitioner in the underlying countervailing duty ("CVD") proceedings.

The COALITION would have this Court's analysis begin and end with the absence of specific statutory language expressly providing for CVD expedited reviews. COALITION Brief ("COALITION Br.") at 15–17. In doing so, the COALITION ignores statutory provisions authorizing Commerce to promulgate CVD expedited review regulations. As the Canadian Parties discussed in their opening brief, under *Chevron* step one, this Court uses *all* of the "traditional tools of statutory construction" to determine if Congress has spoken clearly as to what the agency is to do. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984); *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1347 (Fed. Cir. 2017). These tools, while beginning with the language of a statute, also require that the meaning of that language be determined "in context and with a view to [its] place in the overall statutory scheme," including an examination of "the statute's text, structure and legislative history" and applying "the relevant canons of interpretation." *See* Canadian Parties Br. at 20–21 (listing

cases). The traditional tools of statutory construction demonstrate that Congress intended for there to be an expedited review process, and in section 103 of the Uruguay Round Agreements Act, Pub. L. 103-465, 108 Stat. 409 (1994) ("URAA"), Congress provided Commerce with the authority to promulgate regulations to implement this process. This is clear whether this Court examines Commerce's authority to promulgate the expedited review regulation under section 103(a) or 103(b). An evaluation of these provisions in the full context of the URAA—including sections 101(a)(1), 101(a)(2) and 102(d), the URAA's legislative history, and the legislative process by which the URAA was adopted—confirms Congress' intention to establish an expedited review process.

The COALITION never engages with this central point, the need to undertake a full statutory-construction analysis under *Chevron* of the authority delegated to Commerce. Instead, it makes a series of arguments that are either irrelevant to the issues raised, or simply wrong. Nowhere does the COALITION address that sections 101(a)(1), 101(a)(2) and 102(d) of the URAA are "provision[s] of this Act" within the meaning of section 103(a), under which "appropriate officers of the United States Government may issue . . . regulations" as may be necessary to ensure that any provision of this Act, or amendment made by this Act . . . is appropriately implemented." 19 U.S.C. § 3513(a). Nowhere does the COALITION address that the URAA was passed under "fast track" trade

agreement authority, and that the extensive negotiations that occurred between the executive and legislative branches in adopting the URAA inform this Court's analysis of congressional intent. And nowhere does the COALITION address that this Court's decision in *Bestfoods v. United States*, 165 F.3d 1371 (Fed. Cir. 1999) upheld an agency's authority under another fast track statute to issue regulations that implement portions of that agreement with no corresponding statutory change. Instead the COALITION seeks to manufacture unsupported limitations on this authority regarding the nature of "interim" regulations under URAA section 103(b).

All of these points are relevant to the central issue in this appeal: the exact scope of the power delegated to Commerce under the URAA to carry out an expedited review procedure that is required by the Uruguay Round agreements, that is required in the URAA's accompanying Statement of Administrative Action ("SAA"), H.R. REP. No. 103-316, (1994), reprinted in U.S.C.C.A.N. 4040, and that Congress indicated could be implemented through a change in agency practice alone.

Finally, if after conducting a full *Chevron* step one analysis the Court concludes that Congress' intent is still unclear, Commerce's reasonable interpretation of the scope of the various URAA provisions as including the power to conduct CVD expedited reviews is nonetheless due *Chevron* deference.

Here, the Canadian Parties reply to five specific areas where the COALITION misapprehends the Canadian Parties' arguments, misstates the law or facts, or misapplies the law to the record. Specifically, the following flaws in the COALITION's argument will be demonstrated:

(A) The COALITION wrongly claims that no "provision of the [URAA]" within the meaning of section 103(a) expressly authorizes expedited reviews, and so Commerce lacks authority to carry them out under section 103(a). This ignores that Sections 101 and 102 are also "provisions" of the URAA;

(B) The COALITION argues that the SAA indicates that Congress did not believe the United States is obliged to provide the type of CVD expedited review provided for in Commerce's regulation. This cannot be squared with the text of either the SAA or Article 19.3 of the SCM Agreement. And, in discussing what Congress understood as the United States' obligations under Article 19.3, the COALITION misconstrues the WTO documents it cites;

(C) Contrary to the COALITION's mischaracterization of the Canadian Parties' arguments, congressional acquiescence here demonstrates that Congress considers Commerce's conduct of expedited reviews to be consistent with congressional understanding of the URAA's meaning and congressional intent;

(D) The COALITION's argument that Commerce is not due *Chevron* deference in promulgating the expedited review regulation misstates the record and ignores relevant caselaw; and

(E) The COALITION's arguments regarding the authority conferred on Commerce by section 103(b) of the URAA are without merit.

Before turning to these points, we note that a number of the COALITION's arguments are simply statements of the law that do not bear on the issues raised in this appeal. We do not address their substance except to point out below to this Court which of the COALITION's arguments fall in this category.

First, the COALITION argues that the absence of a statutory prohibition cannot be the source of an agency's authority to do something. COALITION Br. 16–17. The Canadian Parties have not argued otherwise. Second, the COALITION argues that the SAA cannot trump the actual language of the URAA. COALITION Br. 18–19. This argument is similarly irrelevant, as the Canadian Parties never argued that the SAA can trump any actual statutory provision, nor has the COALITION identified any statutory provision that bars or would be inconsistent with the conduct of expedited reviews. Last, the COALITION devotes five pages to the unremarkable proposition that WTO agreements are not

self-executing. COALITION Br. at 19–23. No one has argued to the contrary.[1] Because these three arguments are—even if valid—legally irrelevant, this Court need not consider them at all.

We now turn to the five points that we address on the merits.

## ARGUMENT

### A. Contrary to the COALITION's Arguments, the URAA Considered as a Whole Authorizes Agency Action in this Case

The Canadian Parties argue that Sections 101(a), 102(d), and 103(a) provide Commerce with authority to conduct expedited reviews. *See* Canadian Parties' Br. at 23–25. The COALITION mischaracterizes the Canadian Parties' argument in stating that (1) the Canadian Parties "fail to identify any statutory language that provides for CVD expedited reviews," and (2) the Canadian Parties' argument is centered on legislative history and the SAA, not on the URAA itself. COALITION Br. at 17. While the COALITION correctly notes that "it is the implementing legislation, rather than the agreement itself," that is U.S. law,

---

[1] The COALITION's argument appears to be that because the Uruguay Round Agreements are not-self-executing, Congress's approval of those Agreements in section 101(a)(1) of the URAA is irrelevant to Congressional authorization of expedited reviews. This reflects a thematic error in the COALITION's arguments throughout—its reading of section 101(a)(1) in isolation, without considering it in conjunction with sections 101(a)(2), 102(d), 103(a) 103(b), and the SAA. *See Clear Correct Operating, LLC v. Int'l Trade Comm'n*, 810 F.3d 1283, 1290 (Fed. Cir. 2015) (provisions of a statute are read "in context and with a view to their place in the overall statutory scheme").

COALITION Br. at 22, the Canadian Parties' argument *is* grounded in the language of the implementing legislation.

To begin with, and as the Canadian Parties explained, *see* Canadian Parties Br. at 25–26, Congress implemented the Uruguay Round Agreements using "fast track" authority for congressional approval of trade agreements. *See* 19 U.S.C. § 3511(a); 19 U.S.C. §§ 2901–2906 (fast track procedures). Beyond how this fast track procedure affects the analysis of the powers Congress intended to give to Commerce in sections 103(a) and (b), *see* Canadian Parties Br.at 25–28, and the knowledge imputed to Congress for acquiescence analysis, *see id.* at 44–45, this means that every statutory provision upon which the Canadian Parties have relied—URAA sections 101(a), 102(d), and 103(a)—is part of that implementing legislation and is, therefore, domestic law. The COALITION's arguments regarding non-self-executing treaties are simply inapplicable. Congress used the fast track procedures to import the treaty obligations into domestic law, including by expressly "approv[ing]" the Agreement on Subsidies and Countervailing Measures ("SCM Agreement") and "the statement of administrative action proposed to implement the agreements." 19 U.S.C. § 3511(a), (d)(12).

The relevant statutory language lies first in URAA section 101(a), where Congress approved the Uruguay Round Agreements (including the SCM Agreement) and the SAA, and second in section 102(d)'s declaration that the SAA

is "the authoritative expression by the United States concerning the interpretation and application of the Uruguay Round agreements and [the URAA]." The latter necessarily means that a court must consider the SAA as part of any analysis that calls for interpreting either the URAA itself or one of the Uruguay Round Agreements—as does this case. The Canadian Parties focus on the SAA and the purposes of the URAA not because Commerce's power to conduct expedited reviews flows from them independent of the URAA, but because they inform the scope of Congress's grant of authority to Commerce under section 103 of the URAA to enact regulations based on those provisions of the URAA.

The COALITION argues that "Congress's approval of [the Uruguay Round Agreements] in section 101 of the URAA does not authorize the executive branch, including Commerce, to give the effect of domestic law through regulations to international obligations that the agency believes Congress failed to address." COALITION Br. at 22. Commerce did not enact expedited review regulations because Congress failed to address them. Congress did address them.

Specifically, Congress approved the Uruguay Round Agreements, approved the SAA, and then deemed the SAA an "authoritative expression" of the "application of" the URAA. 19 U.S.C. §§ 3511(a), 3512(d). The SAA provides for expedited reviews: "any exporter . . . not actually investigated for reasons other than a refusal to cooperate, *shall be entitled to an expedited review*." SAA at 941

(emphasis added). Commerce correctly determined that congressional approvals of the SCM Agreement and the SAA in section 101(a), and the designation in section 102(d) of the SAA as "authoritative," were "provisions of this Act" as used in section 103(a), and, taken as a whole, authorize an expedited review regulation. As section 103(a) authorizes regulations necessary to implement "any provision of this Act," one must necessarily examine the other provisions of the URAA, and, by force of sections 101(a)(2) and 102(d), the SAA, to determine what regulations Congress authorized. The SAA's explicit inclusion of expedited reviews demonstrates that the authorization for Commerce to issue "necessary" regulations under section 103(a) includes regulations implementing expedited reviews. As Commerce noted in the Remand Redetermination before the CIT: "[W]ith respect to 103(a) of the URAA, Commerce has consistently interpreted the URAA to grant the agency with the authority . . . to conduct CVD expedited reviews, because the SAA indicates Congressional intent that Commerce conduct CVD expedited reviews. Remand Redetermination at 24 (Appx0570); *see also* SAA at 941.

Further, the legislative history of the URAA confirms that Congress understood that expedited reviews were matters that *Bestfoods* described as those "expected to be addressed through regulation." *Bestfoods v. United States*, 165 F.3d 1371, 1376 (Fed. Cir. 1999). The report by the Senate Finance Committee (to which the URAA was referred under fast track procedures), confirms that

Congress expected Commerce would carry out expedited reviews through regulations, and believed that the URAA empowered Commerce to do so. Specifically, this report noted:

> These provisions [Section 264 of the URAA] implement the requirements of Article 19.3 of the Agreement, which provides that any producer whose exports are subject to a countervailing duty order, but which was not actually investigated (other than because it refused to cooperate), shall be entitled to an expedited review to establish an individual countervailing duty rate. Current Commerce *practice* . . . must be modified in order to comport with Article 19.

S. REP. NO. 103-412 at 98 (1994) (emphasis added). In other words, the Committee understood that expedited review procedures would be implemented through regulatory changes.[2]

The COALITION argues that consideration of the SAA would "muddy clear statutory language." COALITION Br. at 18 (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011). This is simply wrong. As the above discussion demonstrates, the Canadian Parties "make use of legislative history" because it is a

---

[2] Indeed, from 1980 until the URAA, Commerce had implemented similar regulatory procedures, without explicit statutory authorization, to provide relief to exporters that either had zero margins or margins with a "significant differential" from the norm of country-wide CVD rates. *See* Countervailing Duties, 45 Fed. Reg. 4,932, 4,947 (Dep't Commerce, Jan. 22, 1980); Countervailing Duties, 53 Fed. Reg. 52,306 (Dep't Commerce, Dec. 27, 1988). The expedited review procedure similarly allows exporters who would otherwise be subject to the "all-others" rate (comparable to the previous country-wide rate) to seek an individual review.

standard tool to determine whether congressional intent can be clearly discerned, not to supplant the statutory language. *Milner*, 562 U.S. at 572.

If, after a proper and complete *Chevron* step-one analysis, this Court nevertheless concludes that section 103(a), using all tools of statutory construction, still does not resolve the issue, Commerce's interpretation is nevertheless reasonable, and should be upheld under *Chevron* step two. *See United States v. Eurodif S.A.*, 555 U.S. 305, 319 (2009) (once an agency makes a decision as to the scope of a statute, courts only ask "whether the department's application was reasonable")*; see also* Canadian Parties' Br. at 48–51. This aspect of the argument is addressed further in Section D below.

### B. Congress's Understanding of the United States' Article 19.3 Obligations, Expressed in the SAA, Encompasses CVD Expedited Reviews

When Congress passed the URAA, beyond approving the Uruguay Round Agreements, it also approved the SAA and deemed it "authoritative" as to the meaning of the URAA. *See* 19 U.S.C. §§ 3511(a)(2), 3512(d). The SAA explicitly calls for Commerce to provide expedited reviews, consistent with the United States' obligations under Article 19.3 of the SCM Agreement. The COALITION's argument to the contrary, that the SAA only provides for "new shipper" reviews, is meritless.

The SAA was part of the URAA legislative package passed by Congress. It provides that expedited reviews were intended to be part of U.S. CVD practice. As stated in the SAA: "Article 19.3 of the Subsidies Agreement provides that any exporter whose exports are subject to a CVD order, but which was not actually investigated for reasons other than a refusal to cooperate, shall be entitled to an expedited review." SAA at 941. Commerce and the Canadian Parties explained that this provision mandates that Commerce provide an expedited review mechanism for exporters that exported during Commerce's investigation period but were not chosen to be individually examined as mandatory or voluntary respondents. *See* Canadian Parties' Br. at 28–30.

The COALITION argues instead that the phrase "exporters . . . not actually investigated" in the SAA refers only to exporters who had *not* exported during the investigation, but who did export subsequent to that period (such exporters are generally referred to as "new shippers"). COALITION Br. at 24–28. In other words, the COALITION considers the universe of respondents "actually investigated" to include not only those "individually investigated," as this Court interpreted that term in *Mac-Lean Fogg Co. v. United States*, but also every other exporter or producer who exported during the investigation but was *not* subject to investigation as a mandatory or voluntary respondent. *See Mac-Lean Fogg Co. v. United States*, 753 F.3d 1237, 1244 (Fed. Cir. 2014) (interpreting the phrase

"individually investigated" to mean both mandatory and voluntary respondents to an investigation). As demonstrated below, the COALITION's interpretation cannot be reconciled with the plain text of the SAA (or the equivalent text of Article 19.3 itself). Nor do the COALITION's citations to WTO documents support their position.

Under the COALITION's reading, any exporter or producer who exported merchandise to the United States during the period of investigation was "investigated," whether or not their individual exports were examined by Commerce. *Id.* at 27. This interpretation cannot be squared with the SAA's language itself. The relevant sentence of the SAA reads: "[a]rticle 19.3 of the Subsidies Agreement provides that any exporter whose exports are subject to a CVD order, *but which was not actually investigated for reasons other than a refusal to cooperate*, shall be entitled to an expedited review to establish an individual CVD rate for that exporter." SAA at 941 (emphasis added). The exception in this sentence for exporters who refuse to cooperate (which is found in substantively identical language in Article 19.3 of the SCM Agreement) cannot be reconciled with the COALITION's reading.

That is, an exporter who refuses to cooperate must have been exporting to the United States during the investigation period; had it not been exporting, it would not have been included in Commerce's investigation so as to be able to

refuse to cooperate. *See* 19 C.F.R. § 351.204 (defining the period and scope of an investigation, including the goal to include "each known exporter or producer of the subject merchandise"). In contrast, a new shipper is incapable of refusing to cooperate with Commerce's investigation, as it will not be included in that investigation in the first place. *See* 19 C.F.R. § 351.214(a) (defining a "new shipper" as "an exporter or producer that did not export, and is not affiliated with an exporter or producer that did export, to the United States during the period of investigation"). Indeed, under the COALITION's reading of the SAA, the single exception to the general rule included in the text would never apply, as no new shipper exporter would ever be in a position to qualify for that exception, rendering it mere surplusage. The Canadian Parties' reading, in contrast, gives effect to that exception. *See, e.g.*, *Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91, 106 (2011) (favoring an interpretation that "gives effect 'to every clause and word of a statute'" (quoting *Duncan v. Walker,* 533 U.S. 167, 174 (2001))).

If there were any doubt on this, Congress clearly knew how to draft language for new shippers when it meant to cover new shippers, *see* 19 U.S.C. § 1675(a)(2)(B) (allowing for reviews of new shippers), as did the drafters of the Uruguay Round Agreements. Article 19.3 of the SCM Agreement provides as follows:

> Any exporter whose exports are subject to a definitive countervailing duty but who was not actually investigated for reasons other than a

> refusal to cooperate, shall be entitled to an expedited review in order that the investigating authorities promptly establish an individual countervailing duty rate for that exporter.

SCM Agreement, Art. 19.3. Article 19.3, thus, is clearly different from Article 9.5 of the Antidumping Agreement, which provides:

> If a product is subject to anti-dumping duties in an importing Member, the authorities shall promptly carry out a review for the purpose of determining individual margins of dumping for any exporters or producers in the exporting country in question who have not exported the product to the importing Member during the period of investigation . . . .

Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994 ("Antidumping Agreement"), Article 9.5. Indeed, the United States has made clear that Article 19.3 of the SCM Agreement is not directed at new shippers: "[T]he purpose of an expedited review is 'to allow manufacturers, producers, and exporters of the subject merchandise *who were not selected as mandatory respondents* to receive an individual CVD rate . . . .'" *See* Government of Canada's Response to the COALITION's Objections to Conducting Expedited Reviews at 5 (quoting Responses of the United States of America to the Panel's Questions following the First Substantive Meeting of the Parties, *United States – Countervailing Measures on Supercalendered Paper from Canada*) (emphasis added)) (Appx0764).

The WTO documents to which the COALITION cites do not support their strained reading of the SAA. The fact that Chinese Taipei made a comment to the

WTO Negotiating Group on Rules in 2006 proposing to limit to new shippers the Article 19.3 obligation to provide an expedited review (a proposal that was not accepted) does not establish that Congress, twelve years earlier in 1994, believed Article 19.3 was intended to only cover to new shippers. *See* COALITION Br. at 29–30 (citing COALITION Objection to the CVD Expedited Review at 15 (Appx0720)).

Next, the COALITION, in discussing the WTO panel's decision in *Mexico – Antidumping Measures on Beef and Rice*, quotes that panel's description of the limitations applicable to antidumping duty ("AD") new shipper reviews under Article 9.5 of the Antidumping Agreement in support of its argument that CVD expedited reviews are also limited to new shippers. COALITION Br. at 30 (citing COALITION's Objection to the CVD Expedited Review at 17 (Appx0722)). But that same panel report makes clear three paragraphs later that no such limitation applies to CVD expedited reviews: "Article 19.3 of the SCM Agreement does not subject this right [to an expedited review] to *any other conditions* than the fact that the exporter's product is subject to a definitive duty and that he was not actually investigated for reasons other than a refusal to cooperate." COALITION's Objection to the CVD Expedited Review at 17 (quoting Report of the Panel, *Mexico – Definitive Antidumping Measures on Beef and Rice*, WT/DS295/R) (emphasis added)) (Appx0722). This is so because, as noted above, Article 9.5 of

the Antidumping Agreement is limited to reviews of new shippers, but Article 19.3 of the SCM Agreement is not.

### C. Congressional Acquiescence Demonstrates that Congress Understands CVD Expedited Reviews to Be Part of the Powers Congress Granted to Commerce in the URAA

The "fast track" procedure under which the URAA was passed, congressional approval of an SAA that calls for expedited reviews, and the Senate Finance Committee Report noting that Commerce practice will have to change to carry out expedited reviews, all evince that Congress was aware that Commerce was expected to conduct expedited reviews from the start. *See* Canadian Parties' Br. at 39–41. Congress's inaction since evinces that Congress considers Commerce carrying out expedited reviews to be consistent with the URAA. *See id.* at 42–45. The COALITION's arguments against the acquiescence analysis do not change that.

The Canadian Parties do not, as the COALITION suggests, argue that congressional acquiescence to agency action can supplant an agency's lack of statutory authority for taking that action; that legal issue is not before this Court. COALITION Br. at 36. The Canadian Parties argue instead that the acquiescence analysis, undertaken as part of *Chevron* step one, is further evidence that Congress considers the conduct of CVD expedited reviews to be included in the authorities it gave Commerce in the URAA. *See* Canadian Parties' Br. at 39 ("Congress

considered expedited reviews as an appropriate part of administration of the CVD law.”).

All parties agree that the appropriate standard is whether the issue has been “the subject of congressional attention.” COALITION Br. at 39 (quoting *Butterbaugh v. Dep’t of Justice*, 336 F.3d 1332, 1342 (Fed. Cir. 2003); Canadian Parties’ Br. at 41 (“The question . . . is whether Congress was aware of the expedited review regulation and Commerce’s practice to conduct expedited reviews.”); *see also Schism v. United States*, 316 F.3d 1259, 1295–97 (Fed. Cir. 2002). Here, the evidence is clear that Congress was aware of Commerce’s practice.

Initially, and contrary to the COALITION’s assertion, *see* COALITION Br. at 39–40, caselaw supports the proposition that congressional awareness of an issue can be established by an agency’s fulfillment of the notice and comment requirement in rulemaking. This Court has held that Congress is presumed to be aware of existing law and applicable regulations when legislating, and so the passage of the regulations through notice-and-comment rulemaking, while not dispositive, must be considered a relevant factor in the analysis. *See Fitzgerald v. Dep’t of Homeland Sec.*, 837 F.3d 1346, 1355 (Fed. Cir. 2016); *see also* Canadian Parties’ Br. at 43. That is particularly the case where the rulemaking procedure was as high-profile as was that implementing the URAA. *See* Antidumping

Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,296 (Dep't Commerce May 19, 1997) (describing the "unusual" steps Commerce took and the public interest in these regulations).

Further, there were additional indications of congressional awareness of Commerce's practice with respect to expedited reviews. Extensive consultations occurred between the Executive Branch and Congress as were required under the fast track process. *See generally* 19 U.S.C. §§ 2902(d) (pre-agreement consultation with relevant committees), 2191 (movement of the implementing bill from committees to the wider chambers); *see also* Canadian Parties' Br. at 25–28. Those consultations must be considered in informing the question of what Congress knew regarding the implementation of the trade agreement at issue.

Second, contemporary records of Congress's intent, namely both the SAA and the Senate Finance Committee Report, establish that, beyond Congress merely knowing Commerce would conduct expedited reviews, Congress affirmatively intended Commerce to do so. *See* SAA at 941; S. REP. NO. 103-412 at 98 (1994). While acquiescence cases, such as *Bob Jones University v. United States*, 461 U.S. 574 (1983), typically focus on evidence of congressional awareness of an agency practice after the fact, the logic of acquiescence analysis applies with equal, if not stronger, force where it is clear that Congress knew of the agency's practice from the start.

And Congress's silence since answers the key question in the acquiescence analysis—whether "legislative intent has been correctly discerned." *United States v. Rutherford*, 442 U.S. 544, 554 n.10 (1979); *see also* Canadian Parties' Br. at 43. Congress amended the trade laws on numerous occasions over a twenty-five-year period after Commerce first proposed and adopted the expedited review regulation. During that time Commerce conducted multiple expedited reviews. *See* Issues and Decision Memorandum for the Final Results of Expedited Review at 28–29 & nn. 176–82 (noting prior reviews) (Appx1132–1133). This history further supports the proposition that Congress agreed with Commerce's practice as a proper interpretation of Congress's intent, and of Commerce's authority, under the URAA, that there should be an expedited review process.

### D. The COALITION's Argument that Commerce Is Not Due Deference Under *Chevron* Step Two Misstates the Record and Is Foreclosed by Precedent

The COALITION argues that this Court should not grant Commerce due deference at *Chevron* step two because it abandoned its position that sections 103(a) and 103(b) provide authority for the expedited review regulation. COALITION Br. at 11–12, 41–42 (quoting Remand Redetermination at 3 (Appx0549)). Commerce did no such thing. Rather, Commerce concluded that the CIT's opinion gave it no choice but to find that it could not claim authority under those two sections. *See* Remand Redetermination at 2 ("In accordance with the

*Remand Order*, the Draft Remand presumed that Commerce did not have the statutory authority to promulgate the CVD expedited review regulations . . . pursuant to sections 103(a) and 103(b) of the URAA.") (Appx 0549).

Commerce made abundantly clear, however, that it disagreed with the CIT's finding, and explained its reasoning for believing that either section 103(a) or 103(b) provided authority for the expedited review regulation. Remand Redetermination at 22 ("[I]t is Commerce's interpretation of section 103(b) of the URAA, taken in consideration with the SAA language cited herein, that Congress intended Commerce to issue its expedited review regulations under that provision of the Act.") (Appx0568); *id.* at 24 ("[W]ith respect to 103(a) of the URAA, Commerce has consistently interpreted the URAA to grant the agency with the authority, whether it be implicit or explicit, to conduct CVD expedited reviews, because the SAA indicates congressional intent that Commerce conduct CVD expedited reviews . . . .") (Appx0570).

Similarly, the COALITION's assertion that *Chevron* deference does not apply "where the agency itself has articulated no position on the question," COALITION Br. at 42, is inapplicable, as Commerce made abundantly clear in the Remand Redetermination its position that sections 103(a) and 103(b) do provide authority for the expedited review regulation. *See id.* at 22 (Appx0568), 24 (Appx0570).

The COALITION also notes that the U.S. government has chosen not to participate in this appeal, COALITION Br. at 42, implying that the government no longer believes Commerce was authorized to promulgate the expedited review regulation. The government's decision not to participate in this appeal cannot be read as the COALITION suggests. As the Supreme Court has noted, "[u]nlike a private litigant who generally does not forego an appeal if he believes that he can prevail, the Solicitor General considers a variety of factors, such as the limited resources of the government and the crowded dockets of the courts, before authorizing an appeal," and this Court must reject the COALITION's urgings to read any more into the U.S. government not participating further in this appeal. *United States v. Mendoza*, 464 U.S. 154, 161 (1984). Indeed, in cases such as *Federal-Mogul Corp. v. United States*, this Court has found Commerce due deference in appeals the agency did not participate in, and it should do the same here. *See, e.g.*, *Federal-Mogul Corp. v. United States*, 63 F.3d 1572, 1577 n.2 (noting Commerce's non-participation), 1582 (holding that Commerce was due deference) (Fed. Cir. 1995).

Finally, the COALITION argues that Commerce is not due deference because other agencies may also have a role in interpreting section 103. *See* COALITION Br. at 43–44; *see also Comm. Overseeing Action for Lumber International Trade Investigations or Negots. v. United States*, 483 F. Supp. 3d

1253, 1262 n.16 (Ct. Int'l Trade 2020) (Appx0066). However, expedited reviews are part of Commerce's administration of reviews of CVD orders under the Tariff Act, and no agency other than Commerce is involved in that process. *See* 19 C.F.R. § 351.214(l) (the challenged regulations involve only Commerce).

While section 103(a) provides authority for other U.S. Government agencies to determine what the URAA requires by way of implementing regulations for areas within their competencies, Commerce is the only agency that has authority under section 103(a) to adopt regulations regarding expedited reviews. Commerce is the only agency involved in examining and quantifying the benefit of subsidies in CVD investigations, and is the only agency that determines CVD rates applicable to particular companies and whether to exclude particular companies from CVD orders. With respect to section 103(b), Commerce and the International Trade Commission are the only two agencies affected, as that section specifically addresses regulations to implement the WTO SCM Agreement, Antidumping Agreement, and Safeguards Agreement. Whether other agencies may interpret section 103(a) (or 103(b)) differently in other contexts is immaterial to the conduct of any expedited review proceeding Commerce is authorized to conduct, as no other agencies could be involved in that process.

### E. The COALITION's Arguments Regarding Section 103(b) Are Meritless, and Do Not in Any Way Undermine the Fact that Section 103(b) Independently Authorizes Expedited Review Regulations

Section 103(b) of the URAA authorizes the promulgation of interim regulations "necessary or appropriate to carry out any action proposed in the statement of administrative action approved under section 101(a) to implement an agreement described in section 101(d)(7), (12), or (13)." 19 U.S.C. § 3513(b). As to those actions mentioned in the SAA, this goes beyond the grant of authority provided under section 103(a). *See* Canadian Parties Br. at 56–58. To the extent that the Court does not consider Commerce authorized to carry out CVD expedited reviews under power granted by section 103(a) of the URAA, Commerce has that power under section 103(b). *See id.* at 52–61. None of the COALITION's arguments to the contrary withstand scrutiny.

First, the COALITION argues that the expedited review regulation could not be promulgated under section 103(b) because, like other of Commerce's URAA-implementing regulations promulgated at the same time, the expedited review regulation was not issued until 1997, more than one year after the entry into force of the Uruguay Round Agreements. *See* COALITION Br. at 44–45. This argument is meritless.

The Supreme Court has explained that "where, as here, a statute 'does not specify a consequence for noncompliance with' its 'timing provisions,' 'federal

courts will not in the ordinary course impose their own coercive sanction.'" *Dolan v. United States*, 560 U.S. 605, 611 (2010) (quoting *United States* v. *James Daniel Good Real Property*, 510 U.S. 43, 63 (1993)); *see also Liesegang v. Sec'y of Veterans Affairs*, 312 F.3d 1368, 1376–77 (Fed. Cir. 2002) (collecting cases); Canadian Parties Br. at 53, n. 13 (citing *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1320–21 (Fed. Cir. 2021) (collecting further cases)). Because there is no consequence attached to a failure to actually promulgate interim regulations within one year, the deadline does not invalidate later agency action. The COALITION failed to present any authority supporting their assertion to the contrary.

Even if the COALITION's argument was not foreclosed by binding precedent, pragmatic concerns also favor the Canadian Parties' reading of section 103(b). As the Supreme Court noted in *Brock v. Pierce County*, statutory deadlines are better understood as meant "to spur the Secretary to action, not to limit the scope of his authority." 476 U.S. 253, 265 (1986). It is nonsensical to presume Congress would have preferred the United States never be empowered to comply with its obligations rather than to comply, if tardily. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 161 (2003) ("No one could seriously argue that the entire scheme would have been nullified if appointments had been left to the 61st day . . . .").

The COALITION's next arguments, relating to the reference in section 103(b) to "interim" regulations, reflects a misunderstanding of the meaning of that term in the regulatory context. *See* COALITION Br. at 45. An "interim" regulation is one that can be put into effect immediately without notice and comment. Because it is an exception to the normal rule, an "interim" regulation requires a finding of "good cause." 5 U.S.C. § 553(b)(B); *see also Office of the Federal Register, A Guide to the Rulemaking Process*, at 9, https://www.federalregister.gov/uploads/2011/01/the_rulemaking_process.pdf. Thus, by designating these regulations as "interim" and directing that they be issued not later than one year, Congress was indicating that these important regulations should be put into effect as soon as possible. It makes no sense to conclude that Commerce was authorized to issue interim regulations on expedited reviews, but that it was not authorized to promulgate regulations through the more rigorous normal notice-and-comment process instead.

Finally, the COALITION argues that the SAA's description of expedited reviews is not an "action proposed" within the meaning of section 103(b). This argument ignores that the SAA itself treats expedited reviews as an "action required" to implement the SCM Agreement in the section of the SAA titled "Action Required or Appropriate to Implement the Agreement". SAA at 923, 941. What the SAA describes as an "*action* required or appropriate" to implement the

SCM Agreement, SAA at 923 (emphasis added), including the expedited review requirement of Article 19.3, SAA at 941, is just that: an "action." Viewing the actual words of the SAA is not "interpolating" anything. C*ontra* COALITION Br. at 46. Given the congressional command in section 102(d) that the SAA is "authoritative," what the SAA terms an "action" must be considered to be an "action" for purposes of section 103(b).

The COALITION wrongly claims, however, that in the context of what the SAA says about expedited reviews, *see* SAA at 941, only those changes described after the sentences relevant to CVD expedited reviews are proposed "actions." That is, the COALITION argues that, since the second paragraph of this section of the SAA describes two specific changes made to the Tariff Act to shift CVD determinations towards a presumption of individually determined rates over a single country-wide rate, those are the only "actions proposed" by the SAA. COALITION Br. at 46. This claim is plainly wrong.

First, the sentence before those two changes specifies that "[t]he Administration has used the amendments being made to implement the Antidumping Agreement as a model for amending the CVD law." SAA at 941. The two changes specifically discussed in the SAA related to the calculation of the "all others" rate, an issue that was addressed in a different manner under the pre-

URAA law, where the norm was a single, country-wide rate.[3] As the URAA changed the presumption from country-wide to company-specific CVD rates, with an "all-others" rate for companies not individually examined, the text of the statute had to be changed to provide for company-specific rates and an "all-others" rate.[4] That was not the case with respect to the expedited review provisions, where nothing in the statute needed to be changed.[5]

Second, the fact that the SAA refers to several changes to be made to the Tariff Act, but does not refer to a specific statutory change with respect to expedited reviews, did not preclude Commerce from implementing by regulation the obligation to conduct expedited reviews. Indeed, in *Bestfoods*, this Court held that the fact that Congress made certain amendments to U.S. law by statute did not limit Treasury's power to make other amendments by regulation. *Bestfoods*, 165

---

[3] The pre-URAA law created a presumption in favor of a single country-wide rate, with a possibility in limited instances for company-specific rates. *See* 19 U.S.C. § 1671e(a)(2) (1988). The URAA reversed that presumption. *See* 19 U.S.C. § 1677f-1(e).

[4] For example, subpart (5)(b) of the SAA (at 941–942) describes the amendment to section 705(c) of the Tariff Act to provide for the calculation of an "all-others rate" in AD proceedings. *Compare* 19 U.S.C. § 1671d(c)(5) *with* 19 U.S.C. § 1673d(c)(5) (identically determining AD and CVD all-others rates).

[5] As described at note 2 above, under pre-URAA CVD practice, Commerce had a non-statutory exclusion procedure that was comparable to the post-URAA expedited review procedure.

F.3d at 1376. The Court should hold the same true of the same grant of rulemaking authority in section 103 of the URAA.

Third, the relevant sub-section of the SAA is titled "Company-Specific Subsidy Rates and Expedited Reviews." SAA at 941. Under the COALITION's reading, the *only* "actions proposed," in the words of section 103(b), by this section of the SAA are "company-specific subsidy rates" referred to in the first part of the title. The COALITION's interpretation ignores the second part of the title ("and Expedited Reviews"). 19 U.S.C. § 3513(b); SAA at 941. It also ignores, as explained above, that the sub-section of the SAA titled "Company-Specific Subsidy Rates and Expedited Reviews" is part of the larger section of the SAA titled "Actions Required or Appropriate to Implement the [SCM] Agreement." SAA at 923. "[S]tatutory titles and section headings 'are tools available for the resolution of a doubt about the meaning of a statute.'" *Florida Dep't of Revenue v. Picadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (quoting *Porter v. Nussle*, 534 U.S. 516, 528 (2002)). The section and sub-section titles read together confirm that Congress intended that expedited reviews described in the sub-section were an "action" within the meaning of the section title.

The Coalition also incorrectly argues that Commerce is owed no deference at *Chevron* step two because Commerce never relied on section 103(b) for its authority to conduct expedited reviews. COALITION Br. at 47. This assertion

simply mischaracterizes the record. While the COALITION notes that the Department of Justice first raised this argument in its briefing to the CIT, Commerce in fact made clear in its Remand Redetermination that it believed that provision provided further support for the regulation:

> Accordingly, it is Commerce's interpretation of section 103(b) of the URAA, taken in consideration with the SAA language . . . , that Congress intended Commerce to issue its expedited review regulation under that provision of the Act [section 103(b)]. . .[W]e do believe that Congress intended for Commerce to have the inherent and implicit authority to conduct expedited reviews and to issue regulations providing for such reviews.

Remand Redetermination at 22 (Appx0568); *contra* COALITION Br. at 47.

Last, the COALITION's reliance on this Court's decision in *Changzhou Trina Solar Energy Co. v. United States* is also unavailing, as its quotation from that case omits the final clause of the relevant sentence—which renders that case inapposite. The COALITION quoted this Court as saying: "we do not apply *Chevron* 'to an agency counsel's interpretation of a statute.'" COALITION Br. at 47. But this Court, in *Changzhou Trina*, actually wrote: "we do not apply *Chevron* to an agency counsel's interpretation of a statute . . . *where the agency itself has articulated no position on the question*." *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1330 (Fed. Cir. 2020) (internal quotation marks omitted and emphasis added). And here, of course, Commerce has spoken. *See* Remand Redetermination at 22 (Appx0568).

For all the foregoing reasons, the COALITION's arguments are either irrelevant, rest on misapprehensions of the record or the law, or are foreclosed by precedent. And for the reasons discussed both here and in the Canadian Parties' principal brief, the CIT erred in holding that Commerce lacked the power under the URAA to promulgate expedited review regulations. We respectfully request this Court to so find.

Respectfully submitted,


*/s/ Joanne Osendarp*
Joanne Osendarp
Lynn G. Kamarck
Alan Kashdan
Tim Hruby
Conor Gilligan
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
Tel: (202) 756-8349
Email: josendarp@mwe.com

*Counsel for Government of Canada*

*/s/ Matthew J. Clark*
Matthew J. Clark
Nancy A. Noonan
Aman Kakar
ARENTFOX SCHIFF LLP
1717 K Street, N.W.
Washington, DC 20006
Tel: (202) 857-6000
Email: matthew.clark@afslaw.com

*Counsel for Government of Québec*

*/s/ Stephan E. Becker*
Stephan E. Becker
Aaron R. Hutman
Moushami P. Joshi
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 17th Street, NW
Washington, DC 20036
Tel: (202) 663-8277
Email:
stephan.becker@pillsburylaw.com

*Counsel for Government of New Brunswick*

*/s/ Edward M. Lebow*
Edward M. Lebow
Angela Oliver
HAYNES AND BOONE, LLP
800 17th Street, NW, Suite 500
Washington, DC 20006
Tel: (202) 654-4514
Email: ed.lebow@haynesboone.com

*Counsel for Les Produits Forestiers D&G Ltée* and *Marcel Lauzon Inc.*

*/s/ Richard L.A. Weiner*
Richard L.A. Weiner
Rajib Pal
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Tel: (202) 736-8075
Email: rweiner@sidley.com

*Counsel for North American Forest Products Ltd.*

*/s/ Mark B. Lehnardt*
Mark B. Lehnardt
LAW OFFICES OF DAVID L. SIMON, PLLC
1025 Conneticut Ave., N.W. Ste. 1000
Washington, D.C. 20036
Tel: (202) 642-4850
Email: marklehnardt@dlsimon.com

*Counsel for Fontaine Inc.*

*/s/ Yohai Baisburd*
Yohai Baisburd
Jonathan M. Zielinski
James E. Ransdell
CASSIDY LEVY KENT (USA) LLP
900 19th Street, NW, Suite 400
Washington, DC 20006
Tel: (202) 567-2319
Email: ybaisburd@cassidylevy.com

*Counsel for Scierie Alexandre Lemay & Fils Inc.*

March 8, 2022

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 22-1021, -1068, -1078

**Short Case Caption:** Committee Overseeing Action for Lumber v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 6969 words.

☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.

☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 03/08/2022

Signature: /s/ Joanne E. Osendarp

Name: Joanne E. Osendarp

Save for Filing