**2022-1021, -1068, -1078**

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

**COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL
TRADE INVESTIGATIONS OR NEGOTIATIONS,**

*Plaintiff-Appellee*,

**FONTAINE INC., GOVERNMENT OF CANADA, MARCEL LAUZON
INC., LES PRODUITS FORESTIERS D&G LTEE, NORTH AMERICAN
FOREST PRODUCTS LTD., PARENT-VIOLETTE GESTION LTEE, LE
GROUPE PARENT LTEE, SCIERIE ALEXANDRE LEMAY & FILS INC.,
GOVERNMENT OF QUEBEC, MOBILIER RUSTIQUE (BEAUCE) INC.,
GOVERNMENT OF THE PROVINCE OF NEW BRUNSWICK**

*Plaintiffs-Appellants*,

**v.**

**UNITED STATES,**

*Defendants-Appellee*.

**Appeals from the United States Court of International Trade in Nos. 1:19-cv-
00122-MAB, 1:19-cv-00164-MAB, 1:19-cv-00168-MAB, and 1:19-cv-00170-
MAB, Chief Judge Mark A. Barnett.**

---

**SUPPLEMENTAL BRIEF OF PLAINTIFF-APPELLEE**
**COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE
INVESTIGATIONS OR NEGOTIATIONS**

---

Sophia J.C. Lin
Andrew W. Kentz
David A. Yocis
Nathaniel Rickard
Zachary Walker
Whitney M. Rolig

**PICARD KENTZ & ROWE LLP**
1750 K Street, N.W., Suite 800
Washington, DC 20006
(202) 331-4040

February 22, 2023

Certificate of Interest
(Filed October 18, 2021)

**FORM 9. Certificate of Interest**                                    Form 9 (p. 1)
                                                                       July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2022-1021 |
| **Short Case Caption** | Mobilier Rustique (Beauce) Inc. v. US |
| **Filing Party/Entity** | Defendant-Appellee Committee Overseeing Action for Lumber International Trade Investigations or Negotiations |

> **Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/18/2021

Signature: /s/ Sophia J.C. Lin

Name: Sophia J.C. Lin

FORM 9. Certificate of Interest

Form 9 (p. 2)
July 2020

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Committee Overseeing Action for Lumber International Trade Investigations or Negotiations | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 3)
July 2020

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| Lisa W. Wang | Picard Kentz & Rowe LLP | Appeared in the originating court, but will not appear in this court. |
|---|---|---|
| Heather N. Doherty | Picard Kentz & Rowe LLP | Appeared in the originating court, but will not appear in this court. |
|  |  |  |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑    None/Not Applicable          ☐    Additional pages attached

| Fed. Cir. Docket No. 2022-1068 | Committee Overseeing Action for Lumber v. US | This case also appeals the final judgment and order in CIT 19-00122, entered on Aug 18, 2021 |
|---|---|---|
|  |  |  |
|  |  |  |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ........................................................ **i**

**TABLE OF AUTHORITIES** ................................................ **ii**

**ARGUMENT** .......................................................................... 1

    **I.**     **THE URAA AND SAA DO NOT CONFER AUTHORITY TO AGENCIES TO IMPLEMENT THE WTO AGREEMENTS** ....... 1

    **II.**    **COMMERCE DOES NOT HAVE GENERAL AUTHORITY TO CREATE NEW CVD PROCEEDINGS NOT OTHERWISE PROVIDED UNDER THE STATUTE** ............................................ 9

        **A. Congress Repealed the Authority for Exclusion Procedures** ..... 9

        **B. The URAA Does Not Provide a Broad Grant of Authority** ..... 12

    **III.**   **CONCLUSION** ............................................................... 15

## <u>TABLE OF AUTHORITIES</u>

### CASES

<u>Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States</u>, 483 F. Supp. 3d 1253 (Ct. Int'l Trade 2020).................... 13, 15

<u>FDA v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120 (2000) .......................5

<u>Flowers v. Sec'y of Dept. of Health and Hum. Servs.</u>, 49 F.3d 1558 (Fed. Cir. 1995) ................................................................................................................12

<u>Kane Cnty., Utah v. United States</u>, 135 Fed. Cl. 632 (2017) ..................................12

<u>MCI Telecomm. Corp. v. American Tel. & Tel. Co.</u>, 512 U.S. 218 (1994)..............4

<u>Medellin v. Texas</u>, 552 U.S. 491 (2008)..................................................................4

<u>West Virginia v. EPA</u>, 142 S. Ct. 2587 (2022)............................................. 4, 5, 6, 8

<u>Whitman v. American Trucking Assns.</u>, 531 U.S. 457 (2001)..................................4

<u>Whitney v. Robertson</u>, 124 U.S. 190 (1888) ...........................................................4

### STATUTES

19 U.S.C. § 1303 (1975) ..........................................................................................9

19 U.S.C. § 1671e(a)..............................................................................................11

19 U.S.C. § 1677f-1 ...............................................................................................14

19 U.S.C. § 1677f-1(e).................................................................................... 14, 15

19 U.S.C. § 1677f-1(e)(2)(A) ................................................................................14

19 U.S.C. § 3512(a)(1).............................................................................................2

19 U.S.C. § 3512(a)(2).............................................................................................2

19 U.S.C. § 3513(a)(2).............................................................................................5

19 U.S.C. § 3513(b) ........................................................................15

Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (1975) ...........................9, 10

Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144 (1979) ...............10

Trade and Tariff Act of 1984, Pub. L. No. 98-573, 98 Stat. 2948 (1984) ...............11

Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994)... 11, 14

## REGULATIONS

19 C.F.R. § 351.214(k) ......................................................................1, 14

## ADMINISTRATIVE DETERMINATIONS

Certain Lined Paper Products From India, 84 Fed. Reg. 23,765 (Dep't Commerce May 23, 2019) ........................................................................7

Certain Steel Nails From the Sultanate of Oman, 83 Fed. Reg. 58,231 (Dep't Commerce Nov. 19, 2018) ........................................................7

Organic Soybean Meal From India, 87 Fed. Reg. 16,453 (Dep't Commerce Mar. 23, 2022) ........................................................................7

Top-of-the-Stove Stainless Steel Cooking Ware from the Republic of Korea, 68 Fed. Reg. 7,503 (Dep't Commerce Feb. 14, 2003) ...............................7

## OTHERS

H.R. Rep. No. 103-826 (1994) ..................................................................3

S. Rep. 96-249 (1979) ........................................................................10

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (2d. Sess. 1994) ..................... 3, 5, 12

**SUPPLEMENTAL BRIEF OF PLAINTIFF-APPELLEE**

<u>ARGUMENT</u>

## I.   THE URAA AND SAA DO NOT CONFER AUTHORITY TO AGENCIES TO IMPLEMENT THE WTO AGREEMENTS

The Court's order of June 10, 2022 invited the United States Government

(the "Government") to file an *amicus* brief discussing whether the language in the

Statement of Administrative Action ("SAA") accompanying the Uruguay Round

Agreements Act ("URAA") provided the U.S. Department of Commerce

("Commerce") the authority to interpret the Uruguay Round Agreements ("WTO

Agreements") and issue regulations to implement its interpretation without specific

statutory authorization.  Order, ECF No. 69 (June 10, 2022).  The Court further

asked the Government to discuss whether Commerce correctly interpreted

requirements under Article 19.3 of the Agreement on Subsidies and Countervailing

Measures ("SCM Agreement"), as reflected in the agency's countervailing duty

("CVD") expedited review regulation at 19 C.F.R. § 351.214(k).[1]  <u>See</u> <u>id.</u>

The arguments presented in the *amicus* brief demonstrate that the

Government does not believe Commerce possesses the authority to directly

implement WTO Agreements according to the agency's interpretation without

---

[1] Section 351.214(k) has been redesignated as 19 C.F.R. § 351.214(l), <u>see</u> Br. of
*Amicus Curiae*, the United States, ECF No. 80 at 2, n.1 (Feb. 7, 2023) ("USG
Br.").  Consistent with the Government's brief, this brief utilizes the old
designation for consistency.

specific statutory authorization.  As the Government admits, "the SCM (and all of the Uruguay Round Agreements) is not self-executing, and does not independently confer rulemaking authority to Commerce.  As the trial court observed, 'interpreting the text and requirements of Article 19.3 is beyond the scope of this litigation.'"  USG Br. at 25.

This conclusion is correct and consistent with the statute, the SAA, the legislative history, and case law.  The URAA made clear that Congress intended to confine the domestic effects of the WTO Agreements only to what was included in the implementing legislation.  For example, section 102(a)(1) provides that "{n}o provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United Sates shall have effect."  19 U.S.C. § 3512(a)(1).  Section 102(a)(2) further states that nothing in the URAA "shall be construed . . . to amend or modify any law of the United States . . . unless specifically provided for in this Act."  19 U.S.C. § 3512(a)(2).

Indeed, the SAA, which provides further explanation for section 102(a), makes clear that Congress intends to occupy the space in determining the parameters of the United States' obligations under these agreements, as expressed through the implementing legislation.  Specifically, the SAA states that, "{a}s section 102(a)(2) of the bill makes clear, those provisions of U.S. law that are not

addressed by the bill are left unchanged." Statement of Administrative Action

Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, 670

(2d. Sess. 1994). It furthers provides that:

> The Administration has made every effort to include all laws in the implementing bill and identify all administrative actions in this Statement that must be changed in order to conform with the new U.S. rights and obligations arising from the Uruguay Round agreements . . . . Accordingly, at this time it is the expectation of the Administration that no changes in existing federal law, rules, regulations, or orders other than those specifically indicated in the implementing bill and this Statement will be required to implement the new international obligations that will be assumed by the United States under the Uruguay Round agreements.

SAA at 670.

> The legislative history of the URAA reflects the same understanding:

> The Uruguay Round Agreements Act incorporates all amendments to existing Federal statutes or provision of new authorities, including authority for Federal agencies to issue regulations, known to be necessary or appropriate to enable full implementation of, and compliance with, U.S. obligations under the agreements. Those provisions of U.S. law that are not addressed by the implementing bill are left unchanged. In the unlikely event that any future changes in Federal statutes should be necessary to remedy an unforeseen conflict between requirements of a Federal law and the agreements, such changes can be enacted in subsequent legislation.

H.R. Rep. No. 103-826, pt. 1 at 25 (1994) (emphasis added).

These statements make clear that Congress expected the URAA to represent

a "finalized contract," encompassing all obligations the United States had agreed to

undertake under the WTO Agreements, as opposed to the grant of a pen through

which federal agencies may create new obligations by promulgating regulations.

3

This reading is consistent with the non-self-executing nature of the WTO Agreements.  See, e.g., Medellin v. Texas, 552 U.S. 491, 505 (2008) (quoting Whitney v. Robertson, 124 U.S. 190, 194 (1888) (when international agreements are "'not self-executing{,} they can only be enforced pursuant to legislation to carry them into effect.'").

Nonetheless, if the Court continues to find the statute, the SAA, and the legislative history ambiguous as to whether Congress delegated federal agencies the authority to directly interpret WTO Agreements and issue regulations without statutory authorization, the Supreme Court's recent holding in West Virginia v. EPA, 142 S. Ct. 2587 (2022) provides guidance in discerning congressional intent. In West Virginia, the Supreme Court presumed that Congress reserves the decision-making on "major questions" – i.e., those that have wide "magnitude and consequence" – to itself, unless there is "a clear delegation" to the agency in question.  Id. at 2616.  The Supreme Court found that "{e}xtraordinary grant of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle devices.'"  Id. at 2609 (quoting Whitman v. American Trucking Assns., 531 U.S. 457, 468 (2001)).  "Nor does Congress typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme."  Id. (quoting MCI Telecomm. Corp. v. American Tel. & Tel. Co., 512 U.S. 218, 229 (1994)).  This is because "'Congress could not

4

have intended to delegate' such a sweeping and consequential authority 'in so cryptic a fashion.'" Id. at 2608 (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 160 (2000)).

As discussed below, this case concerns a "major question." See id. at 2608. The theory that Commerce may directly interpret WTO Agreements and issue implementing regulations without specific statutory authorization rests on the language in (1) section 103(a) of the URAA, which applies to any "officers of the United States"; and (2) the SAA, which states, "the Administration will endeavor to amend or issue the regulations required to implement U.S. obligations under the Uruguay Round agreements." See Order (citing 19 U.S.C. § 3513(a)(2) and SAA at 677).  An affirmative finding for Commerce's authority based on this theory would provide other federal agencies the same authority with respect to all WTO Agreements.  Congress would no longer control the parameters of the United States' obligations under the WTO Agreements.  Instead, federal agencies, at their discretion, would be empowered to promulgate binding regulations implementing unilateral interpretations of any provision of the WTO Agreements that would otherwise have no enforceability under domestic law.[2]

---

[2] Every free trade agreement passed after the URAA through the Trade Promotion Authority was implemented under the same legal framework, based on the same understanding that these agreements are not self-executing.  Each one of these free trade agreements became effective only after Congress passed implementing legislation, which also approved the agreement itself and a statement of

As discussed above, this interpretation contradicts the statute, the SAA, and legislative history, and it represents a "radical or fundamental change to {the} statutory scheme" of the URAA. West Virginia, 142 S. Ct. at 2609. It also departs from Commerce's long-standing position. Commerce has not claimed that it has authority to directly implement WTO Agreements through regulations. The agency did not do so in the Government's brief here, and, over the years, it has repeatedly rejected parties' arguments in other proceedings that Commerce should align its regulation or practice with requirements under the WTO Agreements.

For example, in the final results of an administrative review of the countervailing duty order on certain lined paper products from India, Commerce determined that, when conducting administrative reviews, the agency did not have to abide by requirements for consultations under Article 13.1 of the SCM Agreement, because:

> WTO agreements are not self-executing under U.S. law, unless adopted pursuant to a specified statutory scheme as established in the Uruguay Round Agreements Act. The authority exercised by Commerce is governed by the {Tariff} Act, as well as Commerce's regulations. The {Tariff} Act itself calls for Commerce to provide the opportunity for

_____

administrative action. The same or nearly identical language on page 677 of the SAA is present in the statement of administrative action for all of these agreements. Thus, the interpretation of the SAA language in this case can be applied to the implementation of all of these free trade agreements, thereby allowing federal agencies to issue regulations, to implement whatever agencies believe to be a U.S. obligation under these agreements, without specific statutory authority. See **Appendix I**.

consultations to foreign governments only with respect to a new investigation.

Certain Lined Paper Products From India, 84 Fed. Reg. 23,765 (Dep't Commerce May 23, 2019) (final results) and accompanying IDM at 28-29. In another case, Commerce similarly rejected the Government of India's argument, stating that "the GOI's arguments are based on their interpretation of the SCM Agreement and related WTO jurisprudence. However, Commerce's determination in this investigation is governed by U.S. law." Organic Soybean Meal From India, 87 Fed. Reg. 16,453 (Dep't Commerce Mar. 23, 2022) (final determination) and accompanying IDM at Comment 11. In cases concerning Commerce's zeroing methodology, the agency repeatedly rejected the WTO dispute settlement body's findings that Commerce's practice was inconsistent with the WTO Antidumping Agreement. For instance, the agency agreed that "international trade agreements, such as the WTO Agreement, generally lack direct legal effect within the United States. It is the implementing legislation, rather than the agreement itself, that is given effect as law within the United States." Top-of-the-Stove Stainless Steel Cooking Ware from the Republic of Korea, 68 Fed. Reg. 7,503 (Dep't Commerce Feb. 14, 2003) (final results and rescission, in part) and accompanying IDM at Comment 2; see, e.g., Certain Steel Nails From the Sultanate of Oman, 83 Fed. Reg. 58,231 (Dep't Commerce Nov. 19, 2018) (final results) and accompanying IDM at Comment 7. A finding in favor of Commerce's authority here – that

7

Commerce may independently interpret free trade agreements and promulgate

regulations accordingly – would be inconsistent with the agency's consistent

recognition that WTO Agreements have no effect on its practice.

Because this issue concerns a "major question," the Court should find, as the

Supreme Court in West Virginia did, that a delegation of authority of such

magnitude and consequence requires a "clear congressional authorization." West

Virginia, 142 S. Ct. at 2614. That clarity is lacking here. Even if the SAA

provides some indication of congressional intent in support of Commerce's

authority, it is far from the sort of "clear authorization" required under West

Virginia. See Order. Specifically, the theory that Commerce has authority to

interpret WTO Agreements and issue implementing regulations is predicated on

one sentence in the SAA, which, as the Government acknowledged, "does not have

the force of law" because it is not enacted in the statute and does not appear

anywhere in the U.S. Code. USG Br. at 5. As such, the language in the SAA

cannot confer authority to agencies independent of the statute. Further, as

discussed above, the statute, other parts of the SAA, and the legislative history, all

contain language that muddles, if not directly contradicts, any conclusion that

Congress intended to provide agencies such an expansive authority. Given that

there is no "clear authorization," the Court should find that Congress did not intend

to confer the authority.

## II.    COMMERCE DOES NOT HAVE GENERAL AUTHORITY TO CREATE NEW CVD PROCEEDINGS NOT OTHERWISE PROVIDED UNDER THE STATUTE

### A.    Congress Repealed the Authority for Exclusion Procedures

The Government asserts that because Commerce has been administering exclusion procedures, a similar proceeding to CVD expedited reviews, since 1979, the agency has authority to continue to do so.[3]  USG Br. at 13.  Contrary to the Government's belief, the history of the exclusion procedure further establishes that Congress did <u>not</u> intend to include CVD expedited reviews in post-URAA law. Before 1979, U.S. CVD law was codified in just one statutory provision – section 303 of the Tariff Act.  <u>See</u> Trade Act of 1974, Pub. L. No. 93-618, § 331, 88 Stat. 1978, 2049-50 (1975) (amending section 303 of the Tariff Act; codified as amended at 19 U.S.C. § 1303 (1975)).  The statute directed the administering authority to impose "a duty equal to the net amount of { } bounty or grant" provided to the manufacture, production, or export of the foreign product.  <u>See</u> <u>id.</u>, § 331(a)(1), 88 Stat. 2049.  However, unlike the CVD laws today, the statute did not define what constitutes a "bounty or grant," and it did not provide how countervailing duties should be calculated and applied.  Instead, the statute

---

[3]  No parties raised this argument before the U.S. Court of International Trade ("CIT").  Instead, this argument appeared for the first time in the Canadian Parties' Reply Brief to this Court submitted on March 8, 2022.  <u>See</u> Canadian Parties Reply Br. at 10, n.2, ECF No. 48 (Mar. 8, 2022).

delegated that authority to the Department of Treasury, the administering authority at the time, stating that "{t}he Secretary shall make all regulations he deems necessary for the identification of articles and merchandise subject to duties under this section and for the assessment and collection of such duties." See id., § 331(a)(6), 88 Stat. 2050.  Thus, at that time, Congress did provide a "general grant of authority" to the administering agency to implement CVD laws.

In 1979, Congress passed the Trade Agreements Act of 1979, which implemented the Tokyo Round Agreements.  See Trade Agreements Act of 1979, Pub. L. No. 96-39, § 2(c), 93 Stat. 144, 148 (1979).  The Trade Agreements Act amended CVD laws to include more delineated definitions and procedures, but it did not remove the general authority under section 303(a)(6) of the Tariff Act.  See id., § 101, 93 Stat. 150 ("The Tariff Act of 1930 is amended by adding at the end thereof the following new title").  Accordingly, Commerce acted within this general authority when it issued a regulation establishing an exclusion procedure for companies that "do not benefit from a subsidy found to have been granted to other firms . . . ." as directed under the statement of administrative action accompanying the implementing legislation.  S. Rep. 96-249, 681 (1979).

In 1984, Congress passed another amendment, providing specific statutory authority for the exclusion process.  The amendment stated:

Section 706(a) (19 U.S.C. 1671e(a)) is amended . . . by adding after paragraph (1) the following new paragraph:

"(2) shall presumptively apply to all merchandise of such class or kind exported from the country investigated, except that if –

"(A)  <u>the administering authority determines there is a significant differential between companies receiving subsidy benefits</u>, or

"(B) a State-owned enterprise is involved,

<u>the order may provide for differing countervailing duties</u>."

Trade and Tariff Act of 1984, Pub. L. No. 98-573, § 607, 98 Stat. 2948, 3029 (1984) (emphases added).

Finally, in 1994, Congress passed the URAA, which significantly restructured CVD law.  Through the URAA, Congress <u>repealed the general grant of authority</u> for Commerce and provided explicit directions on how, including through what procedure, CVD law should be administered.  In doing so, Congress cabined Commerce's authority to what is explicitly provided in the statute, which does not include CVD expedited reviews.  See Uruguay Round Agreements Act, Pub. L. No. 103-465, § 261, 108 Stat. 4809, 4908 (1994) (repeals section 303 of the Act).  Further, Congress <u>removed the provision that conferred authority for the exclusion process</u>.  See id., § 265, 108 Stat. 4914-15 ("Section 706(a) (19 U.S.C. 1671e(a)) is amended . . . by striking paragraph (2)").  As the SAA explains:

Pursuant to existing section 706(a)(2), Commerce normally calculates a country-wide rate applicable to all exporters unless there is a significant differential in CVD rates between companies or if a state-owned company is involved.  Article 19.3 of the Subsidies Agreement provides that any exporter whose exports are subject to a CVD order, but which was not actually investigated for reasons other than a refusal

11

> to cooperate, shall be entitled to an expedited review to establish an individual CVD rate for that exporter.
>
> Several changes must be made to the Act to implement the requirements of Article 19.3 of the Subsidies Agreement.

SAA at 941. The SAA then discusses the "changes" made to the Tariff Act, which include procedures for determining individual countervailing duty rates and the all-others rates. See SAA at 941-42. The SAA thus makes clear that Congress believed the exclusion procedure was no longer required in a system that favors individualized CVD rates over a country-wide rate, which is the reason Congress removed the statutory provision conferring authority for the exclusion process.

This history demonstrates that even if Commerce did have general or specific authority for an exclusion process before 1994, that authority vanished with the URAA. To find otherwise would be "essentially read{ing} back into the current version of the statute a part of the very language that Congress removed" in 1994, which is an exercise courts have expressly rejected. See, e.g., Flowers v. Sec'y of Dept. of Health and Hum. Servs., 49 F.3d 1558, 1561 (Fed. Cir. 1995); Kane Cnty., Utah v. United States, 135 Fed. Cl. 632 (2017).

## B.    The URAA Does Not Provide a Broad Grant of Authority

The Government next argues that section 103(a) of the URAA confers "regulatory authority {that} is broad and unambiguous," which allows Commerce to issue the CVD expedited review regulation. See USG Br. at 16.

12

However, as the CIT found, parties in this litigation "explicitly concede that 'this Act' {in section 103(a) of the URAA} refers to the URAA." <u>Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States</u>, 483 F. Supp. 3d 1253, 1264, n.17 (Ct. Int'l Trade 2020) ("<u>Coalition III</u>"), Appx0069.  As such, the text of the URAA "grants Commerce regulatory authority with respect to enacted provisions, but extends no further to encompass perceived international obligations that Congress did not implement through the URAA." <u>Id.</u> at 1264, Appx0068-0069.  And the URAA "does not contain an explicit provision for the administration of CVD expedited reviews." <u>Id.</u> at 1263, Appx0067; Canadian Parties Opening Br. at 30, ECF No. 35 (Dec. 20, 2021) ("there was no statutory provision in the URAA itself or in any amendment made by the URAA that expressly addressed expedited reviews").

The Government also asserts that the CVD expedited review regulation "implements the URAA's provisions establishing general procedures for imposing countervailing duties." USG Br. at 17.  It cites to sections 264 and 269(a) of the URAA. <u>Id.</u>  However, neither of these provisions provide general rulemaking authority for CVD expedited reviews.  Section 264 establishes a presumption in favor of individualized CVD rates and procedures for such rates to be calculated. <u>See</u> URAA § 264, 108 Stat. 4912-14.  Section 269(a) amends 19 U.S.C. § 1677f-1 (section 777A of the Tariff Act), which prescribed the methodology with which

Commerce should determine CVD rates in an investigation. <u>See</u> URAA § 269(a), 108 Stat. 4916; 19 U.S.C. § 1677f-1(e). This provision mandates that if Commerce decides to determine the subsidy rate by examining individual companies but cannot do so for "each known exporter or producer of the subject merchandise," Commerce may use only one of the two methodologies to select respondents: (1) "a sample of exporters or producers that the administering authority determines is statistically valid," or (2) "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country." 19 U.S.C. § 1677f-1(e)(2)(A).

And yet, under 19 C.F.R. § 351.214(k), Commerce will select respondents in a CVD expedited review based on those that "request a review" and certify that they exported subject merchandise during the period of investigation and are not affiliated with the respondents that were individually examined in the investigation. <u>See</u> 19 C.F.R. § 351.214(k). This respondent selection methodology does not account for "each known exporter or producer," and is neither "statistically valid" nor based on those that exported the largest volume of the subject merchandise. <u>See</u> 19 U.S.C. § 1677f-1(e). Accordingly, CVD expedited reviews <u>directly</u> contravene the statute.[4]

---

[4] The Government's argument here is akin to its post-hoc rationalization at the CIT that Commerce's authority for CVD expedited reviews came from the agency's "inherent authority to reconsider its prior decision." <u>See</u> Commerce's

Finally, the Government's reliance on section 103(b) of the URAA as a source of its authority is expressly rejected by the CIT, <u>see</u> USG Br. at 19 (citing 19 U.S.C. § 3513(b)), "because the SAA does not propose any action to implement CVD expedited reviews." <u>Coalition III</u>, 483 F. Supp. 3d at 1267, Appx0075. As discussed above, this finding is correct and continues to be true.

## III.    CONCLUSION

For the foregoing reasons, the COALITION respectfully requests that this Court affirm the judgment of the Court of International Trade.

<div style="margin-left: 50%;">

Respectfully submitted,

 /s/  Sophia J.C. Lin
Sophia J.C. Lin

**PICARD KENTZ & ROWE LLP**
1750 K Street, N.W., Suite 800
Washington, DC 20006
(202) 331-5040

*Counsel to Plaintiff-Appellee*
*COALITION*

</div>

February 22, 2023

---

Final Results of Redetermination Pursuant to Court Remand at 10-11, Appx0556-0557. Commerce had an opportunity to further consider this argument upon remand, but acknowledged that this theory does not provide the agency the authority for CVD expedited reviews.

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**  2022-1021, -1068, -1078

**Short Case Caption:**  Committee Overseeing Action for Lumber v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☐  the filing has been prepared using a proportionally-spaced typeface and includes _____ words.

☐  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☑  the filing contains ___15_____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _69_____).

Date: 02/22/2023

Signature: _____

Name: Sophia J.C. Lin

Save for Filing

## PUBLIC CERTIFICATE OF SERVICE

<u>COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL
TRADE INVESTIGATIONS OR NEGOTIATIONS v. UNITED STATES,
2022-1021, -1068, -1078</u>

I hereby certify under penalty of perjury that on this 22nd day of February, 2023, a copy of the foregoing SUPPLEMENTAL BRIEF OF PLAINTIFF-APPELLEE COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS was filed electronically.

_X__ This filing was served electronically to all parties by operation of the Court's electronic filing system.

____ A copy of this filing was served via:

    ____ hand delivery

    ____ mail

    ____ third-party commercial carrier for delivery within 3 days

    ____ electronic means, with written consent of the party being served to the following addresses:

<u>/s/  Sophia J.C. Lin</u>

Sophia J.C. Lin

**PICARD KENTZ & ROWE LLP**
*Counsel to Plaintiff-Appellee*
*COALITION*

# APPENDIX I

# APPENDIX I

# Implementing Legislation and Statement of Administrative Action of Free Trade Agreements passed under Trade Promotion Authority after the URAA

| Implementing Legislation | Statement of Administrative Action |
|---|---|
| **U.S.-Chile Free Trade Agreement Implementation Act, Pub. L. 108-77, 117 Stat. 909 (2003).**<br><br>**Sec 101(a):** "APPROVAL OF AGREEMENT AND STATEMENT OF ADMINISTRATIVE ACTION.—Pursuant to section 2105 of the Bipartisan Trade Promotion Authority Act of 2002 (19 U.S.C. 3805) and section 151 of the Trade Act of 1974 (19 U.S.C. 2191), the Congress approves— (1) the United States-Chile Free Trade Agreement entered into on June 6, 2003, with the Government of Chile and submitted to the Congress on July 15, 2003; and (2) the statement of administrative action proposed to implement the Agreement that was submitted to the Congress on July 15, 2003."<br><br>**Sec 104(a)(1)(B):** "other appropriate officers of the United States Government may issue such regulations, as may be necessary to ensure that any provision of this Act, or amendment made by this Act, that takes effect on the date the Agreement enters into force is appropriately implemented on such date, but no such proclamation or regulation may have an effective date earlier than the date of entry into force." | "In practice, the Administration intends, wherever possible, to amend or issue the other regulations required to implement U.S. obligations under the Agreement at the time the Agreement enters into force." Statement of Administrative Action accompanying H.R. 2738 (H. Rept. 108-224) at p.5. |
| **U.S.-Singapore Free Trade Agreement Implementation Act, Pub. L. 108-78, 117 Stat. 948 (2003).**<br><br>**Sec 101:** "(a) APPROVAL OF AGREEMENT AND STATEMENT OF ADMINISTRATIVE ACTION.—Pursuant to section 2105 of the Bipartisan Trade Promotion Authority Act of 2002 (19 U.S.C. 3805) and section 151 of the Trade Act of 1974 (19 U.S.C. 2191), Congress approves (1) the United States-Singapore Free Trade Agreement entered into on May 6, 2003, with the Government of Singapore and submitted to Congress on July 15, 2003; and (2) the statement of administrative action proposed to implement the Agreement that was submitted to Congress on July 15, 2003."<br><br>**Sec 104(a):** "IMPLEMENTING ACTIONS.— (1) PROCLAMATION AUTHORITY.—After the date of enactment of this Act— (A) the President may proclaim such actions, and (B) other appropriate officers of the United States Government may issue such regulations—as may be necessary to ensure that any provision of this Act, or amendment made by this Act, that takes effect on the date the Agreement enters into force is appropriately implemented on such date, but no such proclamation or regulation may have an effective date earlier than the date of entry into force." | "In practice, the Administration intends, wherever possible, to amend or issue the other regulations required to implement U.S. obligations under the Agreement at the time the Agreement enters into force." Statement of Administrative Action accompanying H.R. 2739 (H. Rept.108-225) at p.5. |
| **U.S.-Australia Free Trade Agreement Implementation Act, Pub. L. 108-286, 118 Stat. 919 (2004).** | "In practice, the Administration intends, wherever possible, to |

| | |
|---|---|
| **Sec 101(a):** "APPROVAL OF AGREEMENT AND STATEMENT OF ADMINISTRATIVE ACTION.—Pursuant to section 2105 of the Bipartisan Trade Promotion Authority Act of 2002 (19 U.S.C. 3805) and section 151 of the Trade Act of 1974 (19 U.S.C. 2191), Congress approves— (1) the United States-Australia Free Trade Agreement entered into on May 18, 2004, with the Government of Australia and submitted to Congress on July 6, 2004; and (2) the statement of administrative action proposed to implement the Agreement that was submitted to Congress on July 6, 2004."<br><br>**Sec 103(a)(1)(B):** "other appropriate officers of the United States Government may issue such regulations, as may be necessary to ensure that any provision of this Act, or amendment made by this Act, that takes effect on the date the Agreement enters into force is appropriately implemented on such date, but no such proclamation or regulation may have an effective date earlier than the date on which the Agreement enters into force." | amend or issue the other regulations required to implement U.S. obligations under the Agreement at the time the Agreement enters into force." Statement of Administrative Action accompanying H.R. 4759 (H. Rept. 108-597) at p. 4. |
| **U.S.-Morocco Free Trade Agreement Implementation Act, Pub. L. 108-302, 118 Stat. 1103 (2004).**<br><br>**Sec 101(a):** "APPROVAL OF AGREEMENT AND STATEMENT OF ADMINISTRATIVE ACTION.—Pursuant to section 2105 of the Bipartisan Trade Promotion Authority Act of 2002 (19 U.S.C. 3805) and section 151 of the Trade Act of 1974 (19 U.S.C. 2191), Congress approves— (1) the United States-Morocco Free Trade Agreement entered into on June 15, 2004, with Morocco and submitted to Congress on July 15, 2004; and (2) the statement of administrative action proposed to implement the Agreement that was submitted to Congress on July 15, 2004."<br><br>**Sec 103(a)(1)(B):** "other appropriate officers of the United States Government may issue such regulations, as may be necessary to ensure that any provision of this Act, or amendment made by this Act, that takes effect on the date the Agreement enters into force is appropriately implemented on such date, but no such proclamation or regulation may have an effective date earlier than the date the Agreement enters into force." | "In practice, the Administration intends, wherever possible, to amend or issue the other regulations required to implement U.S. obligations under the Agreement at the time the Agreement enters into force." Statement of Administrative Action accompanying H.R. 4842 (H. Rept. 108-627) at p. 4. |
| **Dominican Republic-Central America-U.S. Free Trade Agreement Implementation Act, Pub. L. 109-53, 119 Stat. 462 (2005).**<br><br>**Sec 101(a):** "APPROVAL OF AGREEMENT AND STATEMENT OF ADMINISTRATIVE ACTION.—Pursuant to section 2105 of the Bipartisan Trade Promotion Authority Act of 2002 (19 U.S.C. 3805) and section 151 of the Trade Act of 1974 (19 U.S.C. 2191), the Congress approves— (1) the Dominican Republic-Central America-United States Free Trade Agreement entered into on August 5, 2004, with the Governments of Costa Rica, the Dominican Republic, El Salvador, Guatemala, Honduras, and Nicaragua, and submitted to the Congress on June 23, 2005; and (2) the statement of administrative action proposed to implement the Agreement that was submitted to the Congress on June 23, 2005."<br><br>**Sec 103(a)(1)(B):** "other appropriate officers of the United States Government may issue such regulations, as may be necessary to ensure that | "In practice, the Administration intends, wherever possible, to amend or issue the other regulations required to implement U.S. obligations under the Agreement at the time the Agreement enters into force." Statement of Administrative Action accompanying H.R. 3045 (H. Rept. 109-182) at p. 5. |

| | |
|---|---|
| any provision of this Act, or amendment made by this Act, that takes effect on the date the Agreement enters into force is appropriately implemented on such date, but no such proclamation or regulation may have an effective date earlier than the date the Agreement enters into force." | |
| **U.S.-Oman Free Trade Agreement Implementation Act, Pub. L. 109-283, 120 Stat. 1191 (2006).**<br><br>**Sec 101(a):** "APPROVAL OF AGREEMENT AND STATEMENT OF ADMINISTRATIVE ACTION.—Pursuant to section 2105 of the Bipartisan Trade Promotion Authority Act of 2002 (19 U.S.C. 3805) and section 151 of the Trade Act of 1974 (19 U.S.C. 2191), Congress approves— (1) the United States-Oman Free Trade Agreement entered into on January 19, 2006, with Oman and submitted to Congress on June 26, 2006; and (2) the statement of administrative action proposed to implement the Agreement that was submitted to Congress on June 26, 2006."<br><br>**Sec 103(a)(1)(B):** "other appropriate officers of the United States Government may issue such regulations, as may be necessary to ensure that any provision of this Act, or amendment made by this Act, that takes effect on the date the Agreement enters into force is appropriately implemented on such date, but no such proclamation or regulation may have an effective date earlier than the date the Agreement enters into force." | "In practice, the Administration intends, wherever possible, to amend or issue the other regulations required to implement U.S. obligations under the Agreement at the time the Agreement enters into force." Statement of Administrative Action accompanying H.R. 5684 (H. Rept. 109-574) at p. 5. |
| **U.S.-Peru Trade Promotion Agreement Implementation Act, Pub. L. 110-138, 121 Stat. 1455 (2007).**<br><br>**Sec 101(a):** "APPROVAL OF AGREEMENT AND STATEMENT OF ADMINISTRATIVE ACTION.—Pursuant to section 2105 of the Bipartisan Trade Promotion Authority Act of 2002 (19 U.S.C. 3805) and section 151 of the Trade Act of 1974 (19 U.S.C. 2191), Congress approves— (1) the United States-Peru Trade Promotion Agreement entered into on April 12, 2006, with the Government of Peru, as amended on June 24 and June 25, 2007, respectively, by the United States and Peru, and submitted to Congress on September 27, 2007; and (2) the statement of administrative action proposed to implement the Agreement that was submitted to Congress on September 27, 2007."<br><br>**Sec 103(a)(1)(B):** "other appropriate officers of the United States Government may issue such regulations, as may be necessary to ensure that any provision of this Act, or amendment made by this Act, that takes effect on the date the Agreement enters into force is appropriately implemented on such date, but no such proclamation or regulation may have an effective date earlier than the date the Agreement enters into force." | "In practice, the Administration intends, wherever possible, to amend or issue the other regulations required to implement U.S. obligations under the Agreement at the time the Agreement enters into force." Statement of Administrative Action accompanying H.R. 3688 (H. Rept. 110-421) at p. 5. |
| **U.S.-Colombia Trade Promotion Agreement Implementation Act, Pub. L. 112-42, 125 Stat. 462 (2011).**<br><br>**Sec 101(a):** "APPROVAL OF AGREEMENT AND STATEMENT OF ADMINISTRATIVE ACTION.—Pursuant to section 2105 of the Bipartisan Trade Promotion Authority Act of 2002 (19 U.S.C. 3805) and section 151 of the Trade Act of 1974 (19 U.S.C. 2191), Congress approves— (1) the United States-Colombia Trade Promotion Agreement entered into on November 22, 2006, with the Government of Colombia, as | "In practice, the Administration intends, wherever possible, to amend or issue the other regulations required to implement U.S. obligations under the Agreement at the time the Agreement enters |

| | |
|---|---|
| amended on June 28, 2007, by the United States and Colombia, and submitted to Congress on October 3, 2011; and (2) the statement of administrative action proposed to implement the Agreement that was submitted to Congress on October 3, 2011." <br><br> **Sec 103(a)(1)(B):** "other appropriate officers of the United States Government may issue such regulations, as may be necessary to ensure that any provision of this Act, or amendment made by this Act, that takes effect on the date the Agreement enters into force is appropriately implemented on such date, but no such proclamation or regulation may have an effective date earlier than the date the Agreement enters into force." | into force." Statement of Administrative Action accompanying H.R. 3078 (H. Rept. 112-237) at p. 6. |
| **U.S.-Korea Free Trade Agreement Implementation Act, Pub. L. 112-41, 125 Stat. 428 (2011).** <br><br> **Sec 101(a):** "APPROVAL OF AGREEMENT AND STATEMENT OF ADMINISTRATIVE ACTION.—Pursuant to section 2105 of the Bipartisan Trade Promotion Authority Act of 2002 (19 U.S.C. 3805) and section 151 of the Trade Act of 1974 (19 U.S.C. 2191), Congress approves— (1) the United States-Colombia Trade Promotion Agreement entered into on June 30, 2007, with the Government of Korea, and submitted to Congress on October 3, 2011; and (2) the statement of administrative action proposed to implement the Agreement that was submitted to Congress on October 3, 2011." <br><br> **Sec 103(a)(1)(B):** "other appropriate officers of the United States Government may issue such regulations, as may be necessary to ensure that any provision of this Act, or amendment made by this Act, that takes effect on the date the Agreement enters into force is appropriately implemented on such date, but no such proclamation or regulation may have an effective date earlier than the date the Agreement enters into force." | "In practice, the Administration intends, wherever possible, to amend or issue the other regulations required to implement U.S. obligations under the Agreement at the time the Agreement enters into force." Statement of Administrative Action accompanying H.R. 3080 (H. Rept. 112-239) at p. 5-6. |
| **U.S.-Panama Trade Promotion Agreement Implementation Act, Pub. L. 112-43, 125 Stat. 497 (2011).** <br><br> **Sec 101(a):** "APPROVAL OF AGREEMENT AND STATEMENT OF ADMINISTRATIVE ACTION.—Pursuant to section 2105 of the Bipartisan Trade Promotion Authority Act of 2002 (19 U.S.C. 3805) and section 151 of the Trade Act of 1974 (19 U.S.C. 2191), Congress approves— (1) the United States-Colombia Trade Promotion Agreement entered into on June 28, 2007, with the Government of Panama and submitted to Congress on October 3, 2011; and (2) the statement of administrative action proposed to implement the Agreement that was submitted to Congress on October 3, 2011." <br><br> **Sec 103(a)(1)(B):** "other appropriate officers of the United States Government may issue such regulations, as may be necessary to ensure that any provision of this Act, or amendment made by this Act, that takes effect on the date the Agreement enters into force is appropriately implemented on such date, but no such proclamation or regulation may have an effective date earlier than the date the Agreement enters into force." | "In practice, the Administration intends, wherever possible, to amend or issue the other regulations required to implement U.S. obligations under the Agreement at the time the Agreement enters into force." Statement of Administrative Action accompanying H.R. 3079 (H. Rept. 112-238) at p. 6. |
| **U.S.-Mexico-Canada Agreement Implementation Act, Pub. L. 116-113, 134 Stat. 11 (2020).** | "In practice, the Administration intends, |

| | |
|---|---|
| **Sec. 101(a):** "APPROVAL OF USMCA AND STATEMENT OF ADMINISTRATIVE ACTION.—Pursuant to section 106 of the Bipartisan Congressional Trade Priorities and Accountability Act of 2015 (19 U.S.C. 4205) and section 151 of the Trade Act of 1974 (19 U.S.C. 2191), Congress approves— (1) the Protocol Replacing the North American Free Trade Agreement with the Agreement between the United States of America, the United Mexican States, and Canada, done at Buenos Aires on November 30, 2018, as submitted to Congress on December 13, 2019; (2) the Agreement between the United States of America, the United Mexican States, and Canada, attached as an Annex to the Protocol, as amended by the Protocol of Amendment to the Agreement between the United States of America, the United Mexican States, and Canada, done at Mexico City on December 10, 2019, as submitted to Congress on December 13, 2019; and (3) the statement of administrative action proposed to implement that Agreement, as submitted to Congress on December 13, 2019." | wherever possible, to amend or issue the other regulations required to implement U.S. obligations under the USMCA at the time the Agreement enters into force." Statement of Administrative Action accompanying H.R. 5430 (H. Rept. 116-358) at p.6. |
| **Sec. 103(a)(1)(B)**: "other appropriate officers of the United States Government may prescribe such regulations, as may be necessary to ensure that any provision of this Act, or amendment made by this Act, that takes effect on the date on which the USMCA enters into force is appropriately implemented on such date, but no such proclamation or regulation may have an effective date earlier than the date on which the USMCA enters into force." | |